DAVID BARRIE, Respondent, v. UNITED RAILWAYS CO. OF ST. LOUIS, Appellant.

St. Louis Court of Appeals, Submitted February 4, 1909. Opinion Filed May 24, 1909.

1. **PLEADING: Motion to Elect: Inconsistent Causes of Action.** In an action against a corporation by a judgment creditor of another corporation, whose property had been absorbed by the defendant, where the petition alleged that no adequate consideration was paid by the defendant for the property and assets of the judgment debtor, and that no consideration whatever was paid for such assets, and praying that the defendant pay the judgment out of such assets, it did not state inconsistent causes of action and a motion to elect would not lie; the action is maintainable whether an inadequate consideration or no consideration whatever was paid.

2. ———: ———: **Waiver.** After answer is filed to a petition, and issue taken thereon by plaintiff's reply, it is too late for the defendant to file a motion requiring plaintiff to elect between two inconsistent causes of action stated in the petition.

3. **EVIDENCE: Creditor's Bill: Schedule of Assets and Liabilities.** In an action against a corporation, seeking to charge certain assets, in possession of the corporation, with the payment of a judgment held by the plaintiff against another corporation which was insolvent and whose assets the defendant had acquired, a schedule of the assets and liabilities involved in the transaction was admissible in evidence, where it was shown that the schedule had been submitted to, and approved by the parties interested in the two corporations and in the transaction, and to the agents of all parties who conducted the transfer of the assets.

4. ———: ———: **Assets Undisposed of: Equity.** And in such action, where the petition alleged that the defendant had acquired the property of the judgment debtor without any consideration, evidence tending to show a disposition of assets of the judgment debtor which may not have come into the possession of the defendant was admissible as throwing light on the transaction.

5. **PLEADING: Creditor's Bill: Fraud: Constructive Fraud.** A creditor's bill, having for its object the discovery of assets which have been transferred by the judgment debtor to the defendant without consideration and the subjection of such assets to the payment of the plaintiff's judgment, need not allege that such transfer of assets was done fraudulently or with a fraudulent intent; it is only necessary to allege the acts which constituted the constructive fraud by which the judgment debtor's assets were placed out of reach.

6. **CORPORATIONS: Lessor and Lessee: Surrender of Lease: Consideration.** Where a corporation, holding a lease running for a term of years upon a street railway system, surrendered its lease on the demand of the lessor, without having violated any terms of the lease so as to work a forfeiture, and without any provision for any such surrender in any contract between the parties, such surrender was without consideration. And where the lessee at the same time, turned over to the lessor a large amount of cash which had been realized in the operation of the system, there being no provision in the lease for the surrender of any property, on the surrender of the lease, "except all personal property of every sort and kind held as lessee," the payment of such money was without consideration and not included in the requirements of the lease.

7. ———: ———: **Sales: Parties.** Where a street railway corporation leased all its property to another street railway corporation and subsequently the lessee surrendered its lease and delivered all its property to the lessor without adequate consideration, through the instrumentality of agents, and where

the directors and officers of the lessor were also directors and officers of the lessee and the parties controlling both concerns where identical in person and identical in interest, the transaction whereby the property of the lessee was transferred to the lessor was not a sale be~ause there was no meeting of minds; there was but one mind and one controlling body.

8. ———: ———: **Consideration: Assumption of Debts.** Where one corporation transferred its property to another, an assumption by the purchaser of the liabilities of the seller is a good and valuable consideration, provided such liabilities assumed bear a fair relation in value to the assets transferred; such consideration is good against a creditor of the seller.

9. ———: ———: ———: ———. But where debts assumed by the purchaser, in such case, on a fair analysis of the transaction, were incurred in part for the benefit of the purchaser so that they were really the debts of the purchaser, an assumption of such obligations would not, to that extent, be a valuable consideration for the sale. And where a corporation transferred all its property and assets to another corporation and included in the transfer certain stock of the first, such stock was not a liability assumed by the purchaser and therefore not a consideration for such transfer; stock is a liability of the corporation issuing it, but in the hands of another corporation which has assumed no liabilities on account of such stock, it is an asset; while a corporation must carry its stock as a liability so far as its stockholders are concerned it cannot do so as to its creditors because the stockholders can receive none of such property until the creditors have been paid in full.

10. ———: ———: ———: **Creditor's Bill.** In an action by a judgment creditor of a corporation, brought against another corporation, where the petition alleged that the defendant had acquired all the assets of the judgment debtor without sufficient consideration, and sought to subject such assets to the payment of the plaintiff's judgment, the plaintiff made out a *prima-facie* case in support of his petition, by showing that the transfer of the judgment debtor's property and assets to the defendant was at a price greatly below the reasonable value of such property and below any value which reasonably could be assigned to it.

11. ———: ———: ———: **Assumption of Obligations.** And in such action, where the agreement by which the defendant acquired the property of the judgment debtor, stated that the defendant assumed certain obligations of the judgment debtor, as part of the consideration for the purchase, this did not necessarily exclude an implied assumption of plaintiff's judgment, under the circumstances of the case.

12. ——: ——: Creditor's Bill: General Creditor. Where the plaintiff in such case had not reduced his claim to judgment, though his suit was pending at the time of the transfer of the property, but was reduced to judgment within a short time thereafter, the fact that he was a creditor at large at the time of the transfer did not bar his recovery.

13. ——: Lessor and Lessee: Contracts: "Dummy Corporation." Where a corporation owning a street railway system leased all its property to another corporation for the purpose of operating the system and where the directors and officers of both corporations were the same and equally interested in both corporations, and where the lessee, on incurring financial embarrassment, transferred all its property to the lessor without adequate consideration, and where the evident purpose of such transaction was to avoid the liabilities of the lessee, the transaction by which such transfer was made was not a contract, because there was only one party to it, and it was not the result of negotiation by different parties. In such case the lessee was a dummy corporation, and the defendant lessor was liable at the suit in equity of a judgment creditor of such dummy.

Appeal from St. Louis City Circuit Court.—*Hon. Matthew Given Reynolds,* Judge.

AFFIRMED.

*Boyle & Priest, T. M. Pierce* and *T. E. Francis* for appellant.

The court erred in not sustaining defendant's motion to elect because the positions assumed by the plaintiff in his petition were inconsistent, irreconcilable and the proof of one necessarily disproved the other. Jordan v. Transit Co., 202 Mo. 426. Plaintiff cannot recover because he has failed to prove that the defendant took the assets of the Transit Company without any or adequate consideration. Benesh v. Insurance Co., 72 N. E. 674; Baker v. Harpster, 22 Pac. 415; Fernschild v. Vedder, 49 N. E. 151; Shoe Co. v. Prickett, 84 Mo. App. 94; Alexander v. Williams, 14 Mo. App. 13; Kitchen v. Railway, 69 Mo. 224; Powell v. Railroad, 42 Mo. 63; Burge v. Railway, 100 Mo. App. 160; Fogg v. Blair, 133 U. S. 534; Warfield v. Canning Co., 34 N. W. 467; Noyes

on Intercorporate Relations, sec. 123; Huston v. Tyler, 140 Mo. 263; Cole v. Armour, 154 Mo. 350; Schiffman v. Schmidt, 154 Mo. 214. Neither by operation of law nor by any stipulation in the tripartite agreement did the defendant agree to pay the judgment of the plaintiff. Bank v. Iron Co., 97 Mo. 44; Hageman v. Railroad, 202 Mo. 249. The court erred in admitting, over the objection of the defendant, plaintiff's "Exhibit R," being an agreement between Brown Brothers & Company and F. S. Smithers and others. Barrie v. Railways, 125 Mo. App. 121. The court erred in admitting, over the objection of the defendant, plaintiff's "Exhibit S," being a letter written by Mr. Carleton on the 14th day of November, 1904. Barrie case, *supra.* The court erred in admitting, over the objection of defendant, plaintiff's "Exhibit U," being an affidavit made by James Campbell and accompanied by an exhibit in a lawsuit unconnected in any way with the case under consideration. Barrie case, *supra.* The court erred in admitting, over the objection of defendant, plaintiff's "Exhibit V," being a copy of a telegram from James Campbell to Brown Brothers & Company, dated October 11, 1904. Barrie case, *supra.*

*Marion C. Early* for respondent.

The assets of a corporation are impressed with a trust in favor of creditors and no distribution can be made among shareholders until all debts and liabilities have been satisfied. Toy Mfg. Co. v. Insurance Co., 4 S. D. 173; Oil Co. v. Refining Co., 108 La. 74; 2 Morawetz on Corp., 790; Berry v. Rood, 168 Mo. 316. When the directory and principal officers of two corporations are substantially identical all transactions between them are *prima facie* fraudulent as against the rights of creditors. The findings of the trial court that the consideration was inadequate and that as to the leasehold

there was no consideration is conclusive. Barrie v. United Railways Co., 125 Mo. App. 96; Noyes on Intercorporate Relations, sec. 124, pp. 194, 195; Sweeney v. Sugar Co., 30 W. Va. 443; Insurance Co. v. Transportation Co., 13 Fed. 578; Railroad v. Evans, 66 Fed. 810; Railroad v. Bell, 44 Cal. 398; Couse v. Powder Co., 33 Atl. 297; Bank v. Alabama Sanitarium, 103 Ala. 358; Montgomery Web Co. v. Dienelt, 133 Pa. St. 585; Lewis v. Gro. Co., 38 S. W. R. 755; Coningsham's Appeal, 57 Pa. St. 474; Chouteau v. Allen, 70 Mo. 290, 338. When one corporation acquires all the assets of another corporation, issues its stock in exchange for the stock of the old company, and the old company ceases to be a going concern and the new company continues the business, the new company receives the assets of the old company burdened by its liabilities.     Such arrangement has the effect of distributing assets of the old company among its stockholders to the exclusion of creditors.     This cannot be done.     The new company will by operation of law be held to have assumed and agreed to pay the debts of its vendor, including a judgment subsequently recovered against it in an action for negligence which was pending at the time of the transfer.     Jennings v. Lumber Co., 91 Mo. App. 333; Railroad v. Lee, 84 S. W. 332; Grinnell v. Gas Co., 112 Mich. 70; Capsule Co. v. Isaacs, 55 N. E. 836; Railroad v. Jones, 29 Ind. 465; Railroad v. Boney, 117 Ind. 50; Meyer v. Johnston, 64 Ala. 656; Railroad v. Ashling, 160 Ill. 373; 10 Cyc. pp. 303-308 inclusive; Thompson on Corp., secs. 405, 8231, 8240-41; Cook on Corp. (4th Ed.), sec. 897; Furniture Co. v. Hall, 107 N. W. 117; Cook on Stock and Stockholders (3 Ed.), sec. 671; Session Acts of Mo., 1907.     And in such case the new company holds the property received from the absorbed company with notice of any trust attaching to it in favor of creditors and cannot claim the rights of a *bona fide* purchaser without notice.     The Key City, 14 Wall. 653.

REYNOLDS, P. J.—This is the second appeal in
this case, the first having been taken by plaintiff, and
the action in this court reported 125 Mo. App. 96. In
the present appeal, as in the former, it was heard be-
fore two of the judges of this court, one of the judges
not sitting. It was reversed and remanded, with the
concurrence of both judges, for error in the admission
of a tabulated statement of assets received and liabili-
ties assumed by the defendant, generally hereafter re-
ferred to as Railways or United Railways Company,
from the St. Louis Transit Company, generally here-
after referred to as the Transit Company, and for fail-
ure to set out evidence as to the value of a certain lease-
hold, surrendered by the last-named company to the
defendant. On the second trial there was evidence cov-
ering both of these, and the case is now here on appeal
by defendant. It might be a sufficient statement of
the facts in the case to refer to the statement prepared
by Judge BLAND, who has in the meantime retired from
the bench by reason of the expiry of his term, as the
evidence on the second trial was practically the same
as that introduced when the case was first tried, with
the additions above noted, but it will probably be more
satisfactory to here make a connected statement, re-
ferring, however, to the one in 125 Mo. App. for points
in evidence there developed but not specifically covered
by this statement.

A corporation known as the Central Traction Com-
pany was incorporated on the fifth of March, 1898, un-
der the laws of this State. Its capitalization was
$100,000, divided into 1000 shares of the par value of
$100 each. The purposes for which the corporation
was formed, as stated in its articles of association, were
"to construct or acquire by purchase, lease or otherwise,
and to maintain and operate by any and all kinds of
motive power, street railways for public use in the con-
veyance of persons and property in the city of St. Louis,
and in the county of St. Louis, State of Missouri."

By Ordinance No. 19352, the city of St. Louis authorized the Central Traction Company to construct, operate and maintain a single or double-track passenger railroad over, along and across certain streets, etc., in that city and to operate its road by electric power, "and to run over the tracks of other roads, and to acquire and convey by lease, purchase or sale its own property and franchises or the property and franchises of other street railway companies in the city of St. Louis, and to operate the same." The franchise was granted for a period of fifty years from the date of its passage. It was passed April 12, 1898. It does not appear that the Central Traction Company ever operated or constructed any line under that name.

On the second day of March, 1899, a corporation under the name of the St. Louis Transit Company was formed with a capital stock of $3,000, divided into thirty shares of the par value of $100 each.

By an ordinance of the city of St. Louis, approved March 20, 1899, certain street railways named in it, their successors and assigns, were authorized to sell, lease or convey, "if found desirable, their property, rights, privileges and franchises now owned and held or herein granted, respectively, to any of the said companies named in this section, or to the St. Louis Transit Company, its successors and assigns." The title of this ordinance and the first and third sections of it are set out in the opinion of Judge GOODE, in the case of Moorshead v. United Railways Co., 119 Mo. App., commencing at page 550, and it is not necessary to repeat that here nor to transcribe any other portions of that ordinance.

It does not appear that the Transit Company ever owned or built any line in its own right—whatever it built being under the lease before and hereafter referred to.

On the tenth day of July, 1899, the Central Traction Company filed an affidavit in the office of the Sec-

retary of this State, changing its name to United Railways Company of St. Louis, and afterwards, on the sixteenth day of September, 1899, United Railways increased its capital stock from $100,000 to $45,000,000, divided into $20,000,000, or 200,000 shares of preferred cumulative 5 per cent stock, and $25,000,000 or 250,000 shares of common stock; and on the twentieth day of September, 1899, under its new name of United Railways Company of St. Louis, by unanimous vote of its stockholders, determined "to increase the bonded indebtedness of said company from nothing to $45,000,-000, . . . and to issue $45,000,000 par value, of first general mortgage 4 per cent gold bonds of said company, and to secure the same by a mortgage upon all the property, real, personal and mixed, including all rights, franchises and privileges of whatever kind and nature now owned and possessed and which might be hereafter acquired" by United Railways. Of the authorized issue of $45,000,000 of bonds, it was provided in this indenture that $3,000,000 thereof were to be reserved for the acquisition of the St. Louis & Suburban and St. Louis & Meramec River Railroad Company and their subordinate railroad companies, and for the purpose of taking up the bonds of said two roads, both of them commonly known as the Suburban System, and not acquired by the United Railways until after November 1, 1904.

On the twenty-first of September, 1899, the Transit Company increased its capital stock from $3,000 to $20,000,000.

Prior to the thirtieth day of September, 1899, the United Railways had acquired by purchase or otherwise, under the authority of Ordinance No. 19352, approximately 300, or to be more exact, 293.48 miles of street railway in the city of St. Louis, being all the lines of street railway in the city of St. Louis, except what was known as the Suburban System. It never operated any lines in or under its own name—save pos-

sibly for a few days prior to this September.30th, but the various lines of which it had acquired control were operated under their own offices and boards. These lines so controlled or acquired by the United Railways are enumerated and described in an indenture of date October 1, 1904, between it and the Mercantile Trust Company, to be hereafter referred to.

On September 30, 1899, a contract of lease was entered into between the United Railways and the Transit Company, under and by which the United Railways leased to the Transit Company all of its owned and controlled lines for a term running from the first day of October, 1899, until the first day of April, 1939, and under this contract of lease, the United Railways turned over to the Transit Company not only all of its railways then constructed, owned or operated, or which might thereafter be constructed, owned or operated by it, but also "all its right, title and interest in and to all its property, real, personal and mixed now held by it as owner or otherwise, with all franchises of every sort and kind to it now belonging, or which it may hereafter acquire as fully as it now holds or owns or may acquire the same, together with all income derived from any bonds or stock now owned by the United Railways or which may be hereafter acquired by it," excepting from the demise, its franchise to be a corporation, and excepting any other right, privilege or franchise, "which is or may be necessary to preserve the corporate existence or organization of the United Railways under its charter." The term specified in the lease is forty years, and under its provisions the Transit Company had possession and operated all the lines of street railway in the city of St. Louis, as well as in the county of St. Louis, which had before then belonged to or been controlled by the United Railways Company. This lease is set out in full in the dissenting opinion of Judge BLAND, at pages 605 to 616, in the case of Moorshead v. United Railways Company,

119 Mo. App. A summary of it will also be found at page 553, of the same volume in the same case, and at pages 100 and following, in the case of Barrie v. United Railways Company, 125 Mo. App., where this case is reported when formerly before this court. It is not considered necessary, therefore, to burthen this statement now with a further recital of the provisions of the lease. The lease is signed in the name of the United Railways Company of St. Louis, by Edwards Whitaker, its then president, its seal attested by James Adkins, as secretary; and it is signed in the name of the St. Louis Transit Company by Murray Carleton, as its president, and its seal attested by Albert H. Bauer, as secretary.

At the time of the execution of the lease, and under its provisions, the United Railways Company turned over to the Transit Company everything that it had, including all cash on hand, amounting to about $413,000. There was also turned over to the Transit Company, stock, sometimes stated at 172,643 shares, then again at 172,613 shares, of United Railways common stock, in exchange for a like number of shares of the Transit Company stock. Whether, in following the testimony, we use the one number or the other, the same stock is always meant. Along with these shares of the United Railways common, which were turned over to the Transit Company, there was also paid over to it by a syndicate, of which Brown Brothers & Company were the managers, $11 per share in cash on the 172,613 shares of United Railways common, amounting to $1,898,743. Apparently this money, paid by Brown Brothers & Company, came from the stockholders of the United Railways Company, although its origin is not very clear. At all events, the Transit Company started out in business on September 30, 1899, with $1,898,743 cash, received as a bonus on its stock, also with about $413,000 cash, received from the United Railways Company, the 172,613 shares common stock of the United Railways Company turned over to it by that company in exchange

for a like number of shares of its own stock, as well as with this leasehold, which carried with it all the rolling stock, buildings, equipment, supplies and property of every kind that had been turned over to it by the United Railways Company, the mileage of the system at that time comprising 293.48 miles. Along with the right to operate, went the right to collect and receive all fares, tolls and revenue resulting from the operation of the system. The lease carried a fixed rental of $5 per annum per share, payable to the United Railways, upon all the preferred stock of United Railways Company, "now outstanding or which may hereafter be issued by" United Railways Company "with the consent of Transit Company," payable quarterly, first payment to be made April 10, 1900. The Transit Company was to make repairs, additions, etc., at its own expense, on approval of United Railways. Between that date, that is to say, September, 1899, and October 31, 1904, the Transit Company increased the mileage by the addition of about twenty-four miles; had bought or built two hundred cars, built additional terminals, a sub-station, a powerhouse and a large building at Vandeventer and Park avenues, in St. Louis, all of which were paid for by the Transit Company out of its own resources and for which it was in turn, in part, reimbursed under the terms of the lease by bonds and stocks of the United Railways at par, regardless of the market value of these securities, the lease requiring the Transit. Company to accept these bonds and stock at par for all disbursements and expenditures made by it for improvements and betterments, and had accumulated $614,015.25, as well as $105,380, set aside for matured bonds and coupons. All the revenues accruing to the Transit Company during this period, with the exception of between three and four hundred thousand dollars, received from the sale of some outside real estate, sold with the consent of the United Railways, came to the Transit Company from its tolls, its receipts

of fares. It appears from a circular in evidence, issued in the latter part of 1904, and in which was embodied a letter from Mr. Carleton, then president of the United Railways and also of the Transit Company, as well as from other evidence in the case, that in October, 1904, the physical condition of the track and equipment of the road was excellent and that it was in such generally good condition at that time that no important additions were likely to be made or required to the plant for several years to come, and that its track and equipment could be maintained out of its earnings for several years to come with little if any recourse to capital expenditures, the balance sheet of November 1, 1904, showing a surplus over all current and accrued liabilities, of $633,259.66, of which $288,714.47 was represented by material and supplies on hand, leaving in actual cash a surplus of $344,545.19. As stated in this circular, the gross earnings and other income of the system for 1902 were $6,452,218.90; its operating expenses and taxes $3,976,721.32. Its gross earnings and other income for 1903 were $7,295,847.38; its operating expenses and taxes for the same year $4,513,514.57; and for the year 1904, its gross earnings and other income were estimated at $9,810,150, and its operating expenses and taxes at $5,591,785. These figures for 1904 are estimates for the months of November and December. According to Mr. Carleton, the gross earnings for the ten months were about $9,269,667. According to an exhibit in evidence, produced by defendant—the balance sheet of the St. Louis Transit Company, of date September 30, 1904—under the heading of "Profit and Loss," the loss for the year ending December 31, 1903, is carried at $511,249.99. The profit for the current year, 1904, down to December 30th, is stated at $766,812.86. The fixed charges for these three years were $2,386,080 per annum.

In the spring of 1900, about March, a strike occurred on the street railways of the city then operated

by the Transit Company, which entailed a heavy loss to the Transit Company. The president, Mr. Carleton, testifying as a witness, put the loss at about $4,000,000. The auditor of the company, as also Mr. Edwards Whitaker, who had been president of the Transit Company down to the time that Mr. Carleton took hold in 1899, placed it at between $1,700,000 and $1,800,000. Along in the fall of 1901, the Transit Company having exhausted its cash assets with which it started in business and having made extensive improvements and having gone through the stress of the strike, was in need of ready money with which to carry on and operate the road. This indebtedness, so contracted in making improvements, betterments and additions to the property, as required by the terms of the lease, amounted in the fall of 1901 to approximately $6,000,000. Accordingly, on the thirtieth of November, 1901, it determined to and authorized an issue of $6,000,000 of what are called collateral trust notes, securing the same by pledge of stocks and bonds of the United Railways Company which Transit Company had acquired under the lease. Five million, seven hundred and seventy-six thousand dollars of these collateral trust notes so secured were issued. These collateral trust notes were to mature on the first of November, 1904, and appear to have been held by the Mercantile Trust Company. Judge H. S. Priest, who is now and had been the general counsel of the company from some time in 1899, and down to November 1, 1904, a member of the board testified that the occasion for the execution of this indenture of November 30, 1904, was to make up for the losses entailed by the strike of 1900, and because the earnings realized had not come up to the amount that had been anticipated "at the time of the consolidation of the companies," evidently meaning at the time of the execution of the lease of September 30, 1899. To quote from Judge Priest, he said: "The Transit Company had sustained a very heavy loss by reason of the strike.

In addition to that, the earnings of the property had not reached the amount anticipated at the time the properties were consolidated. In addition to that still, there was a large floating indebtedness accumulated in the operation of the property, and by reason of the improvements and betterments and acquisitions made by the Transit Company as it was required to do under the lease." After stating that the bonds and preferred stock of the United Railways Company were pledged as collateral for these $6,000,000 of collateral notes, Judge Priest testified: "Those bonds and preferred stock the Transit Company had received in payment for betterments which it had made upon the leased property under the terms of the lease. In making those betterments and such expenditures as were required under the lease, the Transit Company unfortunately was compelled to pay in cash. Securities which it had contracted to receive under the lease from the United Railways Company for making the improvements could not be sold upon the market for anything approximating par. . . . So that you see the Transit Company was losing money under the terms of that lease by paying out cash for these improvements and taking securities which it could not dispose of in the market; and hence, in order to not sustain directly that loss at the present time, and hoping that the property would so develop and the securities so enhance that it would get approximately par for them, it preferred to borrow the money on it. Of course, they were bringing in interest, and it was paying out interest, and that was the occasion for that collateral trust." Judge Priest added that the United Railways Board, "instead of paying in the common stock of the United Railways Company, or in the preferred stock, paid, as far as it could in order to minimize the loss in assets of the Transit Company, its very best securities; hence it paid first in the 4 per cent mortgage bonds, which brought the highest price upon the market and were the best investment securities,

and after they were exhausted it paid in the next best, the 5 per cent preferred stock, and when that was exhausted, of course, it would have to pay only—and that was its only reserve—in the common stock issued at its treasury.    In addition to this mode of raising money," Judge Priest adds, "the Transit Company needed money very badly, and its directors, as well as the directors of the United Railways Company, the two Boards being substantially the same, recognized the disadvantageous situation of the Transit Company, and under the lease that it was paying at par and getting in securities far below par, and they were desirous of minimizing the loss to the Transit Company as far as lay in the power of the United Railways Company in making these improvements."    As one way of raising money, therefore, in addition to the execution of this collateral trust mortgage, it was suggested that real estate owned by the United Railways, but unused for corporate purposes, be sold and the cash realized from that sale be paid into the Transit Company for betterments and improvements as far as it would go.    That sale was made and the money turned over to the Transit Company, amounting to something like $400,000.    It must be borne in mind that this indenture of November, 1901, pledged certain stocks and bonds but did not pledge the leasehold, and it was executed by the Transit Company alone, the United Railways Company not joining in the indenture.

Still laboring under its financial stress and looking around for a plan by which the company could successfully operate, the St. Louis Transit Company later determined to issue $20,000,000 of twenty-year 5 per cent improvement and refunding bonds.    Accordingly, on the seventeenth of June, 1903, it executed its indenture of that date in which it is recited, among other things, that "at the instance and for the benefit of the United Railways Company of St. Louis, as well as for its own advantage, and pursuant to the obligations of the said

covenant" (meaning the lease of September 30, 1899), "Transit Company has expended in money, for additions, acquisitions, improvements and betterments to, for and upon the demised property, the sum of eight million, three hundred and thirteen thousand, five hundred dollars ($8,313,500), and has received in payment thereof the following bonds and preferred shares of the stock at par, of the said United Railways Company of St. Louis, pursuant to the aforesaid agreement, viz.:

" 4,851 United Railways Company of St.
 Louis Four per cent bonds........$ 4,851,000.00
"34,625 Shares United Railways Company
 of St. Louis Five per cent preferred
 stock ........... ............. 3,462,500.00."

Following a description of the bonds and stocks which had been put up as security for the collateral trust notes, under the indenture of November 30, 1901, and reciting the desire to save them from a sale, the indenture of the seventeenth of June, 1903, further sets out that the United Railways Company of St. Louis, lessor as aforesaid, and under the terms of said lease, "has requested Transit Company to make further large additions, acquisitions, improvements and betterments to, for and upon the said demised premises," for which United Railways has no other means, except as hereinafter mentioned, of recompensing Transit Company than the loan of its credit; "and, whereas, Transit Company is advised that such proposed additions, acquisitions, improvements and betterments will greatly enhance the value of its leasehold; and, whereas, it is desirable that Transit Company should refund and consolidate all of its indebtedness into one series of bonds, payable as hereinafter provided; and, whereas, said United Railways Company of St. Louis has agreed, in consideration of Transit Company undertaking to make the additions, acquisitions, improvements and betterments as aforesaid, to guarantee the payment of the principal and

interest of the bonds as hereinafter provided and authorized," therefore, the indenture recites, that acting pursuant to the resolution of its stockholders and authorized by law so to do, the Transit Company had determined to make and issue from time to time its certain bonds to the extent of $20,000,000, each for the sum of $1,000, principal and interest payable in gold coin, to bear date April 1, 1903, payable April 1, 1923, interest payable semiannually. The form of the bond is set out, and, indorsed on the bonds, is the guarantee of the United Railways Company of St. Louis. It is further recited that for the security of these bonds and interest thereon, Transit Company has resolved to, and it does, "grant, bargain, sell, assign, transfer and deliver" unto the Mercantile Trust Company, as trustee in the indenture, its successors and assigns, $2,877,000 par value of the 4 per cent general mortgage gold bonds of the United Railways Company of St. Louis, with the coupons due July 1, 1903, and subsequent coupons attached; also $5,324,700 par value of the 5 per cent cumulative preferred stock of the United Railways Company of St. Louis; also $17,261,300 of the common stock of the United Railways Company of St. Louis. "And does hereby further lease, demise and sublet unto the said Trust Company, its successors and assigns, all and singular the lands, tenements, rights, railroad, assessments and property of every kind, nature and description, comprised in or expressed to be demised by the hereinbefore recited indenture of lease by and between the United Railways Company of St. Louis and Transit Company, dated September 30, 1899, for the term of years expiring April 1, 1939, for the residue of the said term thereof, except the last day thereof," in trust to the Mercantile Trust Company as security for the contemplated issue of $20,000,000 of bonds.

Explaining the necessity for the execution of this indenture of June 17, 1903, Judge Priest testified: "The directory of the Transit Company realized that they

must anticipate, some time in advance, current and maturing obligations of the Transit Company, and to provide available resources for making the necessary improvements and adding the required betterments to the leased property, the six million of collateral trust notes would mature in three years after their issue; that is, mature on November 1, 1904. The current obligations had been increasing, as well as obligations of the Transit Company occasioned by making betterments and improvements. So, at that time, there was planned this scheme of a refunding and improvement mortgage, to provide not only for the payment of such liabilities of the Transit Company as should mature in the near and a little more remote future, but to finance the institution for eight or ten years to come, and then put it in such a position that it would need no further fiinancing. . . . Of course, (said Judge Priest) that plan had been under consideration for some months before it was brought out, but it was finally settled upon and action taken which resulted in the making of this mortgage to secure this proposed issue of twenty millions of bonds." At the time the mortgage was issued (he says) it contemplated the issue at that time of not more than $8,000,000.00 of bonds and none over this amount were ever sold or passed from the control of the Transit Company. The refunding and improvement bonds, as they were called, secured by this indenture of June 17, 1903, were the bonds of the Transit Company alone, the liability of the United Railways being that of guarantor thereof. The United Railways did not join in the execution of the indenture.

While it was contemplated, by this plan, to take up the $5,776,000 collateral trust notes held by the Mercantile Trust Company, with these improvement and refunding bonds, that apparently could not be done. Accordingly, after averring the failure of the plan and the inability of the Transit Company to raise further funds to meet the collateral trust notes then nearly due,

as well as other obligations, it is averred in the answer that an arrangement or agreement was made and entered into "with Brown Brothers & Company, Syndicate Managers," by what is called the "Tripartite Agreement." This agreement is set out in full in the answer and was introduced in evidence in the case.    It is of date September 27, 1904, was executed by the United Railways Company, the Transit Company and Brown Brothers & Company.    The name of the United Railways Company is signed by C. H. Spencer, vice-president, its seal attested by James Adkins, secretary.    The name of the St. Louis Transit Company is signed by Murray Carleton, its president, its seal attested by James Adkins, its secretary, and it is also signed by "Brown Brothers & Company, Syndicate Managers." It recites the lease of September 30, 1899, and that under it the Transit Company "has contracted the following note and bonded indebtedness, namely:" (a) $5,776,000 par value three years 5 per cent collateral trust notes, due November 1, 1904 (secured by indenture of Nov. 1, 1901); $2,877,000, par value, United Railways 4 per cent general mortgage bonds (secured by mortgage of September 20, 1899); $4,893,500, par value, United Railways 5 per cent preferred stock.    (b)  $8,000,000, 5 per cent twenty-year gold bonds of a total authorized issue of $20,000,000, secured by the indenture of trust of June 17, 1903.    It recited (c) "Transit Company has a further specific indebtedness, as shown upon August 31, 1904, of $1,665,155.17, but which it is estimated the surplus earnings of 1904 will reduce to $935,000."

It is then recited that the Transit Company is unable to meet the indebtedness of $5,776,000, or to pay the $935,000 shortly thereafter to mature, "except by the sale of the collaterals deposited under the two above recited agreements with the Mercantile Trust Company of St. Louis," and that these collaterals cannot be disposed of without procuring a release thereof from the aforesaid pledges, and from the right of substitution

which the United Railways Company has by reason of the terms of its guarantee and the trust instrument under which said collaterals are pledged; that in order to procure a release of the securities and pay the indebtedness it (the Transit Company) proposes to make an issue of 5 per cent twenty year gold bonds, to be called improvement bonds, in the aggregate amount of $10,-000,000, and to obtain the guarantee of Railways Company thereon, secured by a mortgage of the Railways Company upon all of its property, only subject to the lien of the mortgages already existing. The Transit Company and United Railways Company thereupon agree: *First;* that whenever requested by the Railways Company so to do, the Transit Company will surrender to the Railways Company by proper instrument of conveyance of release, "all and singular the property demised by the aforesaid lease of September 30, 1899, and deliver, assign and transfer to Railways Company, upon such request, the immediate possession of all the said demised property, and all cash, bills receivable or other credits then owned or held by it, for and upon the considerations and conditions hereinafter named; provided, only that Railways Company, at the time of said request, shall release and fully acquit Transit Company from all liability which then has or may thereafter accrue to Railways Company under or by virtue of any of the terms or covenants of said lease." *Second;* that Transit Company further agrees that it will cause the $8,000,000 of refunding and improvement bonds of the authorized issue of $20,000,000, of its refunding and improvement bonds, to be cancelled, and the indenture of June 17, 1903, securing them and pledging certain stocks and bonds, to be released and discharged, and will cause the holders of these $8,000,000 of bonds to agree to exchange the same at par for a like amount at par of its proposed improvement bonds to be guaranteed, as hereinbefore stated, by the United Railways Company.

*Third;* that it will enter into an agreement with the Syndicate (meaning by "Syndicate," the unknown and undisclosed parties, who, under the name of Brown Brothers & Company, a copartnership of the City of New York, acted under the name of Syndicate Managers) for the sale of all bonds and stock deposited with the Mercantile Trust Company, under the agreements of November 30, 1901, and June 17, 1903, together with the $2,000,000 of the proposed improvement bonds which remain after the exchange of $8,000,-000 thereof for the $8,000,000 of the outstanding refunding and improvement bonds, and that in and by such sale to the Syndicate, the Transit Company shall provide that $7,000,000 of preferred stock of the United Railways Company shall be deposited for the use and benefit of the United Railways Company upon terms and subject to restrictions subsequently to be agreed upon and stated in the agreement. . *Fourth;* that the United Railways Company, by consent of the legal majority of its stockholders, shall guarantee the proposed issue of $10,000,000 of improvement bonds, "and to secure its said guarantee thereof by deed of trust or mortgage upon all of its property, subject only to the mortgage liens already existing thereon."

Under the second article the Transit Company, agrees with the Syndicate to assign and transfer to it $2,000,000 of its proposed improvement bonds, at eighty-five cents on the dollar, and $8,227,000, par value, of the preferred stock of the United Railways Company of St. Louis, and $2,870,000, par value, of the 4 per cent general mortgage bonds of the United Railways Company, and $17,261,000, par value, of the common stock of the United Railways Company of St. Louis, "for and in consideration of the sum of $5,300,000." That is to say the Transit Company is to sell and transfer to the Syndicate the above enumerated securities for a sum aggregating $7,000,000, out of which sum of $7,000,000, the sum of $6,711,000, "shall be paid at the time, upon

the terms and conditions, and for the use and purposes specified in a contract between the Mercantile Trust Company as trustee, and Transit Company, bearing date September 9, 1904." (This was to take up the $5,776,-000 collateral trust notes held by the Mercantile, and release the securities put up with the Trust Company as collateral to the collateral trust notes.) The remainder of the $7,000,000, that is to say, $289,000, to be paid upon the order of Transit Company or its president, the Syndicate agreeing to pay for the bonds and stocks the amount so specified, and agreeing to cause $7,000,000 of the preferred stock of the United Railways Company, "so to be acquired by it, to be deposited with a trustee, for the use and benefit of United Railways Company, upon the terms and covenants hereinafter made between Syndicate and Railways Company."

The third article provides that the United Railways Company and Syndicate agree, that in consideration of the purchase by the Syndicate of the stocks and bonds agreed upon between the Transit Company and Syndicate, and the agreement to deposit with the National Bank of Commerce in St. Louis, as trustee, for the use and benefit of the United Railways Company, preferred shares of stock of United Railways Company, aggregating the total par value of $7,000,000, and the agreement of the Syndicate to offer to procure for the United Railways Company shares of stock of the Transit Company, that the Railways Company agrees to sell, for the consideration aforesaid and other considerations, and to issue to the Syndicate, the $7,652,500, par per share, of the unissued shares of common stock of the United Railways Company. United Railways Company further agrees, whenever requested by Syndicate, to demand of the Transit Company the surrender of the leasehold and the demised property leased under the lease of September 30, 1899, and immediately upon such surrender to enter into and upon the premises and the operation of the property, "and coincident there-

with, as between it and Transit Company, to assume the payment of the $10,000,000 of proposed improvement bonds, guaranteed as herein provided, by Railways Company, and all debts then contracted for labor, materials or supplies rendered or furnished to Transit Company." The Syndicate upon its part agrees that it will purchase the bonds and stocks agreed to be sold and deposit them, of the aggregate value of $7,000,000, as before referred to, with the National Bank of Commerce, as trustee, for the use and benefit of the United Railways Company, the stock, or any part thereof, so deposited with the trustee, to be sold for the use and benefit of the United Railways Company by the trustee, whenever requested by the United Railways, at such price, and upon such terms as the United Railways may direct. Paragraph d of the third article of this tripartite agreement provides that the Syndicate will offer to the shareholders of the Transit Company, until the eighteenth of October, 1904, "voting trust certificates, issued under and by virtue of such a voting trust agreement as Syndicate may organize and make," representing two shares of common stock of Railways for five shares of the Transit stock, provided the shareholders of the Transit Company shall deposit their stock under terms and conditions prescribed by the Syndicate for the purpose of such exchange, and, upon the basis aforesaid, with the National Bank of Commerce in St. Louis, as agent for the Syndicate, on or before said eighteenth day of October, 1904, "and such Transit shares as shall be so exchanged shall be and become the property of Railways Company and be transferred to its treasury. All shares of Railways Company's common stock not so exchanged for Transit stock within said period shall be and remain thereafter the property of Syndicate. Syndicate, however, of its own volition, but without any obligation so to do, may thereafter continue to exchange said stock upon said basis, and should it do so, whatever shares of Transit Company stock Syndicate acquires by such

exchange shall become the property of Railways Company."

The concluding article (4), of the tripartite agreement, sets out that the agreement contained in it is conditioned upon the authorization by the shareholders of the Transit Company of an issue of bonds aggregating $10,000,000, to be given at a meeting of the shareholders called for October 19, 1904, and the authority of the shareholders of the United Railways Company to guarantee the said issue of bonds of the Transit Company and to make a mortgage to secure said guarantee, to be given at a meeting of the United Railways Company's stockholders called for October 20, 1904. A special meeting of the stockholders of the Transit Company was accordingly held October 19, 1904, on a notice signed by seven of the eleven directors, it being stated in the notice that the object of the meeting was "for considering and voting upon a proposition then and there to be submitted to cancel an issue of $20,000,-000, of refunding and improvement bonds, guaranteed by the United Railways Company of St. Louis, authorized on the twenty-third of May, 1903, and to issue in lieu and instead thereof bonds to be guaranteed by the United Railways Company of St. Louis, in an amount not exceeding the total sum of $12,500,000, and to consider and determine such other or further matters as the said shareholders then and there assembled may deem expedient or wise in relation to its bonded or note indebtedness." This is all that is set out in the call, no mention being specifically made of a proposed surrender of the leasehold. At this meeting a resolution embodying the proposed tripartite agreement, of date September 27, 1904, was introduced and submitted to the stockholders and on motion adopted. The report of the inspectors shows that this was all that was voted on, and it shows that 162,175 shares of stock were voted in favor of the resolution and no shares against it. Of the shares voted in favor of the resolution, 155,127 were

voted by Brown Brothers & Company, as proxies for the owners, and .6794 were voted by Murray Carleton, as proxy for the owners represented by him. The remaining 254 shares were voted personally by the owners of them. Mr. Murray Carleton, president of the company, was chairman of the meeting; Mr. James Adkins, secretary of the company, was the secretary, and the motion for the adoption of the tripartite agreement was made by Judge H. S. Priest, a stockholder, director and the general counsel of the company. The total outstanding stock of the St. Louis Transit Company, on October 18, 1904, was 172,643 shares, and of the 155,127 shares voted by Brown Brothers and Company, 89,811 shares appear as owned by Brown Brothers & Company individually, which is considerably more than half of the total voted and more than half of the total stock outstanding. Brown Brothers & Company voted 65,316 shares in addition to their own, on proxies held by them.

The vote and the proceedings at the special meeting of the stockholders of the United Railways Company, which appears to have been held October 20, 1904, are not in evidence in detail, nor is the call for that meeting in evidence, but a list of the stockholders of that company as of date October 20, 1904, is in evidence. By that it appears that Brown Brothers & Company were on October 20, the owners of 3959 shares of the common stock of the United Railways Company. Whether they voted them at the meeting is not in evidence. It is in evidence, however, that the 82,232 shares of preferred stock in the United Railways Company, as well as the 172,613 shares common in the United Railways, all of which were then owned by the Transit Company, but, through the mortgage of June 17, 1903, under pledge in the hands of the Mercantile Trust Company, were voted at the stockholders meeting in favor of the proposition, by Mr. Murray Carleton, as proxy of the Transit, for the adoption of the tripartite agree-

ment, by order and authority of the board of directors of the last named company. That is to say, out of a possible 450,000 shares common and preferred of the United Railways, 254,845 shares were voted by Mr. Murray Carleton, the president of both companies, he being at the time interested in the syndicate and one of the voting trustees provided for by the tripartite agreement, in favor of the adoption of the tripartite agreement. That is considerably more than half of the total authorized capitalization of the company, excluding any stock held by Brown Brothers & Company, or by the gentlemen who were then directors in both companies. There is no evidence in the record, however, to show what stock, other than that voted by Mr. Carleton, was represented or voted at the meeting of the stockholders of the United Railways held on the twentieth of October, 1904, the testimony being confined to the voting of these 254,845 shares of stock owned by the Transit Company by Mr. Carleton.

As will be remembered, the last article (Article 4) of the tripartite agreement, calls for the execution of an instrument by the United Railways Company, guaranteeing the $10,000,000 of bonds to be issued. That appears to have been done by a mortgage of date October 1, 1904. This mortgage was objected to by counsel for plaintiff, when offered in evidence, on various grounds, among them being that the Transit Company had absolutely no power, at this meeting of stockholders of United Railways, nor did its officers or a proxy for it have any power to vote the shares of stock of the United Railways Company which were at that time owned by the Transit Company and hypothecated by it. The objection was overruled and the instrument admitted in evidence. This mortgage, while bearing date October 1, 1904, was not acknowledged by Mr. Carleton, as president of the United Railways Company, until October 25, 1904, and it was acknowledged on the part

of the Mercantile Trust Company, the trustee named, on October 27, 1904. It was recorded October 28, 1904.

Referring then to this indenture of date October 1, 1904, but acknowledged on behalf of United Railways Company, as before noted, on October 25, 1904, it is stated in it that the Transit Company, being the lessee of the United Railways Company, under the lease of the thirtieth of September, 1899, has heretofore authorized and executed a series of bonds, aggregating $20,000,000, called refunding and improvement twenty-year 5 per cent gold bonds, bearing date the first of April, 1903, secured by trust indenture of June 16, 1903, and that the United Railways Company, for the consideration and upon the terms mentioned in that indenture, had agreed to and has guaranteed the series of bonds by written guarantee, indorsed thereon, and that $8,000,000 of said series of bonds have been issued and sold and are now outstanding, and that Transit Company finds it impracticable, except at a great loss to it and the United Railways Company, as guarantor, to sell and dispose of the remainder of the bonds for the uses and purposes and in accordance with the conditions and terms of the agreement and indenture of trust, and that the Transit Company has therefore determined to take up and cancel all of said bonds which have been issued and sold and are now outstanding and to cancel the remainder of the bonds and to issue in lieu thereof its bonds, to be called improvement bonds, aggregating the sum of $10,000,000, of the denomination of $1,000 each, bearing date of the first day of October, 1904, payable October 1, 1924, with semiannual interest at 5 per cent, payable the first days of April and October succeeding, the bonds indorsed with the guarantee of the United Railways Company; and it is recited that the Transit Company "has agreed with the holders of the said $8,000,000 of refunding and improvement bonds outstanding to exchange therefor, at par, $8,000,000 of its improvement bonds, and has determined to sell

the remainder, to-wit, $2,000,000 thereof, for cash, for the purpose of paying off and discharging certain collateral notes bearing date November 1, 1901, and maturing November 1, 1904, and secured by a collateral trust agreement of the said Transit Company to the Mercantile Trust Company;" that for the consideration named in the indenture of trust of June 17, 1903, Transit Company had requested the Railways Company to guarantee the improvement bonds and to secure its guarantee thereof by an indenture and deed of trust upon all its property, "subject only to its general mortgage bearing date twentieth of September, 1899, . . . and, *Whereas,* for the considerations aforesaid, and other valuable considerations, it is to the interest of Railways Company to guarantee said bonds and to secure · the same by a mortgage as aforesaid upon all of its property," that, therefore, acting on the authority and vote of its stockholders, taken on October 20, 1904, and by resolution of its board of directors, the United Railways had resolved to guarantee the payment of the principal and interest of the Transit Company's Improvement Bonds, and to secure its guarantee, according to the tenor of said bonds, had resolved to grant, bargain, sell, convey, assign, transfer and set over the property specifically described thereafter; that for that purpose it pledged and mortgaged to the Mercantile Trust Company, "all and singular the entire lines of railways, estates, rights, properties, real and personal, privileges and franchises of Railways Company, whether now held or hereafter acquired, the same being all the railways of said Railways Company, situate, lying and being in the city of St. Louis and in the county of St. Louis, in the State of Missouri, and including the systems of railways of said Railways Company, more particularly described as follows:" It then describes what were known as the lines of the Lindell Railways Company; of Missouri Railroad Company; of Union Depot Railroad Company; of Jefferson Avenue Railroad Com-

pany; of Citizens Railway Company, of Cass Avenue
and Fair Grounds Railway Company; of Southern
Electric Railroad Company; of Clayton and Forest
Park Railway; of St. Louis, Clayton and Creve Coeur
Lake Railroad Company, of Midland Street Railway
Company; of St. Louis Cross County Railroad Com-
pany; of St. Louis County Street Railroad Company, of
St. Louis Railroad Company; of Baden and St. Louis
Railroad Company; of Southwestern Railway Company;
of St. Louis Traction Company (formerly Peoples' Rail-
way); of Kingshighway Railroad Company. Thus the
United Railways Company covers, by this indenture,
the franchise and all the property of the railway and
fixtures and appurtenances and all additions or im-
provements made thereto, which were in the lease to
the Transit Company. It also covers all the capital
stock of the various lines, including all stocks and bonds
of other railroad companies "now owned by Railways
Company, or which may be hereafter acquired." Also
all leaseholds and rights under leases now owned, or
hereafter acquired, all corporate or other rights, priv-
ileges and franchises are included; all of this, however,
subject to an indenture of mortgage dated twentieth of
September, 1899, between the United Railways Com-
pany and the St. Louis Trust Company. The mortgages
antecedent thereto, given by the subsidiary lines before
named, and as therein recited, are also included. It
is further provided in this indenture that the bonds
to be secured under it shall be executed by the St. Louis
Transit Company, with the executed guarantee of the
United Railways thereon; that $8,000,000 of them are
to be used, as before stated, for retiring $8,000,000 of
outstanding refunding and improvement bonds of the
Transit Company, and the remaining $2,000,000 to be
sold for the purpose of paying off, in part, the collateral
trust notes of the St. Louis Transit Company. It is
provided, that until default is made in the payment
of the interest or principal of the bonds, the United

Railways shall retain actual possession of the premises and property mortgaged. It will be noted that no reference whatever is made in this indenture to the fact that at the date of the instrument and at the date of the acknowledgment of it by the president of the United Railways, the Transit Company was in possession of all of these roads, under the lease of September 30, 1899. It is also to be noted that the United Railways did not join in executing the indenture of June 17, 1903, securing the $20,000,000 of bonds therein described; it was executed by the Transit Company alone, the United Railways merely indorsing the bonds as guarantor, while in this indenture of October 1, 1904, the bonds were those of the Transit Company, signed and executed by it, the guaranty was indorsed on them by the United Railways Company, and the trust indenture securing the bonds was executed by the United Railways Company alone.

On a question which arose at the trial as to the liability of the United Railways under this mortgage of October 1, 1904, and as to what change in that respect was effected by this as against its liability as a guarantor on the bonds secured by the mortgage of June 17, 1903, the point being made by counsel for plaintiff that the liability of the United Railways had been increased only by $2,000,000, under the mortgage and guarantee of October 1, 1904, Judge Priest being examined as a witness claimed that the liability of the United Railways "was increased to the extent of ten millions of dollars in certain contingencies. It was not the principal obligor in the eight million dollars of Refunding and Improvement Bonds. . . . It was subordinate." He explained that the equity which the Transit Company had in the bonds and stocks, as well as its leasehold, was pledged by the indenture of June 17, 1903, and that later—that is under the indenture of date October 1, 1904—the liability and guaranty of the United Railways became more special, hence he claimed

that if the United Railways paid off the twenty-year Improvement Bonds, it was entitled to hold the bonds against all the property of the Transit Company.

Reference is also made in the tripartite contract to a voting trust, formed or to be formed under the direction of Brown Brothers & Company, in which the voting power of the common stock of the United Railways Company common stock, acquired under the tripartite agreement, was to be lodged. This agreement was made on the first of November, 1904, between Brown Brothers & Company, as syndicate managers, on the one part, and F. S. Smithers, Anson W. Hard, Murray Carleton, James Campbell, J. C. Van Blarcom, Eugene Delano and James Brown, designated as "voting trustees," on the other. By this agreement, the certificates of common stock of the United Railways Company were transferred to these voting trustees, who issued "participating certificates," transferable on the books of the voting trustees, in lieu of the stock certificates of the United Railways Company, to those who participated, and by this voting trust agreement, the power to vote all of this stock, so put into the voting trust, was to remain in the voting trustees for a term extending to the first of November, 1909. The purpose of this voting trust, as stated in the instrument creating it, is the "desire to provide for a continuous and efficient financial and business policy for the best advantage of all persons interested therein."

Testifying as to the occasion for the tripartite agreement, Mr. Cella, who had been a director of the Transit Company for several years, and was such at the date of the execution of this agreement, said that the object of the "reorganization" of the company, as he called it, in 1904, meaning by that, the turning over of possession by the Transit Company to the United Railways Company, was with the view of providing sufficient funds to prevent the United Railways Company becoming financially embarrassed when it took over the

operation of the road; if the Transit Company could not dispose of its bonds, the United Railways Company could. Mr. Carleton testified that he had tried all through the summer and fall of 1904 to sell the securities and provide money with which to carry on the property, particularly to raise money to meet the collateral trust notes which matured November 30, 1904, but failing in that, it became necessary to adopt some new measures to finance the property and he stated, that by the financial plan adopted under the tripartite agreement, the capitalization of the Transit Company was cut down from $20,000,000 to $8,000,000 on paper, that is to say holders of $20,000,000 of stock in the Transit Company if there was that much out, took $8,000,000 of stock in the United Railways Company in exchange for it; that the Transit Company had no assets outside of the collateral deposited to secure the loans; that it had pledged all it had; had put up everything it had under the mortgage of 1903, and that while under that mortgage, an issue of $20,000,000 of improvement and refunding bonds was authorized, in point of fact, it had been able to sell or negotiate only $8,-000,000 of these bonds, although the whole issue was guaranteed by the United Railways. By the tripartite agreement, said Mr. Carleton, the financial affairs of the Transit, its securities, "went into strong hands," and to that cause he, as well as other witnesses attributed the very rapid rise in the market values of the stocks and bonds of both companies which is shown to have taken place about and immediately after November, 1904.

Referring again to the testimony of Judge Priest— and we refer to his testimony particularly, not only because he was the general counsel of both companies, and, until November, 1904, a director in each of them, and thoroughly conversant with their affairs, but because, as a witness called by the defendant in this case, he has stated the situation not only at considerable

length, but very clearly—referring then to and quoting
from his testimony, he testifies that the directors—
meaning, undoubtedly, the gentlemen who composed the
common directory of both companies, but acting par-
ticularly in their capacity of directors of the Transit
Company—had been working on the plan that finally
crystallized in the tripartite agreement, for eight or ten
months. "They had explored different avenues to find
a means of escape, for the relief of these securities"
(that is the securities of both companies, all of them
practically then being hypothecated and under pledge)
"and they finally adopted one which they thought could
be carried out, and then they called a convention of the
shareholders to ratify and approve it. . . . Well,
of course, the directors of the Transit Company, or the
United Railways Company being the same substantially
as the directors of the Transit Company, realized the
situation, but because of that situation, and because
of the distress of the Transit Company, the directors
of the United Railways Company did not feel that they
were empowered by the stockholders of the United
Railways Company to give away its property to some-
body else." Brown Brothers & Company he testifies,
following out suggestions and plans originated by the
directors of the company here, had procured a New
York syndicate to underwrite the whole plan and had
then presented it to the directors of the two companies
and after the conference with the directors in St. Louis,
in which the plan was submitted by Brown Brothers &
Company to them, it was agreed to by the directors,
whereupon as he, Judge Priest testifies, he wrote the
tripartite agreement, and that agreement sets out the
whole transaction as authorized and approved by the
stockholders of both companies and agreed upon by
Brown Brothers & Company, as syndicate managers,
and it was carried out in all respects as written. Asked
why the United Railways Company itself did not make
the exchange of stock between the two companies, in-

stead of doing it through Brown Brothers & Company, as provided for in the tripartite agreement, Judge Priest said that it was because it was thought that the United Railways Company could do better in this way through the Syndicate; that the Syndicate would be more liable to acquire the stock for the use contemplated by the agreement. He further testified that one of the underlying motives in the execution of the tripartite agreement was that the Transit Company "was met with this condition; it had a large number of creditors. It was interested in paying those creditors in full if it could. And I thought it was its duty to use to the best advantage all of the securities in its possession, and to discharge as far as it could all of its obligations. Now, if it stood without action and allowed these collateral trust notes to be foreclosed and the property sold . . . . then that would affect those securities, they would depreciate far below what they were then, and would affect the securities in the hands of every individual that had them, securities either of the United Railways Company or of the Transit Company, and would entail an absolutely useless and cruel loss upon every individual in the city of St. Louis that owned any of those securities."

Brown Brothers & Company, designated in the tripartite agreement as "Syndicate Managers," were partners, engaged in business as Bankers and Brokers of New York City and were heavy stockholders, largely interested, in the stock of the Transit as well as of the United Railways Company. In point of fact the testimony in the case tends to show that from the beginning of the consolidation of the street railway lines in that city, the moving and controlling spirit in the matter was this firm of Brown Brothers & Company, one of the partners, Mr. James Brown, representing them here in this city in the transactions, and, according to the testimony of Mr. Adkins, who was the secretary of both the Transit and United Railways Companies practically

from the beginning, Brown Brothers & Company managed the syndicate which acquired all of the railway lines in the city of St. Louis, excepting the Suburban. Judge Priest had been their attorney before he became the attorney for either of the corporations and it appears in the evidence that his professional engagement with Brown Brothers & Company originally brought him into the position of general counsel for the two companies. In the perfection and consummation of the tripartite agreement Brown Brothers & Company, under the title of "Syndicate Managers," that firm largely interested, however, in its own right, in the stocks and bonds of both companies, actually and practically acted as the agent of both companies in the transaction, and as above noted, it was through them that the $11 per share on the 172,613 *shares* of the United Railways Company stock, which was turned over to the Transit Company under the lease, was paid into the Transit Company's treasury.    Under the tripartite agreement, Brown Brothers & Company, as managers of the syndicate, received 15,000 shares of the common stock of the United Railways Company for managing and inaugurating and carrying out the tripartite agreement.    Mr. Carleton testified that it was through this same syndicate that the various properties which went into the United Railways was originally purchased.    The Brown Brothers & Company syndicate at first held and controlled the United Railways stock, and a Maryland syndicate held the Transit Company's stock.    Mr. Carleton also testified that while he was interested in both syndicates, he does not think that Brown Brothers & Company were interested in the Maryland syndicate.    The Maryland syndicate held control of certain lines before what is referred to by the witness, as "the consolidation," apparently meaning the lease by the United Railways to the Transit Company, took place.    Brown Brothers & Company syndicate he testifies ultimately had acquired control of all of the lines which went into the United

Railways and which were leased by the United Railways to the Transit Company. Mr. Carleton testifies that after the purchase of these various properties by these several syndicates (that is the Maryland syndicate and Brown Brothers & Company syndicate) "they were operated as independent companies, separate organizations, until such time as everything was accomplished for the consolidation, and about that time this lease was entered into with the Transit Company, and then it took them over and became the operating company. Now, there might have been an interval in there of a little while that the United Railways Company, before it turned over this property to the Transit Company, under the lease, may have operated it for a few days, I don't recall just how that interim was filled in." If the United Railways did operate any of the lines, Mr. Carleton said, he didn't recall it. He became president of the Transit Company about April, 1901, although he had been president prior to that for a short time during its organization, and he continued as president of both companies until March, 1905, and for the same period of time was also president of the United Railways. There were eleven members of each board, that is of the Transit and of the United Railways, and they were made up of the same individuals, except that Mr. Cella was a member of the board of the Transit and not of the United Railways; Mr. Conrades was a member of the board of the United Railways and not of the Transit Company, and Mr. Paul Brown, who had been a member of the board of the United Railways, resigned sometime in 1904, and his place was not filled. Judge Priest was a member of both boards until October 31, 1904; when he resigned. Mr. Christopher Smithers succeeded him. As before remarked, Judge Priest, speaking of the adoption of the tripartite contract and of the conference between the officers and directors concerning it, spoke of the two boards as identical. Mr. Carle-

138 App.—38

ton, Mr. Adkins and Mr. Henry testified to the same effect, all of them testifying substantially that from the time the ownership of the various roads passed over to the United Railways, even covering the time of the trial of this case, the two boards were practically identical. When the boards had meetings, they do not even appear to have met as separate organizations; they met in the same room, and all the witnesses refer to each board acting on the same information and in the same line as the other, by reason of the identity of membership. The only meeting of the separate organization of which there is any mention in the testimony, was the meeting by the stockholders of the Transit Company, held on the nineteenth of October, and of the United Railways, held on the twentieth of October; even these two meetings apparently being held at the same place, and as far as appears by the testimony in the case, the officers presiding at those meetings were identical in each case; they then had the same president, secretary, treasurer and counsel, and the controlling vote in each company, so far as the stockholders are concerned, was in the same hands. Mr. McCulloch was general manager of both roads, commencing with the Transit Company in September, 1904, continuing with it until October 31, 1904, and from that date on continuing with the United Railways. During the greater part of this time he was also vice-president and a member of the board. Mr. Adkins was secretary of both companies, and Mr. Henry treasurer during the whole period covered by the ownership of the United Railways in 1899; the general offices of the two companies were on Vandeventer avenue; their down town offices in the Security Building in the same rooms. The members of the voting trust created under the tripartite agreement, who were also represented on the board of directors of the two companies, were Murray Carleton, James Campbell, Brown Brothers & Company, through James Brown, and Eugene Delano, that

is to say at least four out of the seven voting trustees, possibly more, although that is not clear.

To return to acts following the execution of the tripartite agreement of October 27, 1904, by the officers of the two companies and by Brown Brothers & Company, two papers were executed: First, a letter in the name of the United Railways Company of St. Louis, by Murray Carleton, its president, to the St. Louis Transit Company, which letter is of date and tenor following:

"St. Louis, Mo., October 26, 1904.
"To the St. Louis Transit Company,
    "St. Louis, Mo.

"Gentlemen: Pursuant to the terms of the first paragraph, Article 1, of the Tripartite Agreement made on September 27th, 1904, between you, the undersigned, and Brown Brothers & Company, as Syndicate, you are hereby requested to surrender to the undersigned, by proper instruments or conveyance of release, all and singular, the property demised by the lease of September 30th, 1899, to you by the undersigned, and to deliver, assign and transfer to the undersigned, the immediate possession of all of said demised property, and all cash, bills receivable, and other credits then owned or held by it, for and upon the consideration and conditions named in said contract.

"Respectfully,
"United Railways Company of St. Louis,
(Signed.)            "By MURRAY CARLETON, Pt."

Whereupon, a deed of date October 29, 1904, signed by the St. Louis Transit Company, by Murray Carleton, president, to which was affixed the seal of the St. Louis Transit Company, attested by James Adkins, its secretary, was executed, as follows:

"*Whereas,* in pursuance of a resolution of the stockholders of the United Railways Company of St. Louis,

passed and adopted at a meeting of its shareholders, convened and assembled in pursuance of and in accordance with the statutes of the State of Missouri and the by-laws of the said United Railways Company of St. Louis, on the 20th day of September, 1899, the said United Railways Company of St. Louis did on September 30th, 1899, make, execute and deliver to the St. Louis Transit Company a certain contract and indenture of lease dated September 30th, 1899, wherein and whereby the said United Railways Company of St. Louis leased to said St. Louis Transit Company all of its property as therein specified and described, and upon the covenants and conditions therein contained for a term of years ending on the first day of April, 1939, and whereas in pursuance of a resolution of the shareholders of the St. Louis Transit Company passed and adopted at a meeting of its shareholders convened and assembled in pursuance of and in accordance with the Statutes of the State of Missouri, and the by-laws of said St. Louis Transit Company on September 20th, 1899, the said St. Louis Transit Company on September 30th, 1899, accepted said lease upon the covenants and agreements therein provided by it to be kept and performed; and whereas on the 27th day of September, 1904, the said St. Louis Transit Company, the said United Railways Company of St. Louis and Brown Brothers and Company (a co-partnership of the City of New York) as Syndicate Managers, entered into a contract whereby it was provided upon the terms and for the consideration therein expressed that the said St. Louis Transit Company would whenever thereto requested by the said United Railways Company of St. Louis surrender the lease-hold and demised property leased to it by and under the indenture of lease dated September 30th, 1899, to said United Railways Company of St. Louis and whereas the said St. Louis Transit Company by resolutions of its shareholders passed on October 19th, 1904, and the United Railways Com-

pany of St. Louis by resolutions of its shareholders pass-
ed on October 20th, 1904, at meetings respectively held
on those respective dates (which meetings were respec-
tively convened and assembled in pursuance of and in
accordance with the Statutes of Missouri and the re-
spective by-laws of said Companies) did each ratify,
approve and confirm said contract of September 27th,
1904, and

"*Whereas,* the said United Railways Company of
St. Louis has demanded of the said St. Louis Transit
Company the surrender of said lease and the property
demised thereunder, in accordance with the terms and
provisions of said contract of September 27th, 1904, the
said St. Louis Transit Company being lawfully author-
ized so to do by vote of its shareholders, as well as by
the direction of its Board of Directors doth in pursu-
ance of the premises and in consideration that the said
United Railways Company of St. Louis does release
and fully acquit said St. Louis Transit Company from
all liability which now has accrued or may hereafter ac-
crue to said United Railways Company of St. Louis
under or by virtue of any of the terms, conditions or
covenants of said lease, and in further consideration of
the payment of five dollars (the receipt of which is
hereby acknowledged) Surrender, Remise, Release and
Forever Quitclaim unto the said United Railways Com-
pany of St. Louis, the said lease dated September 30th,
1899, and all property, rights and privileges demised
and leased thereby, together with all rights thereunder
accruing to the lessee therein, so as to re-invest the said
United Railways Company of St. Louis with its former
estate in said premises and every right granted by said
lease, as fully as if said lease had never been entered
into; it being distinctly understood and agreed that it is
the clear intention of the parties hereto to cancel said
lease and of the St. Louis Transit Company to relin-
quish every right acquired or to be acquired thereunder
and to vest the property fully in the United Railways

Company of St. Louis unincumbered by said lease and its use in every part of its part of said property unimpaired by anything contained in or connected with said lease; and the United Railways Company of St. Louis by the acceptance of the surrender of said lease hereby made releases and fully acquits said St. Louis Transit Company from all liability which now has accrued or may hereafter accrue to said United Railways Company of St. Louis, under or by virtue of any of the terms, conditions or covenants of said lease.

"In Witness Whereof, the said St. Louis Transit Company has caused its corporate name to be hereto subscribed by its president and attested by its secretary and its corporate seal to be hereto affixed this 29th day of October, A. D. 1904.

"ST. LOUIS TRANSIT COMPANY,

"Attest: James Adkins, Secretary.

"By Murray Carleton,, President.

> Copy of Seal.
> St. Louis Transit Company
> St. Louis, Mo.
> Seal.

Both these papers were objected to by plaintiff when offered, for the reason, among others, that the controlling interest in the Transit was held and owned by United Railways at the time of the attempted surrender and there were therefore no parties competent to enter into a legal or valid contract.

Neither in the tripartite agreement nor in the demand for the surrender of the lease, which the United Railways made upon the Transit Company, is there any suggestion that there had been any default upon the part of the Transit Company in observance of the terms of the lease. In point of fact, an exhibit of assets and liabilities of the Transit Company—balance sheet of date September 30, 1904,—introduced in evidence by the defendant, shows that on that date United Railways

owed Transit Company $958,886.16, in securities at par for amounts expended for construction, betterments and improvements, and that on that date the Transit Company owed the United Railways Company $249,790 on rentals.    The balance sheet of October 31, 1904, also in evidence, shows that in the intervening thirty days Transit Company had paid up all of the rental except $54,096.66.    The demand for the surrender was based solely on the provisions set out in the tripartite agreement.    Accordingly the syndicate required the United Railways to make the demand, the United Railways made the demand, and the Transit Company complied with the demand by surrendering possession of everything that it had, including not only all stocks and bonds of the United Railways which had before then been paid to it and accepted by it at par for improvements and betterments upon the property but also all material and supplies on hand, 172,613 shares of its own stock, bills and accounts receivable, credits of all kinds, and $614,015.25 cash, this cash being outside of and exclusive of $105,380, which Transit Company had on deposit for payment of matured bonds and coupons, which last item of cash it also turned over.    The release of the securities pledged with the Mercantile Trust Co. was also affected.

Touching the relative value of the liabilities assumed and assets turned over from the one corporation to the other on the surrender of the lease by the Transit to the United Railways, and as to the solvency of the Transit Company, there is a vast amount of testimony.    The transcript before us covers 807 pages, much of it devoted to questions of value.    We will not go into it in detail further than necessary.

Mr. Henry, the auditor, testified, and in this he was corroborated by the president, that in the valuations which had been placed upon the assets and liabilities at the time of turning over from one company to the other, on October 31, 1904, as those valuations appeared

on the books and balance sheets in evidence, nobody had fixed any value on the property that was taken over. That is to say, there was no appraisement ever made of the property by any one, as far as he knew.   The valuations that appeared in the statement of assets turned over, he said, were those appearing or placed upon the books of the company in carrying out its accounts in the usual way.

The testimony of Mr. Carleton was to the effect that no estimate or appraisement of values was gone into by the officers or directors of the two companies; that they were and had been the same persons, practically, during the whole of the year 1904, and before then, and that the bankers who underwrote the scheme adopted and set out in the tripartite agreement were the ones to be satisfied as to values, and he presumes they were or they would not have gone into it.

At this present trial an exhibit, showing liabilities assumed and assets turned over to the United Railways Company, on October 31, 1904, which was introduced in evidence when this case was first tried, and which will be found at pages 112 and 113, in 125 Mo. App. (Barrie v. United Railways Company) was again offered.   We will not reproduce it here, referring to it as there copied, calling attention, however, to the fact that there is a typographical error in it on page 113. The capital stock of Louisiana Purchase Exposition Company is carried at $210,000.   It should be $2,100. It was chiefly on account of the admission of this tabulated statement, without proper identification of it, that this court reversed and remanded the cause.   It was identified by the books of account at this second trial and is now before us, having been offered by defendant and. admitted in evidence, in connection with the books and oral testimony concerning it.   The learned trial judge, in his opinion handed down at the time of the decision of the case, states concerning it, that "while this statement purports to be taken from the

books, when considered in the light of the testimony in this case, it is incorrect." Taking up the first entry on the liabilities side, "$10,000,000, St. Louis Transit Company's Improvement Twenty-year 5 per cent gold bonds, guaranteed by the United Railways Company," the trial judge held that this item should be credited with $2,000,000, the remainder of this issue of bonds left over after providing $8,000,000 for exchange of a like amount of outstanding bonds issued under the trust indenture of June 17, 1903. As this conclusion is very strenuously contested by appellant, we will refer to it when we state our own conclusions. The learned trial judge also finds that there was omitted from the list of assets turned over 172,613 shares, approximately, of Transit Company stock, par value $100 per share, taken over by the United Railways, and which went into its treasury, and in this finding he is supported by testimony, the testimony however being that this stock was worth, approximately, ten cents on the dollar, or $1,726,130. He therefore added it to the assets. He also finds that this balance sheet omits from assets received, any valuation of the unexpired term of the surrendered leasehold, and he valued that. Testimony as to the value of this unexpired term was introduced at this second trial, thus supplying data for the lack of which at the former trial, this court—judges concurring—also reversed and remanded the case. The testimony as to the value of this leasehold was very wide apart, as given by the witnesses. Mr. Carleton, Mr. Cella and Mr. Henry, possibly others, testified that in their opinion it was absolutely valueless, one or more of them saying that instead of being an asset of any value, it was a positive burthen. To the contrary, witnesses, produced on the part of the plaintiff, held by the trial court to be qualified to testify as to its value, valued it at between three and five millions of dollars; one of them put the valuation at $4,900,000, basing his valuation on its earning capacity, as to which there was

evidence tending to show that it was about $633,259.66 per annum. All of the witnesses who were examined on this proposition concurred in saying that a leasehold for' long term of years is always to be considered as non-productive of profits for the first years, those years absorbing all profits as well as additional money, in necessary improvements and betterments, to put the leased property up to a full earning capacity, and that profits were not to be expected to flow in until the succeeding years. Witnesses for the defendant based their opinion as to the lease being valueless upon the proposition that the Transit Company, the owner of the leasehold, was in such financial stress that it had exhausted its resources and was utterly unable to carry on the operations of the road. As between these two views the trial judge valued the leasehold at $4,000,000.

As touching the condition of the property when taken over by the United Railways Company in November, 1904, Mr. Carleton, its president, in a letter of date November 14, 1904, in which, answering an inquiry as to the physical condition of the property of the United Railways Company, "and its financial condition under the readjustment of the capitalization of the Transit Company and the United Railways Company," wrote as follows:

"The St. Louis Transit Company, during 1902 and 1903, and the early part of 1904, expended large sums of money for betterments, construction and equipment, to prepare itself to carry effectively and economically the largely increased traffic incident to the Louisiana Purchase Exposition:

"The above important expenditures inure entirely to the benefit of the United Railways Company. I am, therefore, of the opinion, notwithstanding the increased service required of it, that the condition of the track and equipment is good. The company's power plants have been fully maintained, and a detailed report, now being prepared, will, I think, show that no important

additions need to be made to these plants for several years to come.    I believe, also, that the company can maintain its track and equipment out of earnings for several years to come with little, if any, recourse to capital expenditure."

Outside of this letter of Mr. Carleton, there was testimony corroborating his statement.

There is testimony which tends to prove that on October 31, 1904, the Transit Company was technically insolvent.    Its officers have unequivocally testified that it then was and for some time had been actually insolvent and utterly unable to provide means with which to carry on operations, the securities upon which it was compelled to rely for the raising of money for any extraordinary purpose, not being marketable, except at a figure far below their par value, at which figure, that is at par, it had been compelled to accept them in turn for cash outlays made by it.    While circulars given out by those who were handling the securities of the United Railways Company, after it had gone into possession on surrender of the lease, show a profit each year, as we have before noted, the evidence seems to show that this profit was on paper, more the creation of expert bookkeeping than a portrayal of an actual condition.    This appears very clearly from the testimony of Mr. Henry, the auditor of the United Railways, and for all the years of its operation under the lease, also auditor of the Transit Company.    Having reference to these statements before quoted, showing receipts, expenditures and fixed charges for a series of years, and which were given out by the Mercantile Trust Company, which was endeavoring to sell a million of the improvement bonds, and in which is embodied the letter of Mr. Carleton, as president, before quoted from the circular giving a very glowing account of the financial condition of the United Railways immediately after taking over the property, Mr. Henry states that his books, starting with the first year in which he has a complete record,

that is to say, 1900, indicate a loss by the Transit Company in the operation of the property of $1,694,392.02. The year 1901 showed a deficit of $525,630.00. The year 1902 showed a deficit of $268,083.49. The year 1903 showed a loss of $62,786.66. The year 1904, including the two months of operation by the United Railways showed a surplus for that year of $1,182,182.66. The year 1904 was the year of the Louisiana Purchase Exposition, and Mr. Henry testified that so far from the receipts that year being normal the gross earnings were a million and a half more than in 1905.

There is evidence showing beyond question, practically indeed without being controverted, that on the thirty-first of October, 1904, there were a vast number of actions pending against the St. Louis Transit Company, in which damages were claimed for injuries connected with the operation of the road while under control of the Transit Company and that no provision whatever was made either under the tripartite agreement, or outside of that, after its execution, looking to the payment of any of these claims which might thereafter mature into judgments. Judge Priest, testifying on this matter of these pending suits and claims, said, when asked if the board of directors of the United Railways, as well as its shareholders did not know that by the transfer of the leasehold the Transit Company would be left with no tangible assets to meet any liabilities which should be placed against it after the adoption of the tripartite agreement, that while he knew, in October, 1904, that there were a great many suits of this character pending and undetermined, he saw no reason, "why if that matter was specifically mentioned, that the board of directors of the United Railways Company should take from its shareholders property which belonged to them and give to some one else who had no claim upon that property." The testimony of Mr. Carleton was to the same effect, namely, that in arranging the tripartite agreement and in turning over the control of

the property from the Transit to the United Railways, no
discussion whatever was indulged in as to these out-
standing claims which had not matured in judgments, no
provision whatever was made for their payment, and that
it was the intention of the boards of both companies to
eliminate them from all consideration.    Mr. Carleton
speaking of these claims, testified further, in effect, that
as they did not know what they amounted to, it was
impossible to provide for them.    Judge Priest had said
practically the same thing, adding that a great many of
these outstanding claims were not genuine and in point
of fact were fraudulent.    Mr. Henry, the auditor of
the company, testifying as to an account which was in-
troduced in evidence, being a balance sheet of liabilities
and assets, showing the liabilities and assets of the Tran-
sit Company, as of date September 30, 1904, in which
there appeared an item among what are called "de-
ferred liabilities," reading "reserve fund for personal
damages accrued $5,566.90," stated that instead of
reading "reserve fund for personal damages accrued,"
it should more properly read, "reserve fund for personal
injuries accrued;" and stated that instead of charging
the specific amount paid out any given month for person-
al injuries, the Transit Company set up a ratio of the re-
ceipts in order to get a more equitable distribution. In
other words, he said, that is the means by which the
Transit Company provided funds for paying personal
injury claims.    In explanation of this Mr. Henry testi-
fied:    "We    had arrived at a percentage which    we
thought would meet the direct disbursements of funds
to meet the personal injuries.    In the setting up of that
percentage we had during the course of the operation
of the St. Louis Transit Company made all payments
out of this fund so set up and had this reserve left;"
and he stated that this $5,566.90 was the amount left
over from the sum which had been set aside to meet
these judgments and payments, the point being that the
company, always mindful of the fact that claims for

damages would always accrue, had made an average of amount required to meet such claims (for personal injuries) and taking that into consideration, had set aside annually a sum to draw on for that purpose, and this $5,566.90 was what was left of it.    That is, in the operation of the road, it had always been within the thought of those managing it, that there would have to be so much expended for settlement of damage claims and their experience had resulted in their setting apart a certain sum with which to meet that loss, and they had carried an estimated amount regularly through the accounts.    Judge Priest, further testifying as to damage claims, said that the Transit Company had found that the average loss to the company from claims of this character in the City of St. Louis was smaller than that in any of the larger cities of the country.    That is to say, damage claims for personal injuries were so surely an element of expense, that their yearly average was capable of estimation in advance so closely that a specific amount could be and was set aside to meet them. As stated before, however, the testimony of all the witnesses was to the effect, and without contradiction or pretense to the contrary, that in the execution of the tripartite agreement, providing for liabilities to be assumed by the United Railways, that had fallen on to the Transit Company in its operation of the lease, no thought or consideration whatever was given and no provision made for the payment of unliquidated and unadjusted claims for personal injuries or damages accruing prior to the first of November, 1904.    It was in evidence in the case that in the name of the Transit Company, the United Railways Company had, after November 1, 1904, defended many suits that were brought against the Transit alone for these classes of cases, charging the amount of expenses so incurred to the Transit Company.

By referring to this balance sheet of United Railways Company, of date October 31, 1904, which is found

at pages 112 and 113, of 125 Mo. App., and before referred to, it will be seen that the total liabilities assumed are placed at $11,921,482.54, including the 20 year 5 per cent guaranteed bonds, carried at $10,000,000, while the assets turned over are placed at $10,673,618.-77, showing an excess of liabilities over assets acquired by the United Railways October 31, 1904, upon surrender of Transit Company's lease, of $1,247,863.77.

Having reference to that balance sheet, as well as to the testimony bearing on values, the trial judge, at the conclusion of his finding in the case says:

"Restating this account with the changes indicated and placing $2,000,000 on the asset side, or reducing the liability side from $10,000,000 to $8,000,000, which is the same thing, we have the result changed to excess of assets over liabilities of $752,136.23, plus the stock of the Transit Company in the treasury of the United Railways Company, although of the $10,000,000 improvement five per cent bonds executed by the Transit Company at least $2,000,000 represented an increase of indebtedness by that amount, and the benefits inured when the property was resumed to the United Railways Company."

That is to say he deducts $2,000,000, carried in the balance sheet as a liability of the Transit Company at $10,000,000 on account of Transit Company's Improvement twenty-year 5 per cent gold bonds, guaranteed by the United Railways Company, as not properly chargeable to the Transit Company, and carries the liability of the Transit Company on account of those bonds at $8,000,000, instead of $10,000,000. This gives an excess of assets over liabilities of $752,136.23, to which the trial judge adds the 176,643 shares Transit stock, at ten cents on the dollar or $10 per share, making $1,726,430, giving a total of assets received over liabilities assumed of $2,498,566.23. This is exclusive of any valuation for the leasehold. At this last trial, however, a balance sheet of the Transit Company, as of

date September 30, 1904, duly identified and proven by the books of account of that company, was introduced in evidence by the defendant.     Taking up this balance sheet, we find the assets given as follows:

"2,877 United Railways first mortgage
   bonds, ...... ...... ............. $ 2,852,158.72
"82,273 Shares United Railways pre-
   ferred (par value $100), .......... 7,832,708.20
"172,613 Shares United Railways com-
   mon (par value $100), ............ 17,261,300.00
    "Securities due from United Rail-
     ways, at par value, for amounts
     expended for construction, bet-
     terments and improvements, .. 958,886.16
    "La. Purchase Ex. Co. Stock, ... 210,000.00
    "St. L. Lt. Arty. Arm. Assn. Stock, 2,500.00

                      $29,117,553.08"

     Carried below these items, and under the heading "Suspense Account," but as assets, appears $2,722,568.-21, composed of "Losses sustained in sale of securities acquired under the lease of September 20, 1899, also commissions and expenses in negotiating loans to raise funds to pay for amounts expended for construction, betterments and improvements," less "loss on sale of United Railways 4 per cent bonds used for refunding underlying liens charged to United Railways Company;" material and supplies, $296,115.27; "current assets," $1,443,713.15, including $713,435.73, cash, and $355,450, cash on deposit to pay bond coupons; and under the heading "Deferred Assets," there are carried $228,486.-15.     This gives a total of assets on September 30, 1904, as carried on the Transit Company's books of $33,808,-435.86.     On the liabilities side of this balance sheet, the Transit Company stands charged with 172,643 shares of its own capital stock, at par value of $100

amounting to $17,264,300; collateral trust notes, $5,776,000; 800 Transit Company's refunding and improvement 5 per cent bonds $8,000,000; current liabilities $1,839,996.19; deferred liabilities $672,576.80; and under the heading "Profit and Loss," loss December 31, 1903, $511,249.99, profit for the current year, 1904, to September 30th, $766,812.86, the difference, $255,562.87, being carried as a liability, and thereby balancing the liabilities account, $33,808,435.86, with the assets account. It will be noted that the balance sheet of the United Railways of date October 31st, purporting to give the assets turned over to it on that date by the Transit Company, carries the assets at $10,673,618.77, whereas the balance sheet of the Transit Company thirty days earlier, that is September 30th, carries what purports to be the assets of the Transit Company on that date, namely September 30, 1904, at $33,808,435.86, a difference between the two of $23,134,817.09. A very careful examination of the testimony in the case fails to afford any explanation covering this discrepancy, or accounting for this apparent shrinkage in assets in the intervening thirty days. Very possibly there is some explanation of it, but as no attention was called to this discrepancy at the trial, we have no data before us sufficiently accurate or definite to enable us to account for it, even if it is our business to do so; all we can do, with the statement of the facts in the case before us, showing this discrepancy between these two accounts, is to note it and the fact that the record fails to supply sufficient data by which it can be explained. A partial explanation of this discrepancy is possibly found in the wiping off of $207,900, on account of the Louisiana Purchase Exposition Company stock, that being carried in the balance sheet of September 30th, at $210,000, and in that of October 31st at $2,100, and in the elimination of $2,500 on account of stock in the St. Louis Light Artillery Armory Association, which item is ap-

parently valueless, and it, as well as $207,900 of the Exposition stock, properly omitted.    In fact the evidence tends to show that this Exposition stock, as also the Armory Association stock, could have been omitted entirely as valueless.    The $2,722,568.21 suspense account is also, in all probability, properly eliminated, and what are called "deferred assets," amounting to $228,486.15 have disappeared.    Apart from these, however, we have no means of accounting for the apparent discrepancy.    The $17,264,300 charged as a liability of the Transit for its own stock, on the balance sheet of that company of date September 30th, of course, was not a liability assumed by the United Railways; when that stock went into the hands of the United Railways it became an asset at whatever it was worth.

At the time of the surrender of the lease by the Transit Company and taking over of the lines of the United Railways, plaintiff Barrie had his action pending against the Transit Company, for damages for injuries sustained by him in a collision with a street car, then operated by the Transit Company over one of the lines covered by the lease, the accident occurring on the first of February, 1900.    A judgment was rendered in his favor against the Transit Company, on the tenth day of November, 1904, in the circuit court of St. Louis county, to which court the case had been taken on change of venue from the circuit court of the city of St. Louis, where it had been brought to the June, 1900, term.    Unable to realize on the execution which was issued, or to receive payment of his judgment, Barrie, then a judgment creditor, commenced this suit in the circuit court of this city on the first of January, 1905, against the United Railways Company of St. Louis. The petition sets out the matters concerning the organization of the corporation, the lease of the United Railways system to the Transit Company, and the subsequent surrender of that lease by the Transit Company, and the turning over to the latter of all of the assets

before then held and possessed by the Transit Company. After averring the judgment and that payment of it had been refused and the execution returned *nulla bona,* and that the officers and directors of the Transit Company had admitted and proclaimed its insolvency, and that the Transit Company having conveyed all its assets, was wholly without money or assets with which to pay any debt or liability existing against it, and that it will not pay or settle with any of its creditors, of whom he avers he is one, plaintiff avers that on the thirty-first of October, 1904, the Transit Company was the owner of property of great value, consisting of an unexpired term of the leasehold described, of a vast number of cars, and of various kinds of equipment and property used in the operation of a street car system, as also of its franchise, rights, good-will and business, the exact value of all of which, plaintiff avers, is unknown to him, and that it was, on the thirty-first of October, owner and in possession of $614,015.25, in cash. He avers that the same persons were officers and directors of both the Transit and United Railways Companies and that the same agents managed both companies down to the thirty-first of October, 1904, and that at the time of the transaction thereafter mentioned, both companies were under one and the same management; that the object and purpose of the United Railways was to absorb the Transit Company by acquiring its assets and succeeding to its business, and that pursuant to that purpose the Transit Company "was merged into the United Railways," and that on the thirty-first of October, 1904, the United Railways "did receive, absorb and take over, without paying any consideration therefor, all the assets and property of said St. Louis Transit Company, including its business and good will, and also the sum of six hundred and fourteen thousand, fifteen and twenty-five hundredths dollars in cash, and thereafter carried on, and is now carrying on and operating, said street car system and business as successor

to the St. Louis Transit Company." He further avers, on information and belief, "that upon receiving said assets and in consideration thereof, the said defendant United Railways Company of St. Louis, assumed and agreed to pay all liabilities of the said St. Louis Transit Company; and plaintiff is advised that in the absence of such agreement, defendant, will, by operation of law, upon the facts aforesaid, be held to have assumed all such liabilities." He avers that the United Railways Company has appropriated to its own use the assets and property of the value aforesaid.

The prayer is for an accounting of the assets received by the United Railways from the Transit Company and ascertainment of their value; that the amount of his debt, with interest and costs be computed and the amount so found be adjudged and decreed a claim against the United Railways which it be ordered to pay, and in event of its refusal to pay, that a receiver be appointed to take possession, administer and sell the property, under the direction of the court, and out of the proceeds, pay plaintiff his debt, interest and costs; following this is the general prayer for relief.

The answer, in its first paragraph, avers "that the facts in manner and form stated in the said petition are not true."

In the succeeding paragraphs are set up the organization of the Transit Company, then its own organization, under the corporate name of the Central Traction Company, then the change of its name to United Railways Company of St. Louis; avers acceptance of the provisions of an act of the Legislature of this State, being chapter 155, of the Revised Statutes 1889, by the Transit Company, and also by itself; avers that prior to the thirtieth of September it had constructed and acquired by purchase, under and by virtue of the laws of the State and pursuant to the consent, license and authorization of the City of St. Louis, under Ordinance No. 19352, as hereinbefore stated, approximately four hun-

dred miles of street railway in the city of St. Louis, and
that on the thirtieth of September, 1899, it leased all
of its property to the Transit Company, and sets out
the lease in full; that pursuant to the terms of the
lease, the Transit Company entered into the possession
of the demised premises and property and continued to
control, manage and operate the same until on or about
the thirty-first day of October, 1904; avers that the St.
Louis Transit Company, in the operation of the prop-
erty under the lease, contracted an indebtedness amount-
ing, on the thirtieth of November, 1901, to approxi-
mately $6,000,000, for which it executed collateral trust
notes to the amount of $5,776,000, which it secured by
a written indenture of trust between it and the Mer-
cantile Trust Company; that it afterwards determined
to make an issue, aggregating $20,000,000, of twenty-
year 5 per cent bonds, called refunding and improve-
ment bonds, of date April 17, 1903, and by indenture of
the seventeenth of June, 1903, between the Transit
Company and the Mercantile Trust Company secured
the bonds, the issue of bonds being guaranteed by it,
the defendant, and that of this issue $8,000,000 were
sold to the public; that the mortgage securing these
bonds covered all the property of the St. Louis Tran-
sit Company, "including all of its stocks and bonds, to-
gether with a mortgage upon its leasehold interest un-
der the lease hereinabove set forth." It then avers
that the earnings and income of the property of the
St. Louis Transit Company, operated by it under the
lease, did not at any time between the date of the lease
and the first of November, 1904, equal the amount of
fixed charges and operating expenses and obligations in-
curred by it under the lease, but that the operation of
the property had entailed a loss upon the Transit Com-
pany of about $15,000,000; that the Transit Company,
having no resources other than the bonds and stock
pledged under the two indentures of trust above re-
ferred to, was unable to raise money with which to meet

the payment of the collateral trust notes falling due November 1, 1904, "except under and by virtue of an arrangement and agreement which it made and entered into with Brown Brothers & Company, Syndicate Managers, and this defendant." It then sets out the tripartite agreement of date September 27, 1904, in full. Following the tripartite agreement, the answer avers that "on the — day of October, 1904," it requested the Transit Company to surrender by proper instrument or conveyance of release, all and singular the property demised by the lease of September 30, 1899, and the delivery to it of the demised premises and all cash bills receivable and other credits then owned or held by it, as provided in the agreement, averring that it had been requested by Brown Brothers & Company, Syndicate Managers, to make the demand. It avers that, pursuant to the demand, the Transit Company made the surrender and proper conveyance of release, "and that there upon this defendant did release and fully acquit said Transit Company from all liability which had then accrued, or might thereafter accrue to it under and by virtue of the terms of the said lease; and that this defendant did assume and undertake to pay all debts then contracted by said St. Louis Transit Company for labor, materials and supplies rendered or furnished to said St. Louis Transit Company, as is provided by the said agreement of September 27, 1904;" admits that among the assets turned over to it by the Transit Company was the cash sum of $614,015.25, and avers that the amounts assumed and paid by it under the said agreement of September 27, 1904, "exceeded in value the assets acquired by it under said agreement from the said St. Louis Transit Company, including the said sum of $614,015.25, by an amount approximating $5,000,000."

We have set out these various mortgages and agreements and lease, so that it is unnecessary to burthen this statement with a further reference to them, other

than to remark that they were all in evidence and are set out either in full or substantially in the answer.

A general denial by way of reply was filed to this answer.

The cause was tried on the equity side of the court. When called for trial, defendant filed a motion to compel plaintiff to elect, claiming that he had combined in one and the same count of his petition two separate, distinct and inconsistent causes of action, one based upon an alleged implied contract arising from the charge that the defendant received all assets and property of the St. Louis Transit Company, without paying any consideration therefor, the other based upon an alleged express agreement made by the defendant to pay all liabilities of the Transit Company, in consideration of the transfer to it of all of the Transit Company's property and assets. This motion was overruled, defendant duly saving exception. We have hereinbefore set out such of the evidence as we deem material. There were numerous objections to the evidence as offered. The trial judge, however, allowed practically all evidence offered to go in, so that we have before us in a very full transcript all the evidence offered.

Along with his decree, the learned and very painstaking trial judge filed a written opinion, giving his summary of the evidence, his deductions from it, and his ultimate conclusions. It is such a thorough and exhaustive exposition of the facts and discussion of the transaction that we give it practically in its entirety, and it is as follows:

"Under the pleadings in this case it is made the onerous duty of the court from the evidence to trace and determine the effect of the relations between the two companies, namely: Transit Company and United Railways Company, and Brown Brothers & Company, and the related questions of law and fact which have arisen and been disclosed by the testimony.

"In order to properly understand how this controversy arose it is necessary to consider the formation and history of the two companies, and their financial transactions with each and with Brown Brothers & Company as Managers of a Syndicate, which seems to have intervened in their troubles.

"The first contract appearing between the Transit Company and defendant is what is familiarly known as the 'Contract of Lease,' under which three hundred miles of the street railways of the city were turned over to the Transit Company for forty years from October 1, 1899, to April 1, 1939."

Summarizing the lease, the learned trial judge continues:

"It is perfectly apparent from a casual examination of the provisions of the lease that it was expected that Transit Company should take off of the shoulders of the United Railways Company all public and private obligations and burdens of any nature and kind, and should assume towards it onerous obligations by way of requiring for the betterments and improvements that the Transit Company should for every dollar expended for that purpose at the request of United Railways Company, accept at face value the securities it might have in its treasury, without regard to their real or market value.

"From the testimony of the officers of the two companies it is this provision of the lease which, to a very large extent, resulted in the serious embarrassment of the Transit Company.   The plan adopted by these two companies to operate the great system of street railways of the City of St. Louis was this, viz.:

"The Transit Company having been organized with a nominal capital stock of $3,000, increased its capital stock to $20,000,000, divided into 200,000 shares of the par value of one hundred dollars each.

"The Central Traction Company, which had theretofore been organized with a capital stock of $5,000,000,

changed its name to that of 'United Railways Company,' and immediately thereafter increased its capital stock to $45,000,000, said stock being divided into $20,000,000 five per cent cumulative preferred stock and $25,000,000 common stock.

"The Legislature of the State and the city of St. Louis gave to these two companies large, unusual and extensive powers.

"With the preliminary organization of the two companies and the execution of the contract of lease, it became necessary for the Transit Company to have a large cash fund with which to begin the operation of the system under the terms of the lease. To accomplish this the United Railways gave to the Transit Company 172,613 shares of its common stock for a like number of shares of the stock of the Transit Company. It also gave therefor $11.00 per share and turned over all the funds it had in its treasury. So that Transit Company began the operation of the system on November 1, 1899, with approximately $2,000,000 in its treasury and also with 172,613 shares of the common stock of the United Railways in its treasury, and having no indebtedness save such as it assumed under the terms of the lease.

"It appears from the testimony that Brown Brothers & Company were largely instrumental in bringing these properties together and launching them upon this plan of operation. The $11.00 per share for the stock which the Transit Company exchanged or gave for a like number of shares of the common stock of the United Railways Company was provided by Brown Brothers & Company. This fund became the working capital of the Transit Company. From what source Brown Brothers & Company obtained the $11.00 per share or upon what consideration, does not appear, nor is it material, further than as showing their relations to the properties and the two companies at that time.

"It is contended by plaintiff's counsel, and I so

.find from the evidence, that the boards of directors of the two companies, viz.: Transit Company and United Railways Company, were substantially the same at the time of the execution of the lease, and so continued down to and after the re-transfer on October 31, 1904.

"The management of the system made extensive improvements, betterments and additions, and expended large sums of money for equipment, in order to render the system efficient in the performance of its obligations under the lease, and as well the obligations to the public.    The additions, acquisitions, betterments and improvements made from time to time, and for which Transit Company was required to pay in cash out of the earnings or other sources, were large and costly, and for which, under paragraph three of Section 1, of the lease, it was entitled to be reimbursed in bonds or stocks of the United Railways Company at par.

"During the year .1900, a strike of the employees occurred, resulting in a loss to the Transit Company of between seventeen hundred and eighteen hundred thousand dollars, which, coupled with the large expenditures required for betterments and improvements under the lease, made it necessary for the company to arrange for money, part of which it had already borrowed on short time notes, and resulting in the execution to the Mercantile Trust Company, Trustee, on November 1, 1901, of what is called 'Collateral Trust Agreement' (defendant's exhibit No. 1).

"By way of preamble it is recited that 'the Transit Company has incurred an indebtedness of approximately four million dollars in making additions to, acquisitions for, betterments and improvements in the railway leased by it from the United Railways Company of St. Louis, under and by virtue of the terms of said lease, by reason of its inability to market at their intrinsic value the general mortgage bonds and preferred stock of said United Railways Company, and which indebted-

ness is evidenced by short time promissory notes of this
company, secured collaterally by the bonds and shares
of stock received in consideration of making said addi-
tions, acquisitions, betterments and improvements; and

" 'Whereas, the Transit Company deems it wise and
desirable to fund said short time indebtedness so secured
as aforesaid, and to extend the period of payment there-
of three years,' it was authorized to issue its notes in
an amount not exceeding $6,000,000, and to secure the
payment thereof pledged with the Mercantile Trust
Company $2,877,000 par value of the four per cent gen-
eral mortgage gold bonds of the United Railways Com-
pany, also $2,924,300 par value of the five per cent cumu-
lative preferred stock of the United Railways Company.

"It was also provided by said 'Collateral Trust
Agreement' that the Transit Company, anticipating that
it would receive from the United Railways Company at
various times thereafter large amounts in the preferred
stock of the United Railways Company, amounting in
the aggregate between December 31, 1901, and Decem-
ber 31, 1902, to the sum of $2,348,600, and when and
as received by it from the United Railways Company,
were deposited with the Trustee under the terms of the
said 'Collateral Trust Agreement.' Under the original
pledge $4,609,000 face value collateral trust notes were
issued, leaving unissued of the $6,000,000 provided for
the sum of $1,391,000. These last notes were to be
issued when the Transit Company should receive from
the United Railways Company the anticipated blocks
of preferred stock amounting to 23,486 shares, or
$2,348,600 par value.

"The total amount of notes finally secured by the
'Collateral Trust Agreement' of 1901, was $5,776,000,
and there had been pledged with the Mercantile Trust
Company, Trustee, to secure the same, the following se-
curities, viz.:

"2877 1st Mortgage 4 per cent Bonds of
    United Railways Company at par,.... $2,877,000
"48,935 shares of Pref'd Stock of United
    Railways Company at par, .......... 4,893,500

       "Total at par, .................$7,770,500

"At this time, June 17, 1903, Transit Company, although heavily burdened with debt, secured by this collateral trust agreement and pledge of securities owned by it, and which was not being reduced, was further required by United Railways Company to continue to make large expenditures for improvements, betterments, additions and equipment, and to receive therefor preferred stock of Railways Company at par, although it was never worth or marketable at par, and although $1,900,000 had been lost by the strike of the employees in 1900, and which seems to have been absorbed, yet the improvements and betterments were continued without regard to financial condition.    To relieve the situation, apparently, and to provide for the maturity or retirement in advance thereof of the collateral trust notes, and to refund and consolidate all of the indebtedness of Transit Company, another instrument was executed by the Transit Company to the Mercantile Trust Company as trustee, called in the evidence 'Indenture of Trust,' dated June 17, 1903, providing for an authorized issue of $20,000,000 of five per cent twenty year refunding and improvement bonds.

"The United Railways Company had requested the Transit Company to make further improvements, additions and betterments, and to reimburse the Transit Company therefor it had not sufficient securities to give and must resort to a loan of its credit, and it proposed to become guarantor of the bonds that might be issued under this 'Indenture of Trust' of June 17, 1903.    At that time, according to the recitals of the instrument, Transit Company had expended for additions, improve-

ments and betterments, under Section 1 of the lease, the sum of $8,313,500, and had received therefor under said lease bonds and stocks as follows:

"4851 United Railways Company's 4 per
    cent bonds, ...... .................... $4,851,000
"34,625 shares United Railways Company's
    preferred stock, ...... .............. 3,462,500

"Total at par, ...... .......... $8,313,500

"It is noticeable here and by the foregoing figures that Transit Company was compelled to and did expend in cash in four years, lacking about a month, the sum of $8,313,500 for 'additions, acquisitions, betterments and improvements' under the lease, or quite $2,078,375 per year.

"It must be presumed in the absence of any showing to the contrary, that the property and equipment was increased in value to that extent over and above the maintenance of the property in good physical and operating condition. If we spread this expenditure over 350 miles it will amount to $5,938.21 per mile, or for the first four years of operation it will be $1,484.55 per mile per year.

"To secure the bonds which might be outstanding at any time of this authorized issue there was conveyed to the Trustee to secure the same the securities theretofore pledged with the Trust Company under the 'Collateral Trust Agreement' of September 30, 1901, subject to the lien thereof and other stocks and the leasehold, viz.:

"(1) 2877, 4 per cent general mortgage
    bonds of United Railways Company at
    par ...... .... ...... ............. $ 2,877,000
"Subject to pledge under collateral trust
    agreement.

"(2) 53247 shares preferred stock of United
Railways Company at par, subject to
pledge under collateral trust agree-
ment, .... ...... ...... .......... 5,324,000

"(3) 172,613 shares common stock of Unit-
ed Railways Company at par, ....... 17,261,300

"(4) The leasehold. No value was placed
upon leasehold.

"Total securities at par, .........$25,462,300

"The indenture of trust also provided that $8,000,-
000 of the $20,000,000 authorized issue should be issued
at once, and from the proceeds thereof should be paid
the following amounts, viz. :

"(1)  Directors' Loan ........ ........$ 2,110,423.80
"This loan was secured by 150,887 shares
of the common stock of United Rail-
ways Company, which was to pass to
Transit Company and to the Trust
Company, trustee, under the 'Inden-
ture of Trust,'

"(2)  Real Estate Notes ..............    60,000.00

"(3)  Obligations for improvements and
betterments .............. ........   675,000.00

"(4)  Other general indebtedness ......   150,000.00
Total obligation at face to be re-
tired by part of the $8,000,000 is-
sue ..:.......... ...............$ 2,995,423.80

"The remainder to be applied to betterments, etc.
"It was provided by Article 1, Section 3, that be-
tween January 1, 1904, and December 31, 1905, from
time to time, there should be issued and delivered an
additional block of bonds to the amount of $6,056,000
par value. From the proceeds of this block of bonds
the collateral trust notes amounting to $5,776,000
were to be paid. The remainder of this block of bonds

was to be used for improvements, betterments, etc. The then estimate of the cost of such additions, acquisitions, improvements and betterments during the years 1904 and 1905, was $2,280,000, and that Transit Company would receive therefor 67,590 shares of preferred stock and 16,041 shares of the common stock of the United Railways Company.

"It was further provided that in case of the purchase of any other street railway or their stock, an additional block of bonds should be issued and delivered, not to exceed the amount for such purpose of $1,700,000. The remainder of the authorized issue of $20,000,000, after the year 1905, was to be issued and delivered for improvements, betterments, etc., not exceeding $500,000 per annum. All of the securities given by the United Railways Company to Transit Company on account of improvements, betterments, etc., made under the provisions of the lease, were to pass to the Trust Company, Trustee, to be held under the 'Indenture of Trust,' of June 17, 1903.

"The Indenture of Trust of June 17, 1903, for the purpose of providing the method and means for refunding the indebtedness of the Transit Company, and to provide for improvements, etc., was only partially carried into effect. The only issue of bonds ever made under the Indenture of Trust of June 17, 1903, was the block of $8,000,000 in bonds to be used first in paying the directors' loan, real estate notes, obligations for improvements and betterments, amounting to $675,000 and general indebtedness, the total amount being $2,995,-423.80, the balance of the $8,000,000 to go to betterments, etc., and the Transit Company under the lease being entitled to be reimbursed by the United Railways Company for every dollar expended for such purposes, in bonds, preferred stock and common stock at par. Whatever proportional part of this issue of $8,000,000 of bonds was used in betterments, etc., the Transit Company was entitled under the lease, to receive from the

United Railways Company, bonds and stock at par. If the United Railways Company had none in its treasury, or could not comply with that provision of the lease, it was under obligation to save Transit Company harmless for expenditures which it was required to make, and the benefits of which were to accrue to the United Railways Company.

"The Transit Company continued operating the street railway system, and during the summer of 1904, from the testimony it seems that when the collateral trust notes matured it would be unable to pay them, and it became incumbent upon the officers and directors to avoid the default, if possible. To this end various efforts were made by its officers, but unavailing. The United Railways Company had required it to carry on such extensions, additions, acquisitions, betterments and improvements that the United Railways Company had exhausted its ability to comply with the lease, in this: it had no more bonds or preferred stock to turn over to the Transit Company for such betterments, etc., and the 'Indenture of Trust' from some cause not proving efficient to that end, a refinancing scheme became necessary. The United Railways was a mere shell, with the title to the various street railways composing the system and a small block of common stock in its treasury; but a majority of its stock was in the treasury of the Transit Company, part of its general mortgage bonds were also held by the Transit Company. It may be legally truthful, under the testimony, to say that the Transit Company owned the United Railways Company, although the stock by which such ownership was evidenced had been pledged as collateral security with the Mercantile Trust Company, still its right to vote the same was reserved until default, and its president did vote it under resolution of its board of directors.

"The scheme finally evolved for financing the Transit Company, which resulted in its practical extinction as an operating company, and all else except

the right to be a corporation, is evidenced by what is called the 'Tripartite Agreement' between the St. Louis Transit Company, United Railways Company and Brown Brothers & Company, dated September 27, 1904 (heretofore copied). Immediately thereafter, but provided for before and therein, was another instrument or deed of trust dated October 1, 1904, securing guaranty of United Railways Company on Ten Million Dollars St. Louis Transit Company Improvement Bonds (defendant's exhibit No. 8). This latter deed of trust was intended to be substituted in lieu of the Indenture of Trust of June 17, 1903, and the latter satisfied and released, which was afterwards done. In order to put the tripartite agreement into effect it required the concurrence of the stockholders of the two companies, viz.: Transit Company and United Railways Company.

"At this time and for several years prior thereto the respective boards of directors of these two companies were the same, their officers were the same, and the Transit Company owned the United Railways, and the latter was indebted to the Transit Company in a large sum for betterments which it was unable to pay, as provided in paragraph three of section one of the lease. The preferred stock and bonds of the United Railways Company held by the Transit Company were acquired by payment therefor at one hundred cents on the dollar, viz.: In improvements, additions and betterments, for which it expended its earnings and credit. The United Railways Company was completely exhausted, having nothing save the title to the railways, and subject to heavy general and underlying mortgages. The United Railways was completely under the control and domination of the Transit Company.

"Transit Company owned the following shares of stock of the United Railways Company:

"Common stock (shares) .............. 172,613
"Preferred .........  ................... 82,273

"Total stock owned by Transit Com-
        pany at time of tripartite agree-
        ment ....  ........  .......... 254,886

"This was a majority of all the capital stock of
the United Railways Company, which was $45,000,000,
or 450,000, divided 250,000 shares common and 200,000
shares preferred stock.

"While this stock was under pledge, yet the Transit
Company had the right to vote the same until default,
which had not occurred, and by authority of the board
it was voted by the president of the Transit Company
for the tripartite agreement, and the remainder of the
stock of the United Railways Company was voted by
Brown Brothers & Company as proxy and by the holders
of the preferred stock for themselves. The outstanding
Transit Company stock was voted for the tripartite
agreement by Brown Brothers & Company as proxy,
155,127 shares, Murray Carleton as proxy 6,794 shares,
and 254 shares were voted by the holders thereof. Total
voted 162,175 shares, out of a possible 194,000 shares,
6,000 shares of the common stock of Transit Company
never having been issued. The Transit Company was
indebted to the Mercantile Trust Company in notes
amounting to $5,776,000. These were secured by pledge,
under collateral trust agreement of 1901, by 2,877 four
per cent mortgage bonds at par, aggregating $2,877,000,
and by 48,935 shares of the preferred stock of the United
Railways at par, aggregating $4,893,500. The indenture
of trust executed to the Mercantile Trust Company on
June 17, 1903, to refund and consolidate the indebted-
ness of Transit Company authorizing $20,000,000 issue
of bonds, to be secured by the collateral above men-
tioned, subject to the lien of the collateral trust agree-
ment, and to provide for the future improvements, etc.,

received the guaranty of the United Railways and carried with it the pledge of the leasehold, also 172,613 shares of the common stock of the United Railways Company, then in the treasury of the Transit Company, also 33,297 shares of the preferred stock of the United Railways. Only $8,000,000 of bonds were issued under this agreement. In order to release the securities held by the Mercantile Trust Company, it became necessary to provide means to satisfy both the collateral trust notes and the lien of the $8,000,000 outstanding improvement and refunding bonds upon which United Railways was guarantor. It was necessary to provide first for this block of bonds, and to that end a new bond issue of $10,000,000 was provided for, wherein the United Railways became guarantor and mortgaged all of its property to secure the same. $8,000,000 of the bonds of this issue were to be exchanged for the $8,-000,000 issued under the indenture of trust of June 17, 1903, bond for bond, the indenture of trust satisfied and the securities released. This arrangement was an integral part of the tripartite agreement. In order to release all of the securities from all liens or pledges, it required the payment of the collateral trust notes, amounting to $5,776,000, and the $8,000,000 improvement and refunding bonds which were provided for by exchange for a like amount of the $10,000,000 issue, and left the securities and property of the Transit Company with which to pay the collateral trust notes as follows:

"2,877 First Mortgage 4 per cent Gold
   Bonds of United Railways at par.$ 2,877,000
"82,273 Shares preferred stock of United
   Railways at par ............... 8,227,300
"172,613 Shares common stock of United
   Railways at par ............... 17,261,300
"2,000 Improvement bonds provided for
   by the mortgage of $10,000,000
   dated October 1, 1904, at par.... 2,000,000

"The United Railways had left in its treasury unissued 76,525 shares of common stock which together with its common stock held by the Transit Company (172,613 shares) amounted to 249,138 shares, out of a total authorized issue of common stock of 250,000 shares. The preferred stock of the United Railways was in the hands of investors, except 82,273 shares which belonged to the Transit Company.

"Coming now to the method of transfer we have it thusly: The issue of $10,000,000 improvement bonds of October 1, 1904, and exchange of $8,000,000 thereof for the $8,000,000 issued under indenture of trust of June 17, 1904, which left 2,000 bonds, or $2,000,000, for disposition. The other securities were: 2,877 bonds of $1,000 each of the first mortgage 4 per cent, or at par $2,877,000; 82,273 shares of the preferred stock of the United Railways Company, at par $8,227,300, and 172,613 shares of the common stock of the United Railways at par, $17,261,300.

"For all of the foregoing bonds and stocks $7,000,000 was to be raised by Brown Brothers & Company, syndicate managers, and paid in the following manner, viz.: The $5,776,000 collateral trust notes were to be paid, and also a specific indebtedness of $935,000, making a total of $6,711,000, leaving unexpended the sum of $289,000 which was to be paid to order of Transit Company or its president. This passed all the foregoing securities to Brown Brothers & Company as syndicate managers. In order to complete the transfer it was necessary to get in the outstanding stock of Transit Company. All of its stock had been issued except 6,000 shares, that is, there were outstanding 194,000 shares. The United Railways Company had remaining in its treasury and unissued 76,525 shares of its common stock. This stock was passed out to Brown Brothers & Company for the purpose of exchanging with the stockholders of the Transit Company at the ratio of two shares of United Railways common for five shares

of Transit Company stock. If we calculated upon this basis of exchange these shares would obtain 192,312 shares of the Transit Company, practically all of the outstanding stock of Transit Company; but to effect this exchange Brown Brothers & Company deposited with the National Bank of Commerce 70,000 shares of the preferred stock of the United Railways Company of the 82,273 shares which they claimed to purchase from the Transit Company, thus leaving in the hands of Brown Brothers & Company as syndicate managers 12,273 shares of the preferred stock of the United Railways Company. By the exchange as above indicated the stock of Transit Company passed into the treasury of United Railways Company and remains there. By this method Brown Brothers & Company had released to the syndicate the following securities, viz.:

"2,000 Improvement 5 per cent bonds at
　　　　par ........ ........ .........$ 2,000,000
"2,877 General mortgage 4 per cent bonds
　　　　at par ..................... 2,877,000
"12,273 Shares of preferred stock at par. 1,227,300
"172,613 Shares common stock United
　　　　Railways at par .............. 17,261,300
　　　　　　　　　　　　　　　　　　　　　　───────────
　　　　　　Total at par .............$23,365,600

"The foregoing securities, or part of them, furnished the basis for the speculation of the syndicate under what was called Brown Brothers & Company participation subscription. Upon the foregoing recited conditions all that remained to be done in order to strip the Transit Company was the transfer of cash on hand and surrender of the leasehold. The cash amounted to $614,-015.25. When the lease was surrendered and the United Railways Company assumed charge November 1, 1904, Transit Company was left with merely the right to exist as a corporation. The United Railways had received a surrender of the leasehold having 35 years to run, which carried all property of every description and

kind that had been accumulated by the Transit Company during its operation, also $614,015.25 in cash, also $7,000,000 preferred stock in the hands of the National Bank of Commerce as trustee for its benefit, also practically all of the stock of Transit Company. Whether the $289,000, being balance of the $7,000,000 claimed to have been paid by syndicate managers for the securities owned by Transit Company, went into the treasury of the United Railways Company does not appear. It evidently did not go into the treasury of the Transit Company, and has not been accounted for except upon the theory that it went to the United Railways Company.

"The syndicate managers received after all exchanges had been worked out 2,000 improvement 5 per cent bonds, 2,877 first general mortgage 4 per cent bonds, 12,273 shares of preferred stock of United Railways Company, and at least—if not more—172,613 shares common stock of the United Railways Company.

"I hold that, upon the face of the tripartite agreement and the testimony explanatory of its working, as against a creditor seeking to follow the assets of the Transit Company and subject them to the payment of his debt, the syndicate managers were the agents and representatives of all the parties, and that the transaction must not only have the stamp of bona fides, but that ample and full consideration must have passed. The fact of the purchase by Brown Brothers & Company for their syndicate of the securities required of them, under the circumstances, full and adequate consideration. The agreement so interlocks the relations of all of the parties that while it might be upheld as between them and the stockholders assenting, yet is open and subject to have every test applied at the instance of one who, although at the time did not have his demand liquidated, but shortly after did reduce his claim to judgment, and who seeks to challenge the transaction as one without adequate consideration.

Whether the transaction was as to the subsequent judgment creditor fraudulent in law it is not necessary to determine, as I am of opinion, and so find, that the Syndicate and the United Railways Company, with the consent of Transit Company did not give full and adequate value, as I shall now attempt to show by the testimony.

"I. Brown Brothers & Company, as managers for their Syndicate, and for the United Railways Company, claimed to purchase from Transit Company the securities held by the latter company. In fixing the value of these securities I know of no rule of law permitting other values to be placed than their market values, if they had such. While other elements might be considered in arriving at values in any other way, the rule is too firmly established to be varied that market values are the only general and safe test. By this test we shall determine what these securities were worth according to market values. At or about the time of the signing of the tripartite agreement, and about the time of the transfer, the first general mortgage 4 per cent bonds of the United Railways Company were variously quoted upon the market by the leading and responsible firms of this city at from 82¾ to 84 cents of the par value. The preferred stock of the United Railways Company during the same time was quoted at from 57⅝ to 67 cents of the par value, the latter value of the Railways preferred being quoted on October 22, 1904, at the time of ratification by the stockholders of the two companies of the tripartite agreement. The common stock of the United Railways Company was not on the market and had no market quotation, but it is in testimony that Transit Company stock was in excess of ten dollars per share, and in the exchange of five shares of Transit stock for two shares of United Railways common, some basis must have been fixed, and taking Transit stock at ten dollars per share, it would result in a valuation of twenty-five dollars per

share for United Railways common, and I so find and place this value arrived at in the way indicated. This seems reasonable, for as soon as put on the market it started at 23½ and went up rapidly and quickly, although strengthened by being in the right hand instead of the left.

"The 2,000 improvement 5 per cent bonds had not been on the market and were valued by the parties at 85 cents on the dollar, and I take it that is the fair value.

"The leasehold having thirty-five years to run is claimed to have been a burden and worth nothing, and there is testimony to that effect. But by keeping the operating account separate from the capital account, which latter includes all indebtedness for betterments and improvements, for which United Railways Company was paid in depreciated bonds and stocks at par, it appears by the testimony that the net earnings over leasehold charges were $633,000, and Mr. Whitaker figured upon that basis the lease to be worth nearly $5,000,000. From the testimony upon this point I find the leasehold to be fairly worth four millions of dollars.

"The cash which passed to the United Railways Company out of the treasury of Transit Company was $614,015.25. This takes no account of $289,000 which was to be paid by Syndicate managers to the order of Transit Company or its president.

"II. Recapitulating the foregoing findings and valuations we have:

"To the Syndicate represented by Brown Brothers & Company, 2,000 improvement 5 per cent bonds, $2,000,000, at 85 cents ........................$ 1,700,000.00
"2877 first genl. mort. 4 per cent bonds, $2,877,000, at 82¾ .............  2,380,617.50

"82273 shares preferred stock United Rys.,
$8,227,300, at 57⅝ .............. 4,740,981.62
"172,613 shares common stock United
Rys., $17,261,300, at 25 cents ...... 4,315,325.00

"Total for securities which passed......$13,137,024.12
. First to the Syndicate Managers.
"Add to this the value of the leasehold.. 4,000,000.00
"Add also cash passed to United Rys.. 614,015.25

"Total rec'd by United Rys., and Syndi-
cate .............. .............$17,751,039.73
"Syndicate furnished ............. ...... 7,000,000.00
"Balance in excess of amount paid...... 10,751,029.37

$17,751,039.37

"Restating the account upon other valuations, which
there is testimony to sustain, but which valuations are
not predicated upon market value, the following result
is reached:

"2,000 Imp. 5 per cent bonds, $2,000,000,
at 85 cts. ......................$ 1,700,000.00
"2877 1st Genl. Mtg. 4 per cent bonds, $2,-
877,000, at 75 cts. ............... 2,157,750.00
"82,273 shares Pref. stock, $8,227,300, at
50 cts. ......................... 4,113,650.00
"172,613 shares common stock, $17,261,-
300, at 25 cts. .................. 4,315,325.00
"Total securities which passed to Syndi-
cate Managers .................. 12,286,725.00
"Add to this value of leasehold........ 4,000,000.00
"Add also cash passed to United Rys.. 614,015.25

"Total rec'd by United Railways and by
Syndicate ........ .............$16,900,740.25
"Syndicate furnished .............. 7,000,000.00
"Balance in excess of amount paid...... 9,900,740.25

$16,900,740.25

"An examination of either of the foregoing statements, eliminating the leasehold, we have excess values over the $7,000,000 furnished by Syndicate under first statement of $6,751,039.37: Under the second statement we have the excess of $5,900,740.25.

"III. Again, stating the account upon market values with the syndicate managers only, and charging them with what they paid for themselves and their associates we have:

| | |
|---|---|
| "2,000 imp. 5 per cent bonds, $2,000,000 at 85 cts. .......................$ | 1,700,000.00 |
| "2877 1st mtg. 4 per cent bonds, $2,877,000 at 82¾ ......................... | 2,380,717.50 |
| "12273 shares pref. stock, $1,227,300 at 57⅝ ............. ............... | 707,251.50 |
| "172,613 shares of common stock, $17,261,300, at 25 cents ................ | 4,315,325.00 |
| "Total for securities retained by syndicate for their profit ................... | 103,294.00 |
| "Syndicate furnished ................ | 7,000,000.00 |
| "Balance in excess of amount paid syndicate ............... ............... | 2,103,294.00 |
| | $ 9,103,294.00 |

"IV. Stating this same account at the lowest possible figures of valuation as shown by same testimony, but not market values, we have:

| | |
|---|---|
| "2,000 Imp. 5 per cent bonds, $2,000,000, at 85 cts. .......................$ | 1,700,000.00 |
| "2,877 1st Mtg. 4 per cent bonds, $2,877,000, at 75 cts. ................... | 2,157,750.00 |
| "12,273 shares pref. stock, $1,227,300, at 50 cts. ......................... | 613,650.00 |
| "172,613 shares com. stk., $17,261,300, at 25 cts. ......................... | 4,315,325.00 |
| "Total for securities retained by sydct...$ | 8,786,725.00 |

"Syndicate furnished ................ 7,000,000.00
"Balance in excess of amount paid...... 1,786,725.00

                                    $ 8,786,725.00

"Stating the transaction showing what the United Railways Company received at market values, we have: "70,000 shares of its preferred stock at par,
        $7,000,000, at 57⅝ ..............$ 3,993,475.00
"This was deposited with National Bank of Commerce for use and benefit of United Railways Company. "172,613 shares stock of Transit Company,
        par, $17,261,300, at 10 cents ......$ 1,726,130.00
"This one amount may not be exactly accurate, but Mr. Carleton testified that substantially all of the stock of Transit Company was at the time in the treasury of United Railways Company.
"Reconveyance and surrender of leasehold
        having 35 years to run ............$ 4,000,000.00
"Cash transferred from treasury of Transit Company to treasury of United
        Railways Company ............... 614,015.25

"Total ...... .... .........$10,333,620.25

"If we say that United Railways assumed $8,000,000 of the $10,000,000 improvement 5 per cent bonds, the surplus would still be $2,333,620.25.

"The only cash used, and by which the transaction is attempted to be colored into a bona fide sale, was $7,000,000 furnished through Brown Brothers & Company, syndicate managers. Upon this theory United Railways could not benefit against the creditors of the Transit Company to the extent of $6,333,620.25 or $10,333,620.25, without being subject to be called upon to account therefor. But it is contended that United Railways Company assumed a $10,000,000 obligation of Transit Company. Did it do so? Transit Company had out under the indenture of trust of June 17, 1903,

upon which United Railways Company was guarantor by way of loan of its credit, $8,000,000, of which amount the United Railways had received in betterments, etc., at par $5,679,572.20—that is $8,000,000, less directors' loan, $2,110,423.80; real estate notes, $60,000; other general indebtedness of Transit Company $150,000, leaving a balance of $5,679,572.20 (see Section 1, indenture of trust June 17, 1903—defendant's exhibit No. 2).

"So that United Railways Company when it assumed the payment of the $10,000,000 improvement mortgage under the provisions of article IV of the tripartite agreement was assuming its own debt and simply changing its form and increasing the amount by 2000 improvement five per cent bonds or by $2,000,000, which went to the syndicate at 85 cents. No such arrangement by these two companies, having the same officer, the same directors, and one the owner of a controlling interest in the stock of the other, can pass without question and be protected under the rule of bona fides. The syndicate, a majority in interest composed of stockholders of the Transit Company, the Transit Company holding a majority of all the stock of the United Railways Company, and by agreement passing to syndicate for $7,000,000, securities worth at the lowest estimate $8,786,725, surely must be held to satisfy the speculative end of the trade, and leave the United Railways Company to account to Transit Company creditors, if they elect to proceed against it, for its share of $6,333,620.25 or $10,333,620.25, depending upon whether the leasehold is valued or not.

"There is another collection of figures which it is important to examine and understand under the testimony in the cause, headed: 'Liabilities Assumed and Assets Acquired from St. Louis Transit Co. upon Surrender of its Lease to the United Railways of St. Louis, October 31, 1904.'

"This is the same statement which was before the

Court of Appeals when this case was there on appeal, and the admission of which, over the objection of plaintiff, resulted, in part, at least, in reversal of the judgment. (Barrie v. United Railways Co., 125 Mo. App. 96, l. c. 112, 113.) While this statement purports to be taken from the books, when considered in the light of the testimony in this case it is incorrect, as I shall attempt to show. The first item under the head of 'Liabilities' we find 'St. Louis Transit Company Improvement 20 year five per cent Gold Bonds, Guaranteed by United Railways Co. $10,000,000,' against this item there should be a credit of $2,000,000, which was the balance of that issue of bonds after providing $8,-000,000, for exchange for a like amount of outstanding bonds under the indenture of trust of June 17, 1903. This $2,000,000 of bonds was sold to the syndicate at 85 cents on the dollar, but figuring at par, the credit should be given for $2,000,000.

"The stock of the Transit Company which went into the treasury of the United Railways, approximately $172,613 shares, should also be placed on the credit or asset side of the account. This seems to have been left off entirely.

"Restating this account with the changes indicated and placing $2,000,000, on the asset side, or reducing the liability side from $10,000,000 to $8,000,000 which is the same thing, we have the result changed to excess of assets over liabilities of $752,136.23, plus the stock of the Transit Company in the treasury of the United Railways Company, although of the $10,000,000 improvement five per cent bonds executed by the Transit Company at least $2,000,000 represented an increase of indebtedness by that amount, and the benefits inured when the property was resumed to United Railways Company.

"I have made these calculations with a view of determining whether the securities of the Transit Company had been dealt with at full value by the syndicate

and the two companies. In view of the results and the fact that the United Railways Company and the Transit Company were in their directors and officers one company, and in view of the fact that over $4,000,000 was subscribed by Transit Company stockholders for participation in the profits of the speculation on the securities acquired by the advance of $7,000,000, in view of the fact that the syndicate managers were part and parcel of these two companies from their launching in 1899, I cannot escape the conclusion that this creditor has a clear and unquestionable right to demand and receive payment of his claim against this defendant or any one else who received the speculative benefit of this transaction. It amounted in practice and fact to the Transit Company stripping itself over night, and those who reaped its benefits, which were large, denying to this plaintiff, because his claim had not ripened into judgment, the right to insist that this defendant should respond to his demand.

"I am of opinion that as against a creditor subsequently obtaining a judgment against the Transit Company, by reason of the directors and officers of the two companies being the same, and the syndicate managers having almost the same relations to the two companies and the properties, and further that a majority in amount of the subscribers to the purchase of the syndicate securities being Transit Company stockholders and officers, that a court of conscience cannot do less than hold the tripartite agreement subject to the rights of this plaintiff.

"I find the great preponderance of the testimony to be that the syndicate and the United Railways each received property which in value largely exceeded the value paid or exchanged.

"I hold that the tripartite agreement under the testimony is subject to the rights of this plaintiff, and that each one benefiting may to that extent be called upon to respond to plaintiff's demand.

"Applying the rule that: 'In equity the property of a corporation is regarded as held in trust for the payment of its debts, and creditors may pursue it into the hands of all persons except those of bona fide purchasers,' the United Railways was in no sense a bona fide purchaser, the syndicate managed by Brown Brothers & Company was in no sense a bona fide purchaser, so as to escape all accounting to creditors or to act as a bona fide conduit in passing shares of preferred stock of the United Railways to the National Bank of Commerce as trustee for its benefit. The syndicate cannot shield the United Railways by having passed out to it 76,525 shares of common stock, exchanging two for five with Transit stockholders, and then passing the Transit Company stock into the treasury of the United Railways. The United Railways cannot shield itself under the rule of bona fides in receiving $614,015.25 cash from the treasury of Transit Company.

"While it was perfectly lawful and competent for the syndicate and the stockholders and officers of these two companies to make the exchange, as shown, yet it must be subject to provision being made for creditors existing and those who might thereafter liquidate their demands or have the good faith and adequacy of consideration assailed.

"Upon the foregoing findings I am led without doubt or misgiving to the conclusion, and so find, that defendant should pay the demand of plaintiff. Judgment will be that plaintiff have and recover of the defendant the full amount of this judgment to this date with costs."

So holding, a decree was entered in favor of plaintiff, that he recover of defendant United Railways Company the sum of $1,362.61, together with costs of suit.

A motion for new trial was duly filed, as also motion in arrest of judgment, both of which were overruled and defendant, duly saving exception, has brought the case here on appeal.

REYNOLDS, P. J. (after stating the facts).—I. It is urged by counsel for defendant that the plaintiff's petition sets out causes of action which are inconsistent and irreconcilable; that plaintiff seeks to recover, on the one hand, because, as he alleges, the United Railways Company had taken all the Transit Company's assets without paying anything for them, and on the other hand, as plaintiff further alleges in the same count, because the United Railways Company, for a consideration, had agreed to pay the Transit Company's debts. Hence, defendant contends, that as the proof of one of these positions necessarily disproved the other, its motion to compel plaintiff to elect should have been sustained. We cannot accede to this contention. This is a suit by a creditor to reach assets and to charge against those assets a judgment which plaintiff obtained against the company in whose hands the assets formerly were. The plain meaning of the averments in the petition is, that no adequate consideration was paid by the United Railways Company for the assets which it took over from the Transit Company. Whether the consideration was adequate or whether no consideration whatever was paid, is an immaterial distinction in this case. In either event, the right of the creditor attaches.

Defendant cites in support of its motion to elect, the case of Jordan v. Transit Company, 202 Mo. 418, at page 426. In the same case, however, and at pages 426, 427, the court says: "Where two causes of action that may, by authority of the statute (Sec. 593, R. S. 1899), be united in one petition, each in a separate count, are improperly blended in one count the defect is reached by a motion to require the plaintiff to elect one and to strike out the other." After citing many cases, the court then says: "The rule laid down in those cases is that when a defendant pleads to the merits he waives all mere informality and irregularity in the petition and can thereafter object to it only on the ground

that it states no cause of action or that the court has no jurisdiction of it."

In the case at bar, the motion to elect was inter posed after the case was called for trial and after an answer to the merits had been interposed and issue taken on that by a reply. The motion came too late, even if properly made. In our view of the case, how ever, it was properly overruled on the merits.

II. Another error assigned by the defendant is to the action of the court in admitting, over the objection of defendant, a paper which purported to set out an agreement between Brown Brothers & Company, as syn dicate managers, and F. S. Smithers and others. This is the same agreement that we have referred to, in the statement of the case, by which the voting trust was created, and which provided for participation by the stockholders of the two companies in the reorganiza tion of the finances of the companies under the tripartite agreement. Defendant cites in support of its conten tion that the introduction of this matter is material and prejudicial error, the decision of this court in Barrie v. United Railways Company, 125 Mo. App. l. c. 121. The point of the contention evidently is that it is there held that a case in equity will be reversed for the admission of incompetent testimony. We do not understand that decision to go to that extent. The crucial fact to be proven when this case was then before this court, as it is now, was the relative value of the assets taken over to the liabilities assumed, and this court, required to pass on that fact, held that it could not do so by considering an unauthenticated schedule, which was all the testimony in the case offered by defendant on that fact, and that schedule having been improperly ad mitted, left no testimony whatever covering relative values. Hence—in part—the reversal, the court saying of that schedule, that it was "the baldest hearsay."

138 App.—41

The exhibit here objected to is a document shown by the evidence to have been submitted to all of the parties in interest in the two companies, the stockholders and bondholders thereof, and signed by the voting trustees, the syndicate managers, and others. It was an agreement called for in the tripartite agreement, was provided for by that instrument and was properly admitted as showing one of the very important, and a very material, step in the transaction, it was a paper throwing light upon the whole matter. In objecting to this exhibit, counsel urge that "it can be very easily seen that the dealings between Brown Brothers & Company and various other individuals, concerning the disposition of the subject-matter of their purchase, must be wholly irrelevant and immaterial." We cannot concede this. Brown Brothers & Company were the financial agents of both companies, among the original promoters of the plan by which these street railroad lines were consolidated under one holding. In the plans which culminated in the tripartite agreement, they were chief factors, interested not only individually but as representatives of a large majority of the stockholders. Their vote alone, as proxies and as individuals at the meeting of the stockholders of the Transit Company on September 19, 1904, was sufficient to carry the resolution adopting the tripartite agreement: they were not only the agents of both companies and of a majority of the stockholders in promoting and adopting the plan, but after its adoption they were the conduit through and by means of which the plan was carried out. It is impossible to separate them from this whole transaction. The president of the two companies, testifying as a witness, said that Brown Brothers & Company were the syndicate managers, and speaking of the acts of the voting trustees, of whom he was one, he said: "We acted all the time under the direction of the syndicate managers." There was no error in admitting this exhibit.

III.   Error is further assigned to the admission of three exhibits referred to as plaintiff's exhibits "S," "U" and "V."   Exhibit "S" is the paper which contained the letter of Mr. Murray Carleton, president of the United Railways Company at the time, of date November 14, 1904.   It was shown to have been extensively circulated by the parties undertaking the negotiation and sale of the securities after the property was turned over to the United Railways.   Exhibit "U" contains an affidavit of a witness in this case, the affidavit attached as an ex- hibit in another case, and what purports to be a memorandum of the readjustment of the capital and finances of the St. Louis Transit Company and a financial history of the two companies.   Exhibit "V" is a copy of a telegram from Mr. Campbell to Brown Brothers & Company, on the strength of which, it seems, some enlargement was made of those entitled to the participation in the benefits of the tripartite agreement.   The objection urged in the brief of counsel is, that these papers "had to do with matters arising subsequent to the consummation of the transaction between the United Railways Company and The Transit Company;" and it is urged by counsel that "what may have been done with the assets of the Transit Company, which did not come to the United Railways Company, is of no moment under the issues raised by the pleadings in this lawsuit. By the admission of such evidence as this, no elucidation or clarification of the record was obtained, but, on the contrary, the tendency was to divert the mind of the court from the controlling features of the controversy, and that the trial judge was influenced materially by these exhibits is distinctly reflected in his opinion." We cannot agree with counsel on any of these propositions.   What was done with the assets of the Transit Company which did not come to the United Railways Company is of very great consequence, under the issues raised by the pleadings and tried in this case.   The very thing that the court was endeavoring to do and that it

was bound to do was to trace the assets of the debtor company, and these exhibits were admitted as throwing some light on that matter.    Whether or not the very learned and careful trial judge was influenced or prejudiced by this testimony unduly or at all, is not for our consideration.    This is a suit in equity.    We have, as we are compelled to do, examined all the testimony for ourselves.    While giving all due consideration to the conclusion reached by the trial judge, we have arrived at our own conclusion on our own consideration of the evidence.    When we have thought his conclusion or his comments serviceable to an understanding of his view of the case, we have freely used them, without adopting them further than stated by us. We may also add that in a case of this character, in which the appellate court is bound to act on its own view of the evidence, the wisest and safest course is for the trial court to admit all evidence offered, not obviously irrelevant, or tending merely to burden the record, rather than to risk a reversal because of the exclusion of testimony which the appellate court may deem relevant and material.    We find no reversible error in the admission of these exhibits.    It is due counsel for defendant, however, to say, that we do not attach any importance to either exhibit "U" or exhibit "V."    This disposes of the first, fourth, fifth, sixth and seventh assignments of error made by the defendant.

IV.    As the second point of argument, counsel for defendant maintain that "Plaintiff cannot recover because he has failed to prove that the defendant took the assets of the Transit Company without any or adequate consideration."    Herein lies one of the real and substantial points in controversy.

(a)    Is plaintiff debarred from recovery because he has failed to prove that the defendant took the assets of the Transit Company without any or adequate consideration?    Counsel argue that nothing is better

settled, under the rules of pleading and practice which prevail in this State, than that a party must recover upon the cause of action pleaded and upon no other. There is no room for controversy over this proposition.

Counsel then state that fraud is not pleaded in the case at bar, and that there is no issue of fraud in the case which could be raised by inference from the pleadings.    If counsel mean by this, that there is no actual fraud averred, this is true.    Counsel, however, have apparently lost sight of the distinction between pleading fraud in fact and pleading what is termed "constructive fraud."    When the former is relied on, the acts done must be set out, and, the intent being material, it must be averred that they were done fraudulently, or with intent to cheat and defraud—as for example—in an action for fraud and deceit.    The acts set out may be fair on their face.    The intent with which done may be fraudulent.    But when the right of recovery or relief is founded on constructive fraud, all that is necessary, and what must be done, is to plead the acts; with those acts pleaded, the court will determine whether the doing of them worked a constructive fraud.    In this last class of cases, it is not necessary to use the words "fraud" or "fraudulent," which, when used, are mere epithets and meaningless; a use of these or like words, without any specification of the act or acts which constitute the alleged fraud amounts to nothing in pleading.  See Martin v. Luktkewitte, 50 Mo. 58; McGindley v. Newton, 75 Mo. 115; Smith v. Sims, 77 Mo. 269; Clough v. Holden, 115 Mo. 336, 1. c. 353; Nichols v. Stevens, 123 Mo. 96; Nagel v. Railway, 167 Mo. 89; Mallinckrodt Chemical Works v. Nemnich, 169 Mo. 388; Newman v. Trust Co., 189 Mo. 423, 1. c. 444; Bliss, Code Pleading (3 Ed.), sec. 211.

In Hoester v. Sammelmann, 101 Mo. 619, Judge Sherwood, speaking for the court, says that general allegations of fraud or other general allegations, no facts being stated, are but legal conclusions and for that rea-

son insufficient, and to say that a man acted fraudu-
lently or improperly, without specifying what he did,
is equivalent to make the pleader the sole judge of the
sufficiency of his pleadings and substituting his judg-
ment for that of the court.    "If the facts are stated,
the legal conclusion follows as night follows day and
so no statement of what conclusion the law draws is
necessary."

Judge Bliss, Code Pleading, section 211 (3 Ed.),
further says: "Fraud is not a fact; it is a name given
by law to certain facts, to certain conduct of the ac-
cused party.    The fact may be misrepresentation, de-
ceit, specifically stated, and the term fraud is the legal
epithet applied to such facts; it is not the fact, not the
thing done, but only a conclusion from the thing done.
The term fraud or misrepresentation, may not be used
at all, if the facts appear."

When, therefore a creditor in his petition avers
that his debtor has transferred his property, without
consideration or on an inadequate consideration, leav-
ing the debt unpaid, he sets out a state of facts that
equity holds to be fraudulent.    It is not quite accurate,
therefore, to say that the petition in this case does not
charge fraud.    The acts which it avers, namely, the
taking over of the property of the debtor by another,
for an inadequate consideration, or without consider-
ation, the debtor then being insolvent, are charged in
the petition.    Even in their brief and argument sub-
mitted, counsel for defendant argue the case on the
theory that defendant has met that issue and disposed
of it by the proofs.    The whole gist of the evidence
of defendant, as well as the burden of the argument of
counsel, is an effort to dispel any idea that constructive
fraud has been established.

This is, as before remarked, a creditor's bill, aimed
at the discovery of assets alleged to have been disposed
of without provision for payment of the demand of

plaintiff, and, if and when discovered, to subject them, to the amount of his demand, to payment thereof.

(b) What was the transaction of October 31, 1904, by which the United Railways took over the lines, money and assets, before then in the hands of the Transit Company under the lease of September 30, 1899,—the surrender of that lease and turning over of the assets being pursuant to the arrangement set out in the tripartite agreement of date September 27, 1904,—adopted by the Transit Company September 19th, and by United Railways September 20, 1904, signed by the officers of both companies and by Brown Brothers & Company as "Syndicate Managers?"

We have set out, in our statement, the demand for the surrender signed by Murray Carleton as president of United Railways and the instrument making the surrender signed by Murray Carleton as President of the Transit Company. When the United Railways, as lessor, made the demand of the Transit Company to surrender the lease, there had been no violation of any of the terms of the lease on the part of the Transit Company. There was not even a pretense that there had been any. Confessedly the demand for the surrender was based upon the ground that, under the terms of the tripartite agreement, the syndicate managers had demanded of the United Railways, that it demand the surrender by the Transit Company. In and by the lease no right was reserved by the United Railways Company to cancel except for defaults specifically mentioned; no right of re-entry is cast on the United Railways Company, outside of those stated in the lease itself. It cannot, therefore, be claimed that the surrender of possession by the Transit was a surrender of a tenant to the landlord, either at the expiry of the term or for a violation of the conditions of the lease. That being so, the United Railways has no right in law, certainly none in equity, to look to the lease for the ascertainment of what it should have re-

ceived on surrender. So far as contracts between the two are concerned, if we are to regard the corporations as distinct entities, it was a voluntary surrender by one, on the arbitrary demand of the other.

(c) Even if the surrender had been under and in accordance with the terms of the lease, for causes set out in the lease, neither by the law nor under the lease, was the United Railways entitled to receive or to demand from the Transit Company any cash which the latter then had on hand, and the cash turned over, admittedly, amounted to $614,015.25, outside of cash deposited for payment of coupons, nor did the lease carry any stock, bonds or securities, received by Transit from United Railways in payment for betterments. Article 14 of the lease is the sole clause providing for the contingency of surrender by lapse or forfeiture. Upon the termination of this lease for any cause, arising from breach of covenant by Transit Company, reads Article 14 of the lease, the Transit Company shall surrender "all such property necessary to the operation of the lines of United Railways, as enumerated in section 13 of this agreement, and all betterments to the property that may be made by Transit Company, by which is meant all cars, tools, tracks, rails, roadbeds, wires, poles, motors and appliances that may by Transit Company be put upon the lines and property of United Railways, and necessary to the operation of the said road," which shall then become the property of the United Railways. The property described in section 13 of the lease, referred to in this section 14 is described thus: "All cars, machinery, tools, appliances, etc., generally called personal property, of every sort and kind, belonging to United Railways, or held by it as lessee." The property leased and that to be turned over is particularly described by the parties themselves. While money, cash on hand, as well as stocks and bonds are, in law, personal property, they are excluded, by this particularization—they are not of the class of personal property

described in section 13, and contracted in section 14 to be turned over.  Hence it cannot be claimed that this $614,015.25 in cash, money, or the securities turned over, were turned over by virtue of any contract obligation or under the terms of the lease.   The money was always, and distinctly remained the property of the Transit Company until turned over to the United Railways, and although the stocks and bonds were under pledge, the legal ownership of them was in the Transit Company.

(d)   Nor was the transaction under the tripartite agreement intended to assume the form of a consolidation of the two companies.   The statute, R. S. 1899, sec. 1059, expressly provides that on a consolidation of two or more railroad companies, the consolidated body assumes and becomes liable for all of the obligations of each of the constitutive corporations.   This general liability which the statute cast on the act of consolidation was to be avoided, if possible.   Our courts have invariably enforced this liability where a consolidation has been effected.   They have even treated an act as in law a consolidation, where consolidation was not formally made.   Thus a lease by one railroad to another of all of its property, for a term of 99 years was held, in Black v. Railroad, 110 Mo. App. 198, to be practically and in law a consolidation and merger of the two companies, its effect being to subject the two roads so consolidated to the liabilities of each.

In Manny v. National Surety Co., 103 Mo. App. 716, this court held that where one company had absorbed all the assets and assumed all the liabilities of another, the act was to be treated as a consolidation, and the absorbing company held liable on a bond given by the one absorbed.   In this Manny case, however, there was an express assumption of all liabilities by contract.

In Thompson v. Abbott et al., 61 Mo. 176, it is held that "when one corporation goes entirely out of exist-

ence by being annexed to or merged in another corporation, if no arrangements are made respecting the property and liabilities of the corporation that ceases to exist, the subsisting corporation will be entitled to all the property and be answerable for all the liabilities." Reciting the fact that one of the corporations had ceased to exist, the court (Judge WAGNER delivering the opinion) says: "There was then no power remaining as an independent organization in its behalf to control its frauds or pay off its indebtedness. Its property passed into the hands of the defendant, and when the benefits were taken, the burdens were assumed."

We shall presently see that in such a case, any attempt to escape liabilities excepted or not specifically assumed or provided for, will not be sustained. While Judge WAGNER makes the statement as quoted, as to liabilities assumed, an examination of the report shows that there was no express assumption, nor any exception from liability. The petition in the case was demurred to because it did not aver an express promise to pay. The court held such an averment unnecessary; the obligation to pay arose from the act of taking over the assets.

Eans v. Exchange Bank of Jefferson City, 79 Mo. 182, is a case in which plaintiff alleged in his petition that his intestate had deposited certain money in the National Exchange Bank of Jefferson City; that the latter bank went out of existence and that the defendant bank being organized, came into possession of and received as the successor of the defendant bank all of the funds and assets of the latter. The petition was demurred to. The Supreme Court held (Judge HENRY delivering the opinion) that the demurrer admitting the truth of the averments, defendant was liable to plaintiff for money had and received to his use. "If" (says Judge HENRY) "as alleged, defendant is the successor of the said National Bank and the funds and property of the latter passed into the hands of the former, its

liability to depositors of money in the latter bank has been expressly held in Hopper v. Moore, 32 Iowa 563. See also Hughes v. School Dist., 72 Mo. 643; Thompson v. Abbott, 41 Mo. 176. Any other doctrine, it seems to us would be monstrous. As well contend that because one has his name changed by legislative enactment, he thereby avoids all obligations incurred in his former name. The name of the banks may be changed. At the expiration of the old a new charter may be granted to the same bank, even with enlarged or restricted powers; literally, it is not the same corporation, substantially it is, and to permit it to escape from its liability, by such continuances (contrivances?) would not be very creditable to the law."

See also Springfield Light Co. v. Hobart, 98 Mo. App. 227, in which it is held that section 1334, R. S. 1899, expressly reserves rights of creditors. See also Wells v. Elect. Co., 108 Mo. App. 607. But it is not necessary to here hold that this was a consolidation. We place our decision on other grounds.

(d) While the deed of surrender purports on its face to be an instrument of release and quitclaim, it is not a deed of bargain and sale. In point of fact, while using the words of transfer common to such an instrument, the words usually found in a deed of bargain and sale, or in an instrument evidencing a bargain and sale, this instrument, in a very marked manner, omits words that have been considered by the courts as tantamount to words of bargain and sale. That is to say this instrument itself appears to remove the transaction from the domain of a sale. Tested by authority this transaction was not a sale. A very brief examination of the authorities will demonstrate this. Sir William Blackstone—2 Comm., sec. 446—defines a sale to be "a transmutation of property from one man to another, in consideration of some price or recompense in value." Chancellor Kent defines a sale to be "a contract for the transfer of property from one person to another for a

valuable consideration; three things are essential to its validity, viz., the thing sold, which is the object of the contract, the price, and the consent of the parties." [2 Kent (14 Ed.), sec. 468, par. 4.] Mr. Benjamin, defining a sale practically as above, adds: "By common law a sale of personal property was usually termed 'a bargain and sale of goods.' . . . Hence it follows that to constitute a valid sale there must be a concurrence of the following elements, viz.: (1) parties competent to contract; (2) mutual assent; (3) a thing, the absolute or general property in which, is transferred from the seller to the buyer; and (4) the price in money paid or promised. . . . That it requires parties competent to contract and mutual assent, in order to effect a sale, is manifest from the general principles which govern all contracts." [Benjamin on Sales, 5 Eng. Ed., 1906, sec. 1, pp. 1, 2.] Bouvier, in his law dictionary, title "Sale," defines a sale to be "an agreement by which one of the contracting parties, called the seller, gives a thing and passes the title to it, in exchange for a certain price in current money, to the other party, who is called the buyer or purchaser, who on his part agrees to pay such price." Chancellor KENT further says: "Mutual consent is requisite to the creation of the contract, and it becomes binding when a proposition is made on one side and accepted on the other." [2 Kent (14 Ed.), sec. 477, par. 4.]

The Supreme Court of Arkansas very aptly defines a sale to denote, "the transfer of property in the thing, from one to another, for a valuable consideration. This is its popular, as well as its legal, signification. There must be parties standing to each other in the relation of seller and buyer; their minds must assent to the same proposition; and money must be paid or promised." [Ward v. State, 45 Ark. 351, l. c. 353.]

Our own Supreme Court, defining a sale, says: "By the common law, a sale of personal property is usually termed a 'bargain and sale of goods.' It may be de-

fined to be a transfer of the absolute or general property in the thing for a price in money," citing Benjamin on Sales and Tiedeman on Sales, and quoting Blackstone's definition of a sale to be "a transmutation of property from one man to another in consideration of some price." [State v. Wingfield, 115 Mo. 428, 1. c. 436.]    This case was in part overruled in State v. Rosenberger, 212 Mo. 648, 1. c. 656, but of course not on this proposition.

Madison Avenue Baptist Church v. Baptist Church in Oliver Street, 46 N. Y. 131, 1. c. 140, is a case in which a merger of one church organization into the other was under consideration.    It involved the determination of whether the transfer of the assets of the one organization to the other constituted a sale.   The Court of Appeals, quoting  the definitions of Black-stone, Kent and Bouvier, substantially as quoted above by us, as authoritative definitions of the term "sale," and applying that definition to the case under consideration, decides that when tested by this rule, the  arrangement under review by it was in no sense a sale of the property by the plaintiff to the defendant.   Judge GROVER delivered the opinion of the court, the court, it may be remarked, being composed of judges whose names are illustrious in the judicial annals of the land; the Chief Judge being SANFORD E. CHURCH, the Associate Judges, WILLIAM F. ALLEN, RUFUS W. PECKHAM, CHARLES J. FOLGER, CHARLES A. RAPALLO and CHARLES ALLEN, all of whom concurred, except Judge ALLEN, who did not vote on the question.   Judge GROVER says: "Tested by this construction, the arrangement set out in the petition, was in no sense a sale of the property by the plaintiff to the defendant.   There was no price whatever to be paid therefor.   The plaintiff, as a corporation, was to derive no possible benefit as a consideration for the conveyance.   True, the members of the plaintiff's church were to be received into, and become members of, the defendant's church, and the

plaintiff's corporators were to become corporators of the defendant. This may be regarded as a benefit conferred upon those classes as individuals, but can in no sense be so to the plaintiff, regarded as a corporation. Indeed, the arrangement could only be made effectual by the dissolution of the plaintiff and this result it was the manifest purpose of the arrangement to effect. . . . The trustees of a religious corporation have no power to distribute its property among its individual members or any class of them, and . . . an order for the sale of its real estate, obtained upon a petition showing such to be the purpose of the sale, was without jurisdiction and void; . . . no title could be acquired by a purchaser, at a sale made in pursuance of such order. This necessarily determines, that the consideration for the sale must inure to the corporation making it, as such, and not to the corporators as individuals." He continues with these remarks: "Whether the consideration be pecuniary, or as in the present case, facilities for the enjoyment of religious worship, or of any other nature, can make no difference. The additional security to the creditors of the plaintiff under the arrangement, was not such a consideration to the plaintiff as to constitute the transaction a sale, if indeed, it was any consideration whatever." While it somewhat disturbs the order of our thought to inject this last quoted portion of the opinion here, we do so to avoid the necessity of again referring to the case. That part of the decision strikes us as very apposite, in view of the contention of counsel for the defendant, that the benefits under the tripartite agreement went to the individual stockholders of the companies and not to the corporations. That is to say, if it be true, as urged, that the stockholders of the Transit Company, under the arrangement set out in the tripartite agreement, received valuable stock in the United Railways for their stock of practically little value in the Transit, then that did not inure to the

benefit of the Transit—and the Transit, as a corporation received just that much less for its assets.

Apart from any construction that the law may place on the true nature of the transaction by which the assets before then in possession and apparent ownership of the Transit Company passed over to United Railways on the surrender of the lease, the idea that it was a sale by the Transit to the United Railways was flatly and somewhat vehemently repudiated by the president of the two companies, testifying as a witness in the case. He describes the leasing by the United Railways to the Transit, and the situation which then ensued, by saying that the United Railways "simply rented a house and was collecting rent." Again he says that at 12 o'clock, midnight, of October 31, 1904, "it (the Transit) ceased to operate the properties at that date." Asked if at that time and date the Transit Company did not turn over all its properties to the United Railways Company, this witness said: "Well, I don't think it had title to any properties; I don't know about that; (it) just merely surrendered the lease." Asked if it did not turn over all property it had, he said: "I don't know that it possessed any properties. I am not clear on that. . . . All that it received it turned back, except just the usual wear and tear, and so forth," as well as all additions and improvements. Asked if it was not true that the Transit Company was stripped of all its assets and had ceased to be a going concern, he said he would not express it that way. Asked how he would put it, he answered: "I would say in consideration of what the United Railways Company had agreed to do for the Transit Company in assuming obligations that were existing and had to be provided for and taken care of; that in consideration of that the Transit Company surrendered the lease, and in that manner the United Railways Company became the operating company. . . . The result was that one stopped where the other began." Further along in his testimony, re-

sisting the effort of counsel for plaintiff to have him define the transaction of October 31st, and asked as to what had actually taken place affecting the relative position of the two companies toward the property, this witness said: "The ownership was always in the United Railways Company, and the lease was merely surrendered and the tenant moved out and it (United Railways) took possession of its property." He admitted, after persistent interrogation, that the United Railways had no property in addition to that which it had leased to the Transit Company and which it got back when the Transit Company surrendered the lease.

Tested then, by universally accepted definitions of the essentials of a sale, this transaction was in no sense a sale. There were not two parties to the transaction. The agent was on both sides of the deal, if it had two sides. There was no meeting of two minds; there was but one mind, one body, a common directorate, controlling, carrying out, even originating the whole transaction; there was no buyer, no seller. All there was in this transaction was the abandonment of the use, of the control, management and possession of the property by the very same parties under one name, and the taking over of it by the same parties in another name. That is no "bargain and sale" and does not place the taker in the position of a purchaser.

(e) This brings us to the very important question as to whether, in taking over all of the property before then in the possession of the Transit Company, the physical property, material and equipment, clearly covered by the lease, the securities which the Transit had received from the United Railways not covered by the lease, although all under pledge, and the cash on hand, certainly not covered by the lease, the United Railways paid full or adequate or any substantial consideration for them. To set at rest one proposition advanced by counsel for defendant, and remove any doubt as to our view of that matter, we remark that we do not question

the correctness of counsel's contention, that an assumption of liabilities is a good and valuable consideration; with this proviso, however, that the liabilities assumed must bear a fair relation in value to the assets taken over. It is just as important that the amount of liabilities assumed is equal to the assets taken over as if those liabilities were money or property; just as important as if the amount had been paid in money or property. Therefore, when we speak of the consideration paid for the assets, we make no distinction between that consideration being paid by the assumption of liabilities or by payment in property or money.

What then was the relative value of the assets of the Transit Company to its liabilities on the thirty-first day of October, 1904, when the United Railways Company took over the possession, control and management of the street railway lines and properties, as well as the cash on hand and securities pledged, all before then in the charge, control, possession, and as to the cash and securities, in the ownership of the Transit Company? A statement of liabilities assumed and assets received by the United Railways is set out in the balance sheet of date October 31, 1904, introduced in evidence by the defendant at this trial, after being properly verified; this balance sheet, as before stated, being the same introduced in evidence at the former trial, set out at pages 112 and 113, Barrie v. United Railways Company, 125 Mo. App. By this balance sheet or statement, as we will call it, the liabilities assumed are carried at $11,921,482.54. The assets received are carried at $10,673,618.77. This shows an excess of liabilities assumed over assets acquired by the United Railways Company of St. Louis, October 31, 1904, upon the surrender of the Transit Company's lease, of $1,247,863.77. These are the defendant's own figures; its own valuations; fixed, as far as the evidence has shown, by no one but itself and its own officers. The first item in the list of liabilities assumed is $10,000,000 St. Louis Transit

138 App.—42

Company Improvement 20 year 5 per cent gold bonds, guaranteed by the United Railways Company. The trial court found that it was not correct to charge this $10,000,000 to the Transit, but that it should have been charged to and carried as a Transit liability at only $8,000,000. It is very strenuously insisted by counsel for defendant that the trial court committed grave error in so holding, counsel contending that a very slight analysis of the situation will show the falsity of the legal conclusion arrived at by the trial judge. The argument is that United Railways Company was merely guarantor of the $20,000,000 authorized issue of bonds, $8,000,000 of which had been marketed, and that the United Railways was only secondarily liable on its guarantee, and that before it could be compelled to pay anything on the guarantee it was entitled to have recourse upon all the preferred assets of the Transit Company. This is true under the mortgage of the seventeenth of June, 1903. But that mortgage and those bonds were specifically cancelled under the tripartite contract and a new mortgage and new bonds substituted. The outstanding $8,000,000 of this $20,000,000 authorized by the mortgage of June 17, 1903, were, by the tripartite agreement, as well as in fact, exchanged for $8,000,000 of new bonds, which, with an additional issue of $2,000,000, or $10,000,000 in all, were to be issued and secured by a new mortgage, dated October 1, 1904. This new mortgage expressly provided that these remaining $2,000,000 were to be used, as far as necessary, in taking up the collateral trust notes held by the Mercantile Trust Company and in placing improvements and betterments upon the properties. It is true, that the bonds issued under this mortgage of date October 1, 1904, were the bonds of the Transit Company; it is also true, that on these bonds the United Railways, as it had been in those of 1903, was merely guarantor, but this mortgage of date October 1, 1904, securing these bonds, was the mortgage of the United Railways Com-

pany and covered all of the properties of the system, while that of June 17, 1903, was the mortgage of the Transit Company alone.    While this mortgage bears date of October 1, 1904, it was not acknowledged by the president of the United Railways Company until the twenty-fifth day of October, 1904, nor by the president of the Trust Company until the twenty-seventh day of October, 1904, and while dated October 1st, evidently to correspond to the date written in the bonds, it could not take effect, and was of no force as a subsisting obligation of the company, until delivery, which evidently was not and could not have been until after it was acknowledged.    Unlike mortgages and deeds between private parties, good between them, even without acknowledgment, mortgages and deeds by corporations are only of effect and validity and of force after being duly acknowledged by the proper officers of the corporation.    [Revised Statutes 1899, sec. 904.]    Moreover, while this mortgage is dated October 1, 1904, there is not a particle of evidence in the case to show any authorization for its execution on the part of the directors or stockholders of either of the companies prior to the authorization of the tripartite agreement, given by the Transit Company October 19th, and said to have been given by the United Railways Company October 20th. It is, therefore, a conclusive presumption, that, notwithstanding its date, it was not in fact executed or delivered until October 25, 1904, by the United Railways and on October 27th, acknowledged by the trustee corporation, and was not a valid obligation of United Railways before then.    At these dates the Transit Company had voted to adopt the tripartite agreement, and had practically divested itself of everything.    Between the twenty-fifth of October, when the president of the United Railways acknowledged this mortgage, and the twenty-seventh of October, when the Trust Company acknowledged it, that is to say, on October 26, 1904, a demand had been made, under the provisions of the tripartite

contract, on the Transit Company, by the United Railways Company, for the surrender by proper instrument of conveyance or release, of "all and singular the property demised by the lease of September 31, 1899." Two days after the acknowledgment of this indenture, that is to say, on October 29, 1904, the Transit Company, through its president, by an instrument acknowledged on that date, did transfer all of the property before then held by it under the lease to the United Railways. At these dates, that is to say between October 19th and October 29th, the Transit Company was, confessedly, insolvent. It was insolvent in this sense; that while possessed of assets of very great value, its officers and managers unequivocally testified that owing to the financial stress in which it was placed it was unable to meet maturing obligations and had no property or credit out of which it could raise the means to carry on future operations. In contemplation of the surrender of all its assets of any value, as a part of the agreement by which it was to strip itself, the Transit Company executed these bonds and the United Railways guaranteed them by endorsement and secured them by mortgaging its property. Having in mind its condition, the name of the Transit Company on these new bonds, in an amount of $10,000,000, was a mere formality, its execution of them as ostensible maker a fiction. It is impossible to believe that any man, competent to transact business, took any of these bonds relying on the name of the Transit Company, as maker. It is questionable whether under the facts in evidence, any of these $10,-000,000 of bonds should be charged as a liability of the Transit Company. But it is not necessary for us to determine that in this case. We have no reference to the validity of these bonds, as lawful obligations of both companies. According to the testimony of its own officers, they being also those of the United Railways, the Transit Company was then a nonentity and a financial myth. Furthermore, the $2,000,000 of the bonds in ex-

cess of, and outside of the $8,000,000 required to retire the former issue of $8,000,000, were to be used in betterments and improvements and clearing up the property, in the hands of the United Railways.    Irrespective of any technical claims in the matter, these additional $2,000,000 were exclusively for the benefit of the United Railways, and in no sense real obligations of the Transit Company.    We concur with the trial judge in holding that instead of charging the Transit Company with a liability on account of the twenty-year 5 per cent gold bonds of $10,000,000, the utmost that it should be charged with on that account was $8,000,000.    Making this deduction from the $11,921,482.53 of scheduled liabilities, leaves $9,921,482.54, as the amount of liabilities assumed by the United Railways at the time of the taking over of the property from the Transit Company on October 31, 1904; and as the value of the assets, according to their own statement at that time, was $10,633,-618.77, there was an excess of assets over liabilities of $752,136.23, $614,015.25 thereof being cash. This leaves out of any consideration the leasehold as having any value whatever.    Nor is it necessary to go into an examination of the value of the securities.    The $600,000 and more of cash far exceeded plaintiff's demand, and beyond the amount of that demand we have no concern. In fairness to the United Railways, however, we think there should be deducted from this $752,136.23, $2100.00 carried as the value of the capital stock of the Louisiana Purchase Exposition Company.    Possibly other deductions should be made, but by no facts in evidence, does it fall below plaintiff's demand.    The trial judge added to this $752,136.23, the value of 172,613 shares of Transit Company stock taken over by the United Railways Company, valuing it at ten cents on the dollar, or $1,-726,130; that being added, places excess of assets over liabilities at $2,376,166.23.    From the evidence in the case, and the law as applicable to that evidence, we think it very questionable whether it is proper to charge the

market value of this stock against the United Railways, when considering the value of the assets taken over and received by it under the tripartite arrangement, and as it is not necessary for the decision of this case to do so, we do not follow the conclusion of the learned trial judge in his conclusion on this matter. It is argued that the United Railways Company received this stock, not from the Transit Company, but from its shareholders; 'that the tripartite agreement provided that holders of the Transit stock had the right to make this exchange and give five of their shares of stock for two of the United Railways Company common.     If that is true, then the United Railways Company should not be charged with its value.     But as above remarked, it is not necessary to determine this— as our inquiry is limited here to determine whether the defendant by its acts has made itself liable to plaintiff to the amount of his demand, by taking over property to which he had a right to look for payment of his claim, to an amount of that claim.     If so, that liability is of course limited to the amount of assets it took over up to the amount of plaintiff's demand, over and above liabilities to which it was subject superior in right to that of plaintiff.

As to the proposition made by counsel for defendant, that the stock of a corporation is a liability rather than an asset, the very learned counsel in their zeal, have lost sight of the fact that this depends entirely upon where the ownership of the stock is.     The stock of a corporation is a liability against the corporation, but when that stock passes over to another corporation, or to individuals, it becomes an asset in the hands of the owner, and while this Transit Company stock was a liability of the Transit Company to its stockholders, when it passed into the hands of the United Railways, and the latter became owner, the stock became an asset of the United Railways Company.     This same stock was still a liability of the Transit Company, but the

United Railways Company, in taking over the assets of the Transit Company, very carefully refrained from assuming any liability of the Transit Company on account of it, to the Transit Company's stockholders. It neither guaranteed nor assumed payment of Transit Company's stock.    It is also very earnestly argued by counsel for the defendant, that in the schedule of assets of the Transit Company, turned over to the United Railways, the Transit Company is credited with an item of $1,118,876.57, "which was payable in securities due from the United Railways Company for construction and equipment," and that under the lease, the United Railways Company had a right to pay for the expenditures of its stock at par, and it is argued that as this common stock of the United Railways was worth about $25 a share, that therefore the Transit Company should be credited with it as an asset, or the United Railways charged with it as an asset received, at only $279,691.42, instead of $1,118,876.57.    This is not correct.    No matter what the market value of the stock of a corporation is, that stock, in the hands of the corporation itself, stands and must stand at par and any statement of a corporation which carried its own stock at less than par would be an erroneous statement.    On no possible theory, therefore, is the defendant corporation entitled to a credit in an amount equal to the difference between the market value and the par value of its own stock.    A corporation must always stand charged with its own stock at par.    This, of course, relates to the corporation as between it and its stockholders.    As to creditors and their relation to the corporation, the situation is different.    The corporation has no right, as between it and its creditors, to carry its stock as a liability, because stockholders of the corporation, in no event, can be paid or receive any of the assets or property of the company until its creditors are paid in full. We make this observation here because in the balance sheet of the Transit Company, drawn up as of date

September 30, 1904, the total issued stock of the Transit Company, amounting to $17,264,300, is carried as a liability.    That is correct bookkeeping, as between the corporation and its stockholders, but when considering the assets and liabilities of a corporation with respect to its creditors, the value of the capital stock of the corporation has no proper place in the account.    On no possible theory, therefore, upon which the evidence in this case is entitled to be considered, can we arrive at any conclusion other than that at the time of the taking over by the United Railways of the Transit Company, on the thirty-first of October, 1904, the assets received by the United Railways largely exceeded the liabilities claimed to have been assumed, exceeding them, as we view the testimony, by at least $750,036.23.    As viewed by the trial court, the assets exceeded liabilities by nearly $2,500,000, exclusive of any valuation whatever placed upon the leasehold.    While it is not necessary for us to pass on the value of the leasehold in the consideration of this case, because exclusive of that, the assets taken over exceed the stated liabilities by a very large amount, we feel warranted in saying that we cannot understand or appreciate the argument advanced, nor can we give credence to the testimony given, to the effect that that leasehold was valueless.    The undisputed testimony in the case is that from the time of the execution of the leasehold in 1899, until its surrender in 1904, the Transit Company, out of its earnings and the proceeds of its own securities, had expended in equipment, betterments and improvements nearly $10,-000,000.    The testimony of the officers of the company is that at the time it was taken over by the United Railways, on the thirty-first day of October, 1904, it was in splendid condition for operation, in such condition that for a long period of time thereafter it would require the expenditure of but little money for further improvements or additions.    The last year of its operation showed a profit of over $500,000 in earnings over

expenditures. There was every reason to believe that from that time on it would largely increase in value and earning capacity. It was bound to do that with the growth of the city. The facts in evidence show that within a few days after the adjustment of the financial entanglements, the securities, the sole foundation for which was this very property, enhanced very materially in value on the market, proving conclusively that there was nothing the matter with the property itself as a property, but that the whole difficulty centered around its financial management. But it is said by counsel, as also testified to by witnesses at the trial, that the reason for the improvement in the financial condition of the company and of the securities after it, the United Railways, had taken over the property in 1904, was that its financial affairs had gone into "strong hands." We are unable to appreciate this argument. The testimony in the case shows that the same financiers, who had managed all of these companies from their inception, that is from the very beginning of the consolidation of the street railway systems of St. Louis, were the same financiers who were parties to the tripartite agreement, and who were in the management of the two companies at the time of the change from one to the other in November, 1904. There is no evidence that the management of the company went into new hands and, as the gentlemen testifying modestly say, in depreciation of their own management, "stronger hands," than before. It is possibly true that new stockholders came in after 1904, but that cannot affect the matter, for under the tripartite agreement and the voting trust, no matter how many new stockholders came into the corporation, the control and management of its affairs was to be kept, or is provided to be kept, for a period of five years, in the voting trust, the majority of whom were the same gentlemen who had charge of the property from the inception of the consolidation of the street railway lines. We do not mean to be understood here as recognizing

this voting trust as a lawful arrangement under the laws of this State.    Nor are we here deciding that it is invalid.    Such an arrangement is recognized under the laws of the State of New York, these voting trusts being limited to a term of five years, but New York has not the same provisions that the State of Missouri has in her laws.    Our laws, as well as our Constitution, provide that the business and affairs of corporations shall be managed by a board of directors, all of whom shall be elected annually, for a term of one year, with the provision, however, that a corporation may provide by its by-laws or articles of association, for a division of its board into three classes, and the subsequent annual election of one-third of the number thereafter for a period of three years.    That is to say the longest term, under our corporate law, the same persons elected can remain in office as directors under one election, is for a period of three years, even then one-third of their number must be elected every year.    In effect, this is a legislative and possibly a constitutional construction, or inhibition against the holding over, under one election, of a director for a longer period than three years. The object of this is manifest.    Its purpose is to guard against holding in a few hands in perpetuity the business and management of a corporation and to give all stockholders an opportunity, at least every year, to be heard by their voices and votes in the election of those who are to manage its affairs.    So far do our Constitution and our laws carry this, that we have in this State the right of cumulative voting, by which the stockholder can multiply his vote by the number of directors to be elected annually.    The stockholders in these two corporations have seen fit, however, to continue the affairs of their companies—at least of the United Railways, under the same management for a period of five years; that management is composed, in its controlling numbers and membership, of the very same gentlemen who have had the financial control of these two corpo-

rations ever since 1899 at least.   We express our views on this voting trust herein passing, as we are bound to refer to it, lest by silence, we shall be held to have sanctioned it.   In view of the creation and existence in fact of this voting trust, the argument now made to us that the object of all this financial manipulation and its effect was to put the affairs of the corporation into stronger hands, does not address itself to our favorable consideration, and as we look at the evidence in the case, is not sustained by the evidence.   Technically, the Transit Company, on the thirty-first day of October, 1904, when it went out of possession, more accurately, on the nineteenth day of October, 1904, when it voted to accept the tripartite agreement, was insolvent; it was so in the sense that it was unable to go on with the means at its disposal and operate its property and meet its liabilities.   Within the meaning of the National Bankruptcy law it was insolvent, for while its assets were then of very great value, they could not have been sold, at a forced sale, for enough cash to meet all of the liabilities assumed and incurred by it under the lease and in the operation of the property.   On this part of the case, therefore, we conclude that the liabilities claimed to have been assumed as a consideration by the United Railways for taking over the assets of the Transit Company did not equal, by a large sum, the assets turned over.   Certainly the value of those assets taken over, above the liabilities assumed, were in excess of the amount of plaintiff's claim against them, which, as shown, amounts to something under $2,500.

(f)   In support of their proposition, that "plaintiff cannot recover because he has failed to prove that the defendant took the assets of the Transit Company without any or adequate consideration," counsel cite Warfield v. Canning Co., 72 Iowa 666; Benesh v. Mill Owners Mutual Fire Ins. Co., 103 Iowa 465; Baker v. Harpster, 42 Kan. 511; Fernschild v. Vedder, 154 N. Y. 667; Alexander v. Williams, 14 Mo. App. 13; Powell v.

Railroad, 42 Mo. 63; Burge v. Railroad, 100 Mo. App. 460; Huston v. Tyler, 140 Mo. 252, l. c. 263; Schiffman v. Schmidt, 154 Mo. 204, l. c. 214; Cole v. Armour, 154 Mo. 333, l. c. 350; and Fogg v. Blair, 133 U. S. 534, as also Noyes on Intercorporate Relations, sec. 123.

In the Warfield case, the Supreme Court of Iowa distinctly places its decision upon the ground that the plaintiff was entitled to his lien on the property because it had paid full value for it.     It distinctly finds that the one company obtained no property from the other company, except what it paid full value for.     The court concludes this part of its discussion of the case with these words: "It may be conceded that, if it appeared that the mortgagees received stock in the Gilman Company, in consideration for property conveyed to it, which was in excess of the indebtedness assumed, the plaintiff would be entitled to relief to the extent or value of such excess."

In Benesh v. Mill Owners Ins. Co., the same court held that the old company, reincorporating under new articles and retaining the same offices, the new company receiving from the old all of its premium notes and assets had, by resolution, continued in force all of the old policies until new ones could be issued, and that in case of the old policy holders, after notice, declining or neglecting to take out new policies, that the old should continue in force.     The concluding part of the opinion does bear some relation to this case, but not in favor of defendant, for the court says that the two companies remained substantially the same and that all that was done was simply a reincorporation to meet some defects in the original articles.     "In any event," says the court, "the defendant, under its own showing, is responsible to the same extent as if it had issued the policy in suit."

In the case of Baker v. Harpster, the Supreme Court of Kansas sustained an obligation of an old company, given to its president, to secure moneys advanced by him which by contract was charged as a lien against the same property in the hands of the new company.

We will notice the Fernschild case and the reference to Noyes later, remarking here that the quotation made of section 123 from Noyes does not sustain defendant, in that it is not applicable to the facts developed in this case. In every Missouri case cited, full and adequate consideration was adjudged to have been paid.

It is true, that it is held in the Hageman Case, 202 Mo. 249, that the purchasing company was not liable for the debts and obligations of the seller and that the only remedy for the unsecured creditor of the selling corporation, was against the stockholders who had received benefits in the way of dividends on their stock. The facts in that case bear no analogy to the facts in this case. There was a bona fide sale, which fact, of itself, distinguishes this case from it. Furthermore, Judge Fox, who delivered the opinion of the division of the court by which the decision was rendered, states that "there is no pretense that the Southern Company (the seller) was insolvent, or that a dissolution had taken place, or that it disposed of its property for the purpose of defrauding its creditors, or that it had no power to make the sale of its franchises and effects to the United Company." Reciting the facts in the case, Judge Fox further says: "The defendant in the case at bar has not sold or disposed of its property, or distributed the proceeds thereof to its stockholders, but, upon the other hand, the fact is, it purchased the franchises, capital stock, money, choses in action, and all the other real, personal and mixed property of the Southern Company in good faith and paid a sound price therefor, namely, one hundred and forty dollars a share." Consideration of the decision in the Hageman

Case and of the facts in it, demonstrates that it not only does not work in favor of the defendant in this case, but the corollary of the proposition there advanced by the learned judge, makes directly against the defendant here, the court distinctly basing its decision sustaining the sale on the ground that full value had been paid.

As we have seen, instead of the United Railways in the case before us paying "a sound price" for the assets of the Transit, it took them over at a price greatly below any reasonable valuation that could be affixed to them.

The case of Fogg v. Blair, 133 U. S. 534, 1. c. 541, is invoked in support of the contention that while the property of a corporation is a trust fund for the payment of its debts, it does not prevent a transfer in good faith for a valuable consideration, and quotation is made from that decision to the effect that "that doctrine only means that the property must first be appropriated to the payment of the debts of the company, before any portion of it can be distributed to the stockholders; it does not mean that the property is so affected by the indebtedness of the company that it cannot be sold, transferred, or mortgaged to bona fide purchasers for a valuable consideration, except subject to the liability of being appropriated to that indebtedness. Such a doctrine has no existence." The very foundation of this decision of the Supreme Court of the United States is that the property has been sold, transferred or mortgaged to a bona fide purchaser for a valuable consideration. It may be said as to this case of Fogg v. Blair, that it affords a marked illustration of the way in which a sound doctrine, there announced, can be and has been attempted to be perverted to improper uses. Possibly no case that has ever been decided by any court, has been more frequently invoked, and sometimes successfully, for the protection of those who, by their high-handed and arbitrary acts, have endeavored to cut off

creditors from enforcement of their just demands, than has the decision in this case. In every case of an attack on an attempted diversion of corporate property from the payment of creditors that has come under our observation, this decision has invariably been invoked by those accused of the diversion, and they have endeavored to stand behind it, as behind a stone wall erected between them and their victims, for the defense of their rapacity. That decision does not fit the facts in this case.

Kelly-Goodfellow Shoe Co. v. Prickett, 84 Mo. App. 94, is cited in support of the proposition that knowledge that a seller is insolvent will not affect the purchaser, if full compensation is paid by the buyer. That proposition is not disputed; but we do not think that it applies to the facts in this case. Manufacturers' Bank v. Big Muddy Iron Co., 97 Mo. 38, l. c. 44, is cited and quoted to the same proposition. That case sustained the transaction on the good faith shown and full consideration paid.

This, we believe, covers all the cases cited by counsel on this point. Most of them are inapplicable to the facts in this case; many of them, as we have seen, are against the contention of the learned counsel for defendant.

V.  It is insisted by counsel for defendant that "neither by operation of law nor by any stipulation in the tripartite agreement did the defendant agree to pay the judgment of the plaintiff." But two cases are cited in support of this, namely: Manufacturers' Bank v. Big Muddy Iron Co., 97 Mo. 38, l. c. 44, and Hageman v. Southern Electric R. R. Co. et al., 202 Mo. 249, and in argument counsel also cite Noyes on Intercorporate Relations, sec. 123. That the defendant did not, by any express stipulation in the tripartite agreement, undertake to pay the judgment of the plaintiff is very clear. In the third article of the tripartite agree-

ment, as we have seen, it is expressly set out and stipulated, that immediately upon the surrender of the leasehold United Railways will enter into and upon the premises surrendered and the operation of the property, "and, coincident therewith as between it and Transit Company, to assume the payment of the ten million dollars ($10,000,000) of proposed improvement bonds guaranteed, as herein provided, by Railways Company, and all debts then contracted for labor, materials or supplies rendered or furnished to Transit Company." It is argued that defendant, by providing in this tripartite agreement for the payment of specified claims, by necessary implication excluded all others. This argument of necessity also proceeds upon the assumption that the tripartite agreement is a contract. Assume that to be true, for the purposes of argument, let us see what the law is, as declared by authority. The question of whether exclusion of certain claims by contract, where all property has been taken over, has that effect on claims so excluded, has been before the courts, and, as we think, the weight of authority is against exclusion.

In Hibernia Insurance Co. v. St. Louis & N. O. Trans. Co., 13 Fed. Rep. 516, that point was in judgment. The case was before the United States Circuit Court of this circuit and was heard and determined by Circuit Judge McCRARY and District Judge TREAT. One company had sold all of its property to another, in consideration of five hundred shares of full paid stock in the latter company and the payment of the debts of the former company to an amount "not exceeding $42,000." That part of the consideration required to be paid in stock was fulfilled, and debts to the amount of something over $42,000 were paid, not including, however, the claim of complainant. At the time of the sale the officers and stockholders of both corporations knew of the existence of the claim, which arose in favor of complainant's assignor, for loss and damage, the result of

a marine accident which had been sustained and which complainant, as insurer, paid.    No demand had been made by the insured for the payment of the claim and the officers of defendant did not know, at the time when the sale was made by the one company to the other that any claim would be made for the payment of these damages.    When the transfer between the two companies took place, or was about to be made, inquiry was made as to the amount of outstanding indebtedness of the transferring company, and it was estimated to be about $42,000, and the transferee company stipulated to pay claims up to that amount.    Stating these facts, Judge MCCRARY says:    "Upon these facts this court holds that the sale by the Babbage Company," (the company operating the boat when the loss occurred) "of all its property to another corporation, composed mostly, if not wholly, of the same persons, was fraudulent and void as to all creditors of the former company not assenting thereto.    The purchaser knew that it was buying all the property of the seller, and that, by the transaction, the latter was being deprived of the means and power of meeting any of its outstanding obligations.    The fair inference from the transaction is that the old company was about to be dissolved, and to cease to be.    It was to be absorbed by the new Company.    This is an inevitable consequence of the formation of the new company, composed substantially of the same persons, to transact the same business, at the same places, and with the same property.    By the transfer, the creditors of the old company were deprived of the means of enforcing their claims."    In his concurring opinion Judge TREAT says:    "It is the duty of the court to examine the whole transaction, and to cut through mere paper transfers designed to obstruct or destroy the rights of parties.    The evidence sufficiently discloses that the new corporation was a mere continuance of the old, with substantially the same par-

ties in interest—a mere change of name. Whether that change, with attendant transfers, was designed or not to defeat all outstanding demands of the old corporation, it is evident that substantially the two corporations are the same, and that the new must respond to the obligations of the old. The evidence · is clear enough that there was a hidden purpose in the change of the corporate existence to escape possible liabilities which equity does not tolerate. A mere change of name cannot avoid obligations. The new corporation took all the property of the old, went forward with its business, had the same stockholders, except a few formal ones, was, in short, the old corporation, and now seeks to escape the obligations of the old, rescuing the property of the latter from the demands the former was bound to meet. Can this be done? The old corporation and its property were liable to the demands of the plaintiff. The new corporation must respond to the extent of the property acquired, and possibly to the full extent; that is, if property sufficient therefor is in its possession. This is a proceeding in equity, wherein mere colorable pretenses are to be disregarded. Shiftings of corporate names cannot defeat positive rights, any more than the change of the name of a natural person can absolve him from his personal obligations." This case is referred to approvingly in the Warfield case, supra, cited by counsel for defendant, although the court distinguishes the two cases. ·

Counsel refer us to Noyes on Intercorporate Relations, section 123, in support of the proposition that "neither by operation of law nor by any stipulation in the tripartite agreement did the defendant agree to pay the judgment of the plaintiff, not inferentially or presumptively," and as authority for the further proposition, "that the agreement by a purchaser to pay certain debts does not create a liability for others." A reference to the work cited shows that the author states

that as the law, and that at law or in equity, the right
of the creditor, as against the purchaser, "is based en-
tirely upon the assumption clause of the contract, and
the fact that the purchaser has agreed to pay certain
debts does not make it liable for others." Cited in sup-
port of this by the text writer are the cases of Hall v.
Herter, 83 Hun (N. Y.) 19, decided in 1894 by the
Superior Court of New York, and Fernschild v. Yueng-
ling Brewing Co., 154 N. Y. 667, decided by the Court
of Appeals of New York in 1898. This latter case is
also cited under the title of Fernschild v. Vedder.

Hall v. Herter Bros., 83 Hun (N. Y.) 19, does not
sustain the proposition on which it is cited. The point
in judgment was whether the taking company had as-
sumed certain contracts. It was an action at law on
a contract made between plaintiff and a partnership
to which latter the corporation defendant had succeeded.
It was objected by defendant that neither by written or
oral contract had it assumed to take over the contract,
nor was there any resolution to that effect in its records.
The court held that the assumption could be shown by
acts and that whether or not there had been an assump-
tion was for the jury. The remarks of the court as to
the question of right to exclude certain debts were obiter
and even at that do not go to the extent claimed. This
was a decision by the Supreme Court of New York, not
a court of final jurisdiction.

In Fernschild v. Vedder, otherwise versus Yueng-
ling Brewing Company, the Court of Appeals of New
York, it is true, held that the new corporation did not
assume the payment of bonds held by the plaintiff in
that case. This decision, however, was placed upon the
distinct ground that the new corporation had bid in the
property at a sale under the mortgage securing the
bonds sued on and had provided for their payment in
another manner. Furthermore it appears in this Ferns-
child case, that in taking over the properties of the old
company, other than that covered by the mort-

gage, the new company specifically assumed all debts, obligations and liabilities of every kind, outside of the bonds secured by the first mortgage which had been foreclosed. The Court of Appeals of New York held that the only security of the plaintiff was the property under the mortgage securing his bonds and that he could not look outside of that for the payment of the bonds. Very distinctly then these cases do not sustain defendant's contention, and nothing in it intimates that the rule is as announced by the text-writer.

In Mo. Lead M. & S. Co. v. Reinhard, 114 Mo. 218, the Supreme Court (BLACK, J.) held that "the single circumstance that this contested claim was not provided for, standing alone as it does, is not sufficient proof to warrant or justify the inference that the transaction was made to defraud creditors." [L. c. 232.] That was a case where it appeared that the new company was organized and the property of the old turned over to it for the purpose of raising additional capital to prosecute the further development of the mine. It will be noticed that Judge BLACK here lays stress on the fact that there was but a single claim omitted. Evidently that was a controlling circumstance, and it would seem to mean that if more than a single instance of exclusion had occurred or the exclusion was general, the rule would have been otherwise. It is true that in refusing to declare the transaction by which the property had been turned over by one company to another, made up of practically the same stockholders, Judge BLACK did not follow the rule announced in the Hibernia Ins. Co. case. But reading the Mo. Lead M. & S. Co. case, discloses that it was a suit in equity to remove a cloud on the title to plaintiff's lands, cast by purchase at execution sale by defendant, under a judgment rendered against the plaintiff company. Under this execution, a vast body of very valuable mining lands had been bought in for a mere trifle and no op-

portunity had been given plaintiff, a foreign corporation, to pay off the judgment. The transaction smacked so strongly of an unfair and unconscionable attempt to deprive plaintiff of its property, that a court of equity did not find it within the principles of equity to sustain the attempt. In brief, it was decided on the facts peculiar to that case and is no authority for the proposition here contended for.

We have noticed the Hageman case elsewhere and hold that it does not afford warrant for the claim made by defendant.

Manufacturers' Savings Bank v. Big Muddy Iron Co., supra, in no respect whatever sustains the construction put upon it by defendant. To the contrary, the principles therein applied by Judge BLACK to the facts in this case, is defendant's strong condemnation. In substance it is held that the mere fact that the directors sell the corporate property to a new company, of which they are directors and stockholders, will not make the sale absolutely void, but does subject the transaction to the closest scrutiny, and that if the property is sold for less than its value, the stockholders even—to say nothing of creditors—are to recover the difference between the selling price and the real value. It appeared in the case that the property had been sold for more than its worth. The property sold to the new corporation was valued in the hands of the old, at $75,000. It was sold to the new company for $156,000, and apparently all the debts of the old company were discharged, the attack on the sale being made by stockholders.

VI.    It is said that the plaintiff in this case, at the time of the transaction of October 31, 1904, was a creditor at large, and therefore not entitled to maintain this suit.

In Bertholdt et al. v. Land & Lumber Co., 91 Mo. App. 233, a case very similar to the one at bar, the action was by a creditor at large and it was sustained.

In the Hibernia Ins. Co. case, the complaining creditor was a creditor at large, exactly as in the case at bar, with this difference, that in the Hibernia Ins. Co. case neither the two corporations nor their officers had any notice, at the time of the transfer of the assets from one to the other, that complainant would make any claim for the loss sustained by him.    In the case at bar the claim of the plaintiff was in suit, and within a very few days after the transfer of the property from one corporation to the other, his claim had merged into a judgment.

Following this last-mentioned case is the case of Clapp v. Dittman, 21 Fed. Rep. 15, in which Mr. Justice Brewer, then judge of the United States Circuit Court of this circuit, held: "A general creditor may, without reducing his claim to judgment, proceed in equity to charge one holding the property of his debtor, received under such an assignment or transfer, as a trustee for the benefit of creditors," citing and quoting Case v. Beauregard, 101 U. S. 688, as deciding that "whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting his remedy at law."

In Moffat v. Smith, 101 Fed. Rep. 771, a case decided by the United States Circuit Court of Appeals, Judges CALDWELL, SANDORN and THAYER, it is held that, "The rights of stockholders upon dissolution of a corporation are to receive the assets remaining after the payment of all the corporate debts.    Until the debts are paid, the assets are a trust fund, which may be followed in the hands of any person having notice of the trust."    Judge CALDWELL, who delivered the opinion, cites many cases, from that of Wood v. Dummer, 3 Mason, 308, down, including the Hibernia Ins. Co. case above quoted, in support of this.    In this Moffat case complainant sought to enjoin a sale of mining property under an execution levied on property claimed by him. The judgment under which the execution issued was

rendered against the mining company and in favor of defendant, for damages for personal injuries received by him while working in the mines then being operated by the corporation, in which corporation the complainant was the principal stockholder.     The judgment was rendered October 26, 1883.     On October 10, 1883, that is, sixteen days before the rendition of the judgment, complainant, having bought out all the other stockholders and then being sole stockholder, had had the mining company convey all of its property to him for about $1,250,000.     So that when defendant recovered his judgment, the property of the debtor, as in this case, had been transferred to another; before and at the time of the transfer he was, also as in this case, a creditor at large.     We therefore hold that the fact that at the time of the taking over of the properties by the one company from the other, plaintiff was a creditor at large, does not debar him of his remedy.

VII.     We have treated these last propositions on the assumption that the arrangement, called the tripartite agreement, was a contract.     On the application of the rules relative to sales, it was not a sale; under the law of contracts, it was not a contract.     There were not two parties to it; there was but one mind in the whole transaction, it is difficult to see even two bodies. We hold that when the United Railways took over these assets and properties, they did so, not by contract, but by the mere fact of ownership and control by one and the same set of men, without any regard to a question of sale, or consideration, or of values.     Taking over the properties and assets in this manner, they took them subject to the claims of this creditor to the full amount of his claims.     That the officers and directors of the companies knew that many similar claims were outstanding, is very clear.     That they undertook, with deliberation and purpose, to avoid payment of them, is equally true.     Of the liabilities pretended to have been

assumed, all but a very trifling amount were fixed on the property in such a manner that it was impossible to rid the properties of the lien, so that the pretended assumption of heavy liability, is more specious than solid.     By its act, this defendant is cut off. from claiming as a purchaser, any right, superior to this creditor, in the assets taken over.

We have set out the various mortgages at length, possibly it may be thought, at unnecessary length.   We have done so, however, because they contain the financial history of the two companies, practically from the date of organization of each, and to our minds demonstrate the fact of a common plan, a common purpose, a unity of interest, and a common directing mind. Viewing these plans as set forth in these documents and as explained by the officers and directors of the two companies, in their testimony in the case, they all looked to one and the same purpose, the successful financing of the same enterprise, the development of the same property, and they all tended to that one end.   When that end could best be attained in and under the name of the Transit Company, the control of the lines went under the name of that company, into that company, in the form of a lease; when financial clouds gathered, the lease was abrogated and the United Railways took back its own and operated it in its own name.    Through it all, whether under one name or the other, the identical persons, the one mind, concentrated in the same Board of Directors, operating through those bodies, made up of the same men, were in charge and absolute control. The tripartite agreement was devised and executed, and the United Railways took over the property from the one name to the other, neither by bargain and sale, as those terms are known in law, nor by contract—for a contract needs to its validity, the meeting and agreement of two minds, coming together by mutual agreement, and there was but one mind.    The plan adopted and worked out, involved a mere surrender of posses-

sion, as was thought; a vacation by the tenant, a taking over of possession by the landlord, as was testified to, and this it undoubtedly was thought by all the parties to the transaction, would avoid all liabilities other than those then fixed on the properties, established as liens, from which there was no escape, and thereby throw off all unadjudicated and all unsecured claims, which beyond all doubt, guided by the evidence in the case, we cannot but believe was prominently in the minds of all. The transaction was practically, in law and in fact just what the plaintiff has charged it to be, an absorption by the one corporation of all the effects of the other.

The prerogatives of sovereignty granted by our constitution and laws, in the shape of franchises to a corporation are founded upon the idea that a corporation endowed with quasi public powers will serve the public. Corporations are not created as mechanisms for the issue and floating of securities or as a means for the transfer of assets out of the name of one into that of the other at the will and pleasure of one and the same management and for the benefit of those managers. While it is true that our statute authorizes one street railway company to lease its property to another, it does so on the presumption that both corporations are organized and operated as distinct entities, in good faith to serve the public, and that one actually desires to acquire by lease the property of the other. The statute does not contemplate that a group of men may create two street railway corporations, to operate the same system, both in the same place, covering the same territory, engaged in doing the same work, and then shift the assets from one to the other, under the guise of either leases or sales at their pleasure. The whole history of the Transit and United Railways, as clearly demonstrated by the evidence in this case, shows beyond room for cavil, that there have never been any genuine dealings between them as separate and independent parties or corporations. The same men con-

trolled both companies, voted the controlling stock in each, as occasion demanded under the form of duality. The dual organizing should deceive no one.    Brought to a test before the courts in all its real import, it will not be tolerated.    Nor will such transaction be treated by any court understanding them, as actual business transactions, as contracts executed in good faith, the result of mutual bargaining, and hence to be protected and validated by the courts of the land.    See Schwab v. E. G. Potter Co. et al. (N. Y. Ct. of Appeals), 87 N. E. 670.

It is worth while to point out the provisions in the tripartite agreement for compensation to the syndicate managers, Brown Brothers & Company, for the reason that this provision afforded opportunity for large absorption of the assets of the companies away from creditors.    In the tripartite agreement appears the following paragraph:

"MANAGERS' COMPENSATION.

"Of the Common Stock of the Railways Company acquired by the Syndicate from the Transit Company and the Railways Company, Managers are to retain 15,000 shares as compensation for their services in securing underwriting, carrying out plan of re-adjustment and managing the property of the Railways Company during the life of the Syndicate.    In addition and . for selling the securities acquired by the Syndicate they are to receive 20 per cent of profits from sales, after all expenses of management, etc., have been deducted."

It appears from that clause that Brown Brothers & Company were to receive fifteen thousand shares of common stock of the United Railways Company, of the par value of $1,500,000, for their compensation in carrying out the plan of readjustment, and a further compensation of 20 per cent of net profits from selling the securities acquired by the syndicate.    The magnitude this latter item of compensation might reach is indicated by the finding of the learned trial judge, that the

total assets or securities received by the United Railways syndicate under the tripartite agreement amounted to upwards of $17,000,000.    Inasmuch as the syndicate and syndicate managers and members voted the majority of the stock in both companies by which the tripartite agreement was ratified or assented to, it is plain they themselves authorized this liberal, not to say extravagant, compensation to them.    If assets may be thus absorbed from creditors in such deals, where the individuals to be benefited control the action of the corporations, the creditors of the latter might easily be deprived of access to any property for the payment of their demands.

Under the evidence in this case the Transit Company was but a dummy corporation organized by the United Railways Company to exercise the same franchises and operate the same lines of railway that the United Railways Company or its predecessor, the Central Traction Company, had been created to use.    It has been held by a court of high authority, and the doctrine approved by a text writer of equal authority, that where one corporation causes a dummy corporation of small capital to be incorporated and of which it owns the stock, the controlling corporation remains liable at the suit in equity of a judgment creditor of a dummy corporation for the obligations of the latter.    [Interstate Tel. Co. v. Baltimore & Ohio Tel. Co., 51 Fed. 49; 5 Thompson, Corporations (1 Ed.), sec. 5846.]    The cited case is in all material respects indistinguishable from the one at bar.    The Baltimore & Ohio Railroad owned some seven thousand miles of telegraph poles and forty-seven thousand miles of wire.    The latter company caused to be incorporated the Baltimore & Ohio Telegraph Company, with a capital stock of $100,000, all of which was subscribed and owned by the railroad company and the corporators and officers of the latter were employees of the railroad company.    In truth, the telegraph company was but an agent of the

railroad company, in whose name it made contracts for extending its system and operating its lines, though the former was expected to acquire the telegraph property of the railroad company and pay for it by delivering to the latter bonds of the telegraph company secured on said property to the amount of $6,000,000. Under these circumstances the Baltimore & Ohio Telegraph Company made a contract with the Interstate Telegraph Company, by which the latter was to construct certain lines in Michigan and Ohio, in consideration of an agreement for the exclusive interchange of telegraph business between the two companies. This contract was breached by the Baltimore & Ohio Telegraph Company and the Interstate Company obtained judgment for the breach for $25,000. Three years before the rendition of this judgment, the Baltimore & Ohio Railroad Company sold to the Western Union Telegraph Company the entire property of the Baltimore & Ohio Telegraph system, the Western Union consolidated and combined with its own system the acquired properties, and the Baltimore & Ohio Telegraph Company was thereby left without any property or assets of value and became at once insolvent. Thereafter and on those facts the Interstate Telegraph Company filed its bill in equity against the Baltimore & Ohio Telegraph Company and the Baltimore & Ohio Railroad Company to obtain satisfaction of its judgment.

Two main defenses were urged in favor of the railroad company: first, that the property it had sold to the Western Union Company had never belonged to the Baltimore & Ohio Telegraph Company. This point was ruled against the Baltimore & Ohio Railroad Company, on the ground that the telegraph company organized by it had been held out as having full power to contract with regard to the telegraph system and to control and operate the same; that the Baltimore & Ohio Railroad Company, through its agent, the Baltimore and Ohio Telegraph Company, had made the contract with the In-

terstate Company, and afterwards, by selling the property of its subordinate corporation to the Western Union Company, had put it out of the power of the said subordinate corporation to perform the contract and had further stripped the minor corporation of all its assets. As to the second defense, namely, that the plaintiff by suing the Baltimore & Ohio Telegraph, had elected to proceed against the agent and could not thereafter proceed against the principal, the Baltimore & Ohio Railroad Company, the court held and reasoned as follows:

"It is clear that it was for the benefit of the railroad company, which was the actual owner of the whole telegraph system, that the contract with the complainant was made, and that the railroad company was liable on the contract as principal, and it does not appear that the facts present a case to which, in a creditors' suit in equity the general common-law rule is applicable, by which a creditor who has sued and obtained judgment against an agent is held to be deprived of the right to proceed against the principal. Even at law, it may be doubted whether the rule is as firmly settled as it is sometimes stated. In Maple v. Railroad Co., 40 Ohio St. 313, the court said:

" 'BRAMWELL, in his decision in Priestly v. Fernie, 3 Hurl. & C. 977, places his decision upon the additional consideration that the judgment against the agent altered the situation of the principal. We are also cited to Whart. Ag., sec. 473. The author cites Priestly v. Fernie, but adds: "There is much reason for the position that the mere taking of judgment against the agent, under such circumstances, should not, when the judgment is unsatisfied, extinguish the debt." '

"It would certainly seem that in equity, to be binding, such an election should be made with full knowledge of the relationship between the parties. In this case the relationship between the railroad company and the Baltimore & Ohio Telegraph Company of Baltimore County was so obscured by plans and expectations which

were never carried out, by the operation in the telegraph company's name of a widespread and rapidly extending telegraph system which did not belong to it, although the railroad company held the telegraph company out as controlling it, and by the statements in the railroad company's published reports with regard to telegraph arrangements between the two companies, which were only in progress, and never were consummated, that it was impossible to discover just what that relationship was, especially after the telegraph company was practically obliterated by the action of the railroad company.

"Before the sale to the Western Union Company the railroad company asserts that the Baltimore & Ohio Telegraph Company of Baltimore County was solvent, and able to pay its debts and obligations; and it appears that by that sale, the proceeds of which the railroad company received, it was stripped of its property and agency, and was left powerless to fulfill the contracts made in its name. Whether the railroad company and the Telegraph Company of Baltimore County are to be considered in this litigation principal and agent, or the railroad company as the sole stockholder of a corporation of which it was also creditor, in any case the transaction, in so far as it deprived the complainant in this case of the payment of its claim, was inequitable, and the means by which the result was affected were such as to give jurisdiction in equity, and to require the interposition of the court to grant relief by decreeing the railroad company liable for the debt. The judgment against the telegraph company might be held not to settle the rights of the complainant against the railroad company if the railroad company had not intervened or participated in any way in the defense of the action in which the judgment was obtained; but that defense is not raised by the answer, and quite possibly could not be made. In my opinion, the complainant is entitled to a decree against the Baltimore & Ohio Railroad Company for the amount of its judgment."

This case was affirmed in the United States Circuit Court of Appeals (B. & O. Tel. Co. v. Tel. Co., 54 Fed. 50) and is cited with approval in In re Rieger, etc., 157 Fed. 609, l. c. 614. In the latter case, at page 613 et seq., the court said: "The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case, ignore it to preserve the rights of innocent parties or to circumvent fraud." In re Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530, is cited in support of this. In this latter case one corporation was held liable for the debts of another it had caused to be organized and afterwards controlled, and to which it had transferred all its assets. The Pulp Company, which was the controlling company, becoming bankrupt, the dummy company was forced to turn over the assets to the receiver of the Pulp Company for the latter's creditors on the ground the dummy company had no claim to the property, the dummy company being treated as a mere agent of the controlling company. Judge COXE, who delivered the opinion, said, referring to the two, "The new oil company was the old company under another name."

In Bridgens v. Dollar Savings Bank, 66 Fed. 9, Judge PHILIPS (l. c. 12) states it as a "settled rule of equity jurisprudence that the directors and agents of two companies are disqualified from representing both companies in a transaction when the interests of the two companies are opposed. Nor will one corporation be permitted to form a company ancillary to the original one, and contract with it to the disadvantage of the creditors and stockholders of one of the companies. [Mor. Priv. Cor., secs. 529, 530.] And a court of equity will, in such case, notwithstanding the apparent legal effect of such transfer and transaction between two such companies, treat the same according to the real facts and equities of the case. [McVicker v. Opera Co., 40 Fed. 861; Interstate Tel. Co. v. B. & O.

Tel. Co., 51 Fed. 49; Trust Co. v. Kneeland, 138 U. S. 414; Day v. Tel. Co., 66 Md. 354.]"

The last case above cited by Judge PHILIPS, that of Day v. Postal Telegraph Co., has many points in common with the case before us.   It was the case of one company operating another company and, upon the failure of the subsidiary company, attempting to escape liability to the creditors of that company.   Concluding his opinion Chief Judge ALVEY, speaking for the court of Appeals of Maryland, says that in view, of all the facts disclosed by the record, the court entertains no doubt as to the equity and right of the matter.   The subsidiary corporation being hopelessly insolvent, it is the right of its creditors to avail themselves of any assets that may be found within the jurisdiction of the State and, says the Judge, "a court of equity will, regardless of any mere forms or covers, exercise its powers for protecting and making available such assets for the benefit of creditors.   The property in question was constructed with the means and for the use of The Postal Telegraph and Cable Company, and The Postal Telegraph Company of Baltimore City has no real or substantial interest in it as owner.   The property therefore should be devoted to the payment of the debts of its real owner, the New York corporation."

In Bank et al. v. Trebein Co. et al., 59 Ohio St. 316, l. c. 326, it is said:   "The fiction by which an ideal legal entity is attributed to a duly formed incorporated company, existing separate and apart from the individuals composing it, is of such general utility and application, as frequently to induce the belief that it must be universal, and be, in all cases adhered to, although the greatest frauds may thereby be perpetrated under the fiction as a shield.   But modern cases, sustained by the best text writers, confine the fiction to the purposes for which it was adopted—convenience in the transaction of business and in suing and being sued in its corporate name, and the continuance of its rights and lia-

bilities, unaffected by changes in its corporate members; and have repudiated it in all cases where it has been insisted on as a protection to fraud or any other illegal transaction."

Those and other decisions fully sanction the procedure by creditor's bill in the present case and show the plaintiff is entitled to sue in equity because the remedy at law was neither plain nor adequate. Equity does not sanction the creation of dummy corporations so as to exonerate the main corporation from liabilities of the one it causes to be organized. In the present case the relation between the United Railways Company and the Transit Company was much closer than that between a silent member of a firm and the known members, but the silent member nevertheless is liable for the debts of the firm. [1 Bates, Partnership, section 157.]

Referring to adjudicated cases of our own courts, where like questions have arisen, we find the principle we are here following announced by this court in the case of Bertholdt et al. v. Land and Lumber Co., 91 Mo. App. 233, cited approvingly by the Supreme Court in the Hageman Case. The opinion in the Bertholdt case was rendered by Judge GOODE. In that case it is held that where one corporation is consolidated with another, or merged into another, which latter takes over all its property, such new corporation is bound to discharge the liabilities of the old one, that it takes them *cum onere*—impressed with a lien in favor of the creditors of the old; and the continuance of the first company as a corporation *de jure,* after it had ceased to exist as one *de facto,* constitutes no barrier to a suit by a creditor, who had obtained his judgment against the company after the transfer of the assets from one to the other, to enforce his judgment against the property in the hands of the successor corporation.

In Moorshead v. Railways, this court, 119 Mo. App. 541, confirmed in its opinion by the judgment of the

138 App.—44

Supreme Court, 203 Mo. 121, has held that the United
Railways, as lessor, was not liable, either under the
terms of the lease or under the ordinances and laws of
which the lease was authorized, for damages occurring
in the operation of the leased lines while those lines
were operated under the lease.    The correctness of this
decision is not open to question.    In that case, noth-
ing was before either court but the lease itself, to be
read and interpreted by and on the paper alone, and
as written.    No evidence outside of that paper, tending
to show the true nature of the transaction was before
the court, and Judge GOODE, who delivered the pre-
vailing opinion in the case, expressly so held, saying (1.
c. 549), "The only evidence relied on to fasten liability
for the accident on the United Railways Company was
this contract" (referring to the lease).

In the recent case of Krehmeyer v. Transit and
United Railways Companies, an action at law for dam-
ages in which both companies were sued and which was·
decided by the Supreme Court of this State in an opin-
ion filed May 22, 1909, not yet officially reported, it is
distinctly said by Judge WOODSON, who wrote the pre-
vailing opinion, that all the questions presented by the
record in the Krehmeyer Case, as regards the liability
of the latter company, were presented to and disposed
of by the court in the Moorshead Case.    While there
were dissenting opinions in the Krehmeyer Case on other
propositions in it, all of the members of the court con-
curred in this statement.    It is evident therefore, on
an examination of the Moorshead Case, the report of
which set out exactly what facts were before both this
court and the Supreme Court, that no such state of
facts was developed in that case as in the case at bar,
and there is no intimation in the Krehmeyer Case that
the facts in evidence are in any way different from what
they had been in the Moorshead Case; on the contrary,
the statement of all the judges of the Supreme Court
in the Krehmeyer Case specifically states that the two

cases were identical in fact. We have referred to the Hageman Case and the case of Bank v. Big Muddy Iron Co., as not in conflict with anything announced in this opinion. We consider the conclusions arrived at by us in this case not only in entire harmony with those two cases but fully supported by the principles therein announced, in so far as the facts in those cases are parallel to the facts in the case at bar. It might well be, that if the facts as brought out in the case at bar, establish-ing the identity of the two organizations and the unity of plan and of management and of purpose, all tending to show, as we think, that the lease was a mere oper-ating contract, the Transit Company operating under it as agent of United Railways, had been developed in the Moorshead and Krehmeyer Case, a different result would have been arrived at and the rule announced in St. Joe, etc., R. R. Co. v. St. Louis, Iron Mt. & S. Ry. Co., 135 Mo. 173, been successfully invoked and applied. See also Lehigh Valley R. R. Co. v. Delachesa, 145 Fed. Rep. 617.

The United Railways, lessor and owner, has taken back unto itself, not only the property leased, but its vast accumulations, new cars, new equipment, new buildings, miles of increased trackage, as well as a vast sum in cash, admittedly six hundred thousand dollars, the product of tolls collected by the Transit Company in the operation of the system. It did not buy them—it did not buy back the road; it ousted the putative ten-ant and moved in. It paid no adequate price for the improvements, additions and new assets received. In fact and in law, as developed by the evidence in the case, the Transit, operating the lines under the form of a lease, was operating as agent of United Railways and when it suited the plans and purposes of the latter so to do, and when the exigencies of the matter demanded, it entered into possession of its own. Those assets were, in equity, charged with a lien in favor of this creditor in an amount equal to their full value, and that amount

is ample to satisfy the just demand of this creditor plaintiff. The United Railways Company of St. Louis, possibly the best equipped, certainly the best managed street car system in the country, a magnificent and valuable property, can well afford to pay this plaintiff. Being in possession and ownership of those assets, it has made itself liable to do so to the extent of the plaintiff's claim, and it should pay that claim. The judgment and decree of the circuit court of the city of St. Louis in this case is right and is affirmed. Judge GOODE concurs in full; Judge NORTONI, not sitting or participating in the consideration or determination of the case. Motion for rehearing filed and overruled. Motion to certify to the Supreme Court overruled. See Barnett et al. v. Colonial Hotel Co., 119 S. W. 471.